M. KENDALL DAY, Chief
Asset Forfeiture and Money Laundering Section (AFMLS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
KYLE R. FREENY
Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W., 10th Floor
  Washington, D.C. 20530
  Telephone:  (202) 514-1263
  Email:  Woo.Lee@usdoj.gov

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
CHRISTEN A. SPROULE (CBN: 310120)
Assistant United States Attorneys
Asset Forfeiture Section
  312 North Spring Street, 14th Floor
  Los Angeles, California 90012
  Telephone:  (213) 894-3391/(213) 894-4493
  Facsimile:  (213) 894-7177
  Email: John.Kucera@usdoj.gov
         Christen.A.Sproule@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CV 16-5367 |
|---|---|
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| v. | |
| ONE BOMBARDIER GLOBAL 5000 JET AIRCRAFT, BEARING MANUFACTURER'S SERIAL NUMBER 9265 AND REGISTRATION | 18 U.S.C. §§ 981(a)(1)(A) & (C)<br><br>[F.B.I.] |

NUMBER N689WM, ITS TOOLS AND
APPURTENANCES, AND AIRCRAFT
LOGBOOKS,

                    Defendant.

The United States of America brings this complaint against the above-captioned asset and alleges as follows:

## PERSONS AND ENTITIES

1.      The plaintiff is the United States of America.

2.      The defendant in this action is one Bombardier Global 5000 Jet Aircraft (hereinafter, the "Defendant Asset"), more particularly described in Attachment A.

3.      The Defendant Asset is titled in the name of Wynton Aviation (Global 5000) Ltd.  The persons and entities whose interests may be affected by this action are listed in Attachment A.

4.      Contemporaneously with the filing of this complaint, plaintiff is filing related actions seeking the civil forfeiture of the following assets (collectively, the "SUBJECT ASSETS"):

        a.      **"WOLF OF WALL STREET" RIGHTS**:  All right to and interest in the motion picture "The Wolf of Wall Street" belonging to Red Granite Pictures, a film production company located at 10990 Wilshire Boulevard, 8th floor, Los Angeles, California 90024, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to Red Granite Pictures or its affiliates and/or assigns in connection with its role in producing "The Wolf of Wall Street" (hereinafter, the "WOLF OF WALL STREET RIGHTS");

        b.      **THE L'ERMITAGE PROPERTY**:  All right and title to the real property commonly known as 9291 Burton Way, Beverly Hills, California 90210,

2

including the L'Ermitage Hotel ("L'ERMITAGE PROPERTY"), including all appurtenances, improvements, and attachments thereon.

       c.   **THE L'ERMITAGE BUSINESS ASSETS**:  All assets related to the L'ERMITAGE PROPERTY, including but not limited to all chattels and intangible assets, inventory, and equipment ("L'ERMITAGE BUSINESS ASSETS"), including any and all funds in accounts owned, held or maintained at financial institutions by LBH Real Estate, or for the benefit of LBH Real Estate or the L'ERMITAGE PROPERTY, and all leases, rents, and profits derived from said business.  Collectively herein, the L'ERMITAGE PROPERTY and the L'ERMITAGE BUSINESS ASSETS are referred to as, "L'ERMITAGE."

       d.   **HILLCREST PROPERTY 1**:  All right and title to the real property located in Beverly Hills, California[1] owned by 912 North Hillcrest Road (BH), LLC ("HILLCREST PROPERTY 1"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

       e.   **PARK LAUREL CONDOMINIUM**:  All right and title to the real property located in New York, New York owned by Park Laurel Acquisition LLC ("PARK LAUREL CONDOMINIUM"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

       f.   **TIME WARNER PENTHOUSE**:  All right and title to the real property located in New York, New York owned by 80 Columbus Circle (NYC) LLC ("TIME WARNER PENTHOUSE"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.  The TIME WARNER PENTHOUSE includes all right and title to the real property commonly known as SU-11, New York, New York ("TIME WARNER STORAGE UNIT"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

---

[1] Pursuant to L.R. 5.2-1, residential addresses are listed by the city and state only.

3

g.  **ORIOLE MANSION**:  All right and title to the real property located in Los Angeles, California owned by Oriole Drive (LA) LLC ("ORIOLE MANSION"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

h.  **GREENE CONDOMINIUM**:  All right and title to the real property located in New York, New York owned by 118 Greene Street (NYC) LLC ("GREENE CONDOMINIUM"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

i.  **EMI ASSETS:**  Any and all rights, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to JW Nile (BVI), Ltd.; JCL Media (EMI Publishing Ltd.); and/or Jynwel Capital Ltd., relating to EMI Music Publishing Group North America Holdings, Inc. and D.H. Publishing L.P.

j.  **SYMPHONY CP (PARK LANE) LLC ASSETS:**  All right to and interest in Symphony CP (Park Lane) LLC, a Delaware limited liability company, owned, held or acquired, directly or indirectly, by Symphony CP Investments LLC and Symphony CP Investments Holdings LLC, including but not limited to any interest in the real property and appurtenances located at 36 Central Park South, New York, New York, 10019, known as the Park Lane Hotel, any right to collect and receive any profits and proceeds therefrom, and any interest derived from the proceeds invested in Symphony CP (Park Lane) LLC by Symphony CP Investments LLC or Symphony CP Investments Holdings.

k.  **WALKER TOWER PENTHOUSE**:  All right and title to the property located in New York, New York owned by 212 West 18th Street LLC ("WALKER TOWER PENTHOUSE"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

l.  **LAUREL BEVERLY HILLS MANSION**:  All right and title to the property located in Beverly Hills, California, owned by Laurel Beverly Hills Holdings,

LLC ("LAUREL BEVERLY HILLS MANSION"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

m.   **HILLCREST PROPERTY 2**:  All right and title to the property located in Beverly Hills, California owned by 1169 Hillcrest Road LLC ("HILLCREST PROPERTY 2"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

n.   **VAN GOGH ARTWORK:**  One pen and ink drawing entitled *La maison de Vincent a Arles* by Vincent Van Gogh.

o.   **SAINT GEORGES PAINTING:**  One painting entitled "*Saint-Georges Majeur*" by Claude Monet.

p.   **NYMPHEAS PAINTING:**  One painting entitled "*Nympheas avec Reflets de Hautes Herbes*" by Claude Monet.

q.   **THE QENTAS TOWNHOUSE**:  All right and title to the property located in London, United Kingdom ("U.K."), SW1W 0JR, owned by Qentas Holdings Limited (the "QENTAS TOWNHOUSE"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. QENTAS TOWNHOUSE includes all right, title, and interest in the leasehold for Parking Space 2 at the QENTAS TOWNHOUSE, as well as all sub-leases, rents, and profits derived therefrom.  According to a search of the Land Registry conducted by the U.K. National Crime Agency ("NCA"), title to QENTAS TOWNHOUSE is held in the name of Qentas Holdings Limited, and there are no recorded liens against the property.

## NATURE OF THE ACTION

5.   This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to launder money misappropriated from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company

wholly-owned by the government of Malaysia.[2]  The United States seeks forfeiture of property located in the United States and abroad, including in the United Kingdom and Switzerland, pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was derived from violations of U.S. law, and pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that it is property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957.

6.     1MDB was ostensibly created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on the issuance of various debt securities to fund these projects.  However, over the course of an approximately four-year period, between approximately 2009 and at least 2013, multiple individuals, including public officials and their associates, conspired to fraudulently divert billions of dollars from 1MDB through various means, including by defrauding foreign banks and by sending foreign wire communications in furtherance of the scheme, and thereafter, to launder the proceeds of that criminal conduct, including in and through U.S. financial institutions.  The funds diverted from 1MDB were used for the personal benefit of the co-conspirators and their relatives and associates, including to purchase luxury real estate in the United States, pay gambling expenses at Las Vegas casinos, acquire more than $200 million in artwork, invest in a major New York real estate development project, and fund the production of major Hollywood films.  1MDB maintained no interest in these assets and saw no returns on these investments.

7.     The criminal conduct alleged herein occurred in three principal phases:

8.     The "Good Star" Phase:  The fraudulent diversion of funds from 1MDB began in approximately September 2009, soon after 1MDB's creation.  Between 2009 and 2011, under the pretense of investing in a joint venture between 1MDB and PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi oil extraction company, officials of 1MDB and others arranged for the fraudulent transfer of more than

---

[2] Malaysia is a sovereign country located in Southeast Asia.

6

$1 billion from 1MDB to a Swiss bank account held in the name of Good Star Limited ("Good Star Account").  Officials at 1MDB caused this diversion of funds by, among other things, providing false information to banks about the ownership of the Good Star Account.  Contrary to representations made by 1MDB officials, the Good Star Account was beneficially owned not by PetroSaudi or the joint venture, but by LOW Taek Jho, a/k/a Jho Low ("LOW"), a Malaysian national who had no formal position with 1MDB but was involved in its creation.  LOW laundered more than $400 million of the funds misappropriated from 1MDB through the Good Star Account into the United States, after which these funds were used for the personal gratification of LOW and his associates.[3]

9.    The "Aabar-BVI" Phase:  In 2012, 1MDB officials and others misappropriated and fraudulently diverted a substantial portion of the proceeds that 1MDB raised through two separate bond offerings arranged and underwritten by Goldman Sachs International ("Goldman").  The bonds were guaranteed by both 1MDB and the International Petroleum Investment Company ("IPIC"), an investment fund wholly-owned by the government of Abu Dhabi, in the United Arab Emirates ("U.A.E.").[4]  Beginning almost immediately after 1MDB received the proceeds of each of these two bond issues, 1MDB officials caused a substantial portion of the proceeds – approximately $1.367 billion, a sum equivalent to more than forty percent of the total net proceeds raised – to be wire transferred to a Swiss bank account belonging to a British Virgin Islands entity called Aabar Investments PJS Limited ("Aabar-BVI").

10.    Aabar-BVI was created and named to give the impression that it was associated with Aabar Investments PJS ("Aabar"), a subsidiary of IPIC incorporated in Abu Dhabi.  In reality, Aabar-BVI has no genuine affiliation with Aabar or IPIC, and the Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to

---

[3] All amounts referenced in dollars ($) are denominated in U.S. dollars and all dates, times, and monetary amounts are approximate.

[4] The United Arab Emirates is a sovereign nation in the Arabian Peninsula, comprising seven separate emirates, including the Emirate of Abu Dhabi ("Abu Dhabi").

siphon off proceeds of the 2012 bond sales for the personal benefit of officials at IPIC, Aabar, and 1MDB and their associates.  Funds diverted through the Aabar-BVI Swiss Account were transferred to, among other places, a Singapore bank account controlled by TAN Kim Loong, a/k/a Eric Tan ("TAN"), an associate of LOW.  Those funds were thereafter distributed for the personal benefit of various individuals, including officials at 1MDB, IPIC, or Aabar, rather than for the benefit of 1MDB, IPIC, or Aabar.

11.    The "Tanore" Phase:  In 2013, several individuals, including 1MDB officials, diverted more than $1.26 billion out of a total of $3 billion in principal that 1MDB raised through a third bond offering arranged by Goldman in March 2013.  The proceeds of this bond offering were to be used by 1MDB to fund a joint venture with Aabar known as the Abu Dhabi Malaysia Investment Company ("ADMIC").  However, beginning days after the bond sale, a significant portion of the proceeds was instead diverted to a bank account in Singapore held by Tanore Finance Corporation ("Tanore Account"), for which TAN was the recorded beneficial owner.  Although the Tanore Account had no legitimate connection to 1MDB, the then-Executive Director of 1MDB was an authorized signatory on the account.  1MDB funds transferred into the Tanore Account were used for the personal benefit of LOW and his associates, including officials at 1MDB, rather than for the benefit of 1MDB or ADMIC.

12.    The proceeds of each of these three phases of criminal conduct were laundered through a complex series of transactions, including through bank accounts in Singapore, Switzerland, Luxembourg, and the United States.

13.    Numerous assets, including the DEFENDANT ASSET, were acquired with funds unlawfully diverted from 1MDB, or funds traceable thereto.  As a result, the DEFENDANT ASSET is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), because it is property involved in one or more money laundering transactions in violation of 18 U.S.C. §§ 1956 and/or 1957, and 18 U.S.C. § 981(a)(1)(C) because it is property constituting or derived from proceeds traceable to one or more

violations of U.S. law defined as a specified unlawful activity in 18 U.S.C. §§ 1956(c)(7) and/or 1961(1).

## JURISDICTION AND VENUE

14.     This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

16.     Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California, and/or pursuant to 28 U.S.C. § 1395(b), because the Defendant Asset is located in the Central District of California.

## BACKGROUND:  RELEVANT INDIVIDUALS AND ENTITIES

17.     **1Malaysia Development Berhad** ("**1MDB**") is a strategic investment and development company wholly-owned by the Malaysian government, through the Malaysian Ministry of Finance.  It was formed in 2009 when the Malaysian government took control of a municipal entity called Terengganu Investment Authority ("TIA"). 1MDB's governance structure has been comprised of a senior leadership team, a Board of Directors ("1MDB Board of Directors" or "1MDB Board"), and a Board of Advisors.

18.     **PetroSaudi International Ltd.** ("**PetroSaudi**" or "**PSI**") is a private Saudi Arabia-based oil services company incorporated in Saudi Arabia, which maintains offices in the United Kingdom.

19.     **1MDB PetroSaudi, Ltd.** was a purported joint venture between 1MDB and PetroSaudi formed in or around September 2009 for the stated purpose of exploiting certain energy concessions PetroSaudi purportedly owned in Turkmenistan and Argentina.

20.     **International Petroleum Investment Company** ("**IPIC**") is an investment entity wholly-owned by the Abu Dhabi government.  Its management is comprised of a Chairman, Deputy Chairman, Board of Directors, and Managing Director.

21.     **Aabar Investments PJS** ("**Aabar**") is a public joint stock company incorporated under the laws of Abu Dhabi and a subsidiary of IPIC.

22.     **Aabar Investments PJS Ltd.** ("**Aabar BVI**") is an entity incorporated in the British Virgin Islands in March 2012 that was purported to be owned by IPIC and Aabar.  Aabar-BVI maintained a bank account at BSI Bank in Switzerland.  IPIC and Aabar recently clarified that Aabar-BVI is not their affiliate.

23.     **Abu Dhabi Malaysia Investment Company** ("**ADMIC**") is a purported joint venture between 1MDB and Aabar that was created in or around March 2013 for the stated purpose of promoting the growth and development of Malaysia and Abu Dhabi.

24.     **LOW Taek Jho, a/k/a/ Jho Low** ("**LOW**") is a Malaysian national who advised on the creation of TIA, 1MDB's predecessor.  LOW has never held a formal position at 1MDB, and he has publicly denied any involvement with 1MDB after its inception.

25.     **1MDB OFFICER 1** is a Malaysian national who served as the Executive Director of 1MDB from the time of its creation until approximately March 2011.  During this time, 1MDB OFFICER 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

26.     **1MDB OFFICER 2** is a Malaysian national who served as 1MDB's Chief Executive Officer ("CEO") between at least 2009 and 2013.  During this time, 1MDB OFFICER 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

27.     **1MDB OFFICER 3** is Malaysian national who served as 1MDB's General Counsel and Executive Director of Group Strategy during, at a minimum, 2012 and

10

2013.  1MDB OFFICER 3 was a main point of contact between 1MDB and Goldman in connection with the three Goldman-underwritten bond offerings in 2012 and 2013. During this time, 1MDB OFFICER 3 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

28.  **MALAYSIAN OFFICIAL 1** is a high-ranking official in the Malaysian government who also held a position of authority with 1MDB.  During all times relevant to the Complaint, MALAYSIAN OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

29.  **Riza Shahriz Bin Abdul AZIZ** ("**AZIZ**"), a Malaysian national, is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  He co-founded Red Granite Pictures, a Hollywood movie production and distribution studio, in 2010.

30.  **"Eric" TAN Kim Loong** ("**TAN**") is a Malaysian national and an associate of LOW.  He was the stated beneficial owner of several bank accounts into which misappropriated 1MDB funds were transferred.

31.  **Khadem Abdulla Al QUBAISI** ("**QUBAISI**"), a U.A.E. national, was the Managing Director of IPIC from 2007 to 2015 and the Chairman of Aabar in at least 2012 and 2013.  During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code.  QUBAISI also was a director of Aabar-BVI.

32.  **Mohamed Ahmed Badawy Al-HUSSEINY** ("**HUSSEINY**"), a U.S. citizen, was the CEO of Aabar from 2010 to 2015.  He was also a director of Aabar-BVI.

## EVIDENCE SUPPORTING FORFEITURE

33.  The Defendant Asset represents a portion of the proceeds of over $3.5 billion misappropriated from 1MDB.  That misappropriation occurred in multiple phases over the course of several years.  The misappropriated funds were then used to purchase

11

the Defendant Asset, as well as to fund the co-conspirators' lavish lifestyles, including purchases of artwork and jewelry, the acquisition of luxury real estate, the payment of gambling expenses, and the hiring of musicians and celebrities to attend parties. The use of the diverted 1MDB funds for the personal benefit of the co-conspirators and their associates was not consistent with the purposes for which 1MDB raised the funds, and neither 1MDB nor the government of Malaysia realized any returns on these purchases and expenditures.

## I. BACKGROUND ON THE FORMATION OF 1MDB

34. 1MDB is an investment and development entity wholly-owned by the government of Malaysia, through the Ministry of Finance ("MOF"). It grew out of an entity called "Terengganu Investment Authority" ("TIA").[5] In or around February 2009, the Malaysian municipality of Terengganu, assisted by Goldman, formed TIA with the stated purpose of investing and managing that municipality's public funds. To raise capital for its operations, TIA issued and sold Islamic medium term notes ("IMTNs"), a form of debt security, valued at 5 billion Malaysian ringgit (MYR). By 2009 conversion rates, this amounted to approximately $1,425,680,000. The IMTNs were 30-year notes with a yield of approximately 5.75 percent, issued with the assistance of AmBank in Malaysia.

35. LOW Taek Jho, a/k/a Jho LOW ("LOW"), a Malaysian national, served as an advisor to TIA and its founders as early as January 2009.

36. Electronic communications between Goldman employees and individuals involved with TIA confirm that LOW was involved in the creation of TIA. For example, on or about January 14, 2009, 1MDB OFFICER 1, who served as TIA's Executive Director of Business Development and later became the Executive Director of 1MDB, sent an email to, among others, LOW and Goldman employees with the subject line "Re:

---

[5] Except where a distinction is made, all references to 1MDB may refer to TIA before it was renamed 1MDB.

Project TIARA."  In this email, 1MDB OFFICER 1 stated, referring to LOW:  "I think it is best to get Jho involve[d] at every stage.  Jho will revert on the suitability of dates n [sic] time for the next 48 hrs."

37.    On or about March 31, 2009, LOW sent an email to a Goldman employee and 1MDB OFFICER 1 with the subject line "Re – Press Answer URGENT."  In the email, LOW stated:

> Bro, here is outline of the issues I would like to discuss with the Terengganu
> Investment Authority. In essence the disquiet surrounding the plan is that the
> fund will operate entirely on borrowed money, which is largely anathema
> because it puts taxpayer's money at risk. Could they elaborate on this
> concern?
>
> There is also the issue of transparency and will the money go towards
> portfolio investments or be used to buy strategic stakes in companies.? [sic]

38.    According to Malaysian news reports and archived 1MDB press releases, in or around July 2009, the Malaysian Ministry of Finance assumed control of TIA and the more than $1 billion in IMTNs issued by TIA.  In September 2009, TIA's name was changed to 1Malaysia Development Berhad, or 1MDB.  The Malaysian government also became a guarantor on the IMTNs.  1MDB was to act as a strategic development company, wholly-owned by the Malaysian government, with a mission to promote Malaysian economic development through global partnerships and foreign direct investment.  The Malaysian government exercised a high degree of control over 1MDB pursuant to its governing documents, including its Articles of Association.

39.    Upon its formation, MALAYSIAN OFFICIAL 1 assumed a position of authority with 1MDB.  MALAYSIAN OFFICIAL 1 had the authority to approve all appointments to, and removals from, 1MDB's Board of Directors and 1MDB's Senior Management Team.  In addition, any financial commitments by 1MDB, including

investments, that were likely to affect a guarantee given by the government of Malaysia for the benefit of 1MDB or any policy of the Malaysian government, required, the approval of MALAYSIAN OFFICIAL 1.

## II.   THE GOOD STAR PHASE:  MORE THAN $1 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE GOOD STAR PHASE

40.    As one of its first investment projects, 1MDB entered into an agreement in September 2009 with PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi Arabia-based oil services company, to form a joint venture called 1MDB PetroSaudi Ltd. ("the 1MDB-PetroSaudi JV" or "Joint Venture").  The stated purpose of the Joint Venture was to exploit certain energy concession rights in Turkmenistan and Argentina that PetroSaudi purported to own.  Under the terms of the agreement, (a) 1MDB agreed to invest $1 billion in cash in the Joint Venture in exchange for a forty percent (40%) equity interest in the Joint Venture, and (b) PetroSaudi agreed to give the Joint Venture the mineral extraction concessions it purportedly owned in Turkmenistan and Argentina in exchange for a sixty percent (60%) equity interest in the Joint Venture.  PetroSaudi's energy concession rights were allegedly valued at approximately $2.7 billion.

41.    Both 1MDB's Board of Directors and Bank Negara, Malaysia's Central Bank, approved the transfer of $1 billion to the Joint Venture.  However, as set forth in greater detail in the sections that follow, LOW and his associates caused $700 million of the $1 billion that was to be invested in the Joint Venture to be sent to an account at RBS Coutts Bank in Zurich ("RBS Coutts") held in the name of Good Star Limited ("Good Star Account").

42.    Between May and October 2011, approximately $330 million in additional funds were wired at the direction of 1MDB officials to the Good Star Account purportedly in connection with a financing agreement executed between 1MDB and the 1MDB-Petrosaudi JV.

14

43.     Although 1MDB officials represented, including to Deutsche Bank in Malaysia, that Good Star was a wholly-owned subsidiary of PetroSaudi, this was not true.  According to banking records, Good Star was a company controlled by LOW, and LOW was also the Good Star Account's beneficial owner and sole authorized signatory.  At the time, LOW was a 29-year-old with no official position with 1MDB or PetroSaudi.

## B.     INCEPTION OF GOOD STAR AND THE GOOD STAR ACCOUNT

44.     RBS Coutts bank account records indicate that Good Star Limited was formed in the Seychelles on or about May 18, 2009.[6]   The sole director of Good Star is listed as Smart Power, of which LOW is the sole director.  LOW is listed on the bank records as Good Star's secretary.  Smart Power's ownership equity in Good Star consists of a single bearer share of company stock.  That single bearer share was issued to LOW on or about June 2, 2009, seven days before he opened the Good Star Account.  In exchange for that single bearer share, LOW paid $1 in consideration.

45.     A Memorandum issued pursuant to Good Star's Articles of Association indicates that the company's books, records, and minutes would be maintained at 50 Raffles Place in Singapore, c/o SINGAPORE BANKER 1.  SINGAPORE BANKER 1's office is also designated as the location where "all correspondence" to Good Star should be sent.  At the time, SINGAPORE BANKER 1 was employed as a banker at RBS Coutts in Singapore.  RBS Coutts' Singapore branch occupied an address at 50 Raffles Place in Singapore.

46.     On or about June 9, 2009, LOW opened the Good Star Account at an RBS Coutts branch in Singapore by completing an "Application for Opening an Account/Custody Account by Legal Entities."  The application bears LOW's signature.  LOW also completed a form entitled "Establishment of the Beneficial Owner's Identity," which identified LOW as the sole beneficial owner of the Good Star Account.  LOW

[6] Seychelles is a sovereign country located in the Indian Ocean off of East Africa.

15

also completed a form entitled "Resolutions," in which LOW was named as the sole authorized signatory on the Good Star Account. This form also bears LOW's signature. Included in the account opening records was a copy of a page from LOW's Malaysian passport containing, among other things, LOW's photograph.

## C.   1MDB FORMS A JOINT VENTURE WITH PETROSAUDI IN SEPTEMBER 2009

47.     On or about September 18, 2009, the 1MDB Board of Directors ("Board") met at the Royale Chulan Hotel in Kuala Lumpur, Malaysia. The 1MDB Board minutes of that meeting provide that the purpose of the meeting was to discuss the anticipated creation of the 1MDB-PetroSaudi JV. The following individuals were present: (i) 1MDB OFFICER 1, (ii) the CEO of 1MDB ("1MDB OFFICER 2"), (iii) the Chairman of the 1MDB Board, (iv) 1MDB's Director of Investments, and (v) three 1MDB Directors.

48.     The Board minutes further indicate that 1MDB OFFICERS 1 and 2 offered a Position Paper during the September 18, 2009 meeting. The Position Paper, signed by 1MDB OFFICERS 1 and 2, included a formal request that the 1MDB Board authorize 1MDB "to invest US$1 bln into the [1MDB-PetroSaudi JV] upon signing of the [1MDB-PetroSaudi JV Agreement] as its contribution to the capital of the [1MDB-PetroSaudi JV]."

49.     The Board minutes state further that, on or about September 18, 2009, the 1MDB Board authorized 1MDB to enter into negotiations with PetroSaudi for the purpose of creating the 1MDB-PetroSaudi JV. However, the 1MDB Board also resolved that 1MDB's management should report back to the Board regarding some of the issues raised by the Board, including whether (i) an expert selected by 1MDB could be used to assess the value of PetroSaudi's assets and (ii) PetroSaudi could also be required to invest at least $1 billion in cash into the 1MDB-PetroSaudi JV.

50.     A special meeting of the 1MDB Board was held on September 26, 2009, which was attended by 1MDB OFFICERS 1 and 2 and members of the Board. LOW also attended this meeting.  Just prior to the meeting, LOW spoke by telephone with MALAYSIAN OFFICIAL 1.

51.     According to the 1MDB Board minutes of the September 26, 2009 meeting, 1MDB's Board passed a resolution authorizing 1MDB to transmit $1 billion to the 1MDB-PetroSaudi JV.  Specifically, the 1MDB Board approved 1MDB's resolution to transfer $1 billion from 1MDB through a foreign exchange transaction with Deutsche Bank (Malaysia) Berhad ("Deutsche Bank"), "into the bank account of [the 1MDB-PetroSaudi JV] for the purpose of subscribing of 1 billion ordinary shares in [the 1MDB-PetroSaudi JV]."  The resolution was signed by the Chairman of the 1MDB Board and 1MDB OFFICER 2.

52.     The Joint Venture Agreement ("JVA") between 1MDB and PetroSaudi was executed on or about September 28, 2009.  Under the terms of the JVA, 1MDB agreed to invest $1 billion into the 1MDB-PetroSaudi JV in exchange for one billion equity shares, equivalent to a 40% equity stake in the 1MDB-PetroSaudi JV.  In turn, PetroSaudi agreed to place into the 1MDB-PetroSaudi JV certain assets valued at approximately $2.7 billion, purportedly consisting of "energy interests in the Turkmenistan sector of the Caspian Sea" and "the Argentinean provinces of Rio Negro" and Chubut.  1MDB OFFICER 2 signed the JVA on behalf of 1MDB, and the CEO and co-founder of PetroSaudi ("PETROSAUDI CEO"), a Saudi national, signed on behalf of PetroSaudi.

53.     The JVA provided further that 1MDB's $1 billion contribution was to be made in "immediately available cleared funds to a bank account in the name of, and nominated by, [the 1MDB-PetroSaudi JV] with BSI Bank."

54.     BSI Bank is a private bank based in Switzerland that maintained a branch in Singapore.  The JVA required that 1MDB and PSI officials be joint signatories on the BSI Bank account into which 1MDB's contribution to the Joint Venture was to be deposited.  The JVA expressly required that, upon 1MDB's contribution of $1 billion,

17

the 1MDB-PetroSaudi JV was to "deliver to 1MDB evidence, in the name of BSI Bank, establishing that 1MDB was a joint beneficial owner" of the account at BSI Bank into which 1MDB's contribution to the 1MDB-PetroSaudi JV was deposited.

55.     The JVA also required that by September 30, 2009 (within two days of the JVA's execution), the 1MDB-PetroSaudi JV pay to PetroSaudi $700 million, purportedly as repayment for a loan PetroSaudi made to the 1MDB-PetroSaudi JV. According to the JVA, PetroSaudi agreed to make this loan to the Joint Venture just three days prior to execution of the JVA, that is, on or about September 25, 2009.

56.     Notwithstanding the reference in the JVA to a "loan" from PetroSaudi to the Joint Venture, PetroSaudi made no such loan, based on the following facts and circumstances, among others:

a.     On September 25, 2009, before the JVA was signed, PetroSaudi purportedly agreed to make the loan, which was due to be repaid on or about September 30, 2009.  There is no apparent commercial purpose for this loan.

b.     The bank account maintained by the Joint Venture at J.P. Morgan (Suisse), into which 1MDB ultimately transferred $300 million, was not opened until September 30, 2009, after the loan was purportedly made.

c.     Although PetroSaudi opened an account at J.P. Morgan (Suisse) in June 2009, this account was "inactive" until December 2009.

d.     The Malaysian Public Accounts Committee ("PAC"), a committee within the Malaysian Parliament responsible for examining the accounts of public authorities and other bodies administering public funds, conducted an examination of 1MDB and its financial activities, and it produced a public and non-public report of its findings.  According to an English-language translation of the public report available on the PAC's website, the auditors tasked by the PAC to examine 1MDB's activities were unable to validate documents related to PetroSaudi's purported $700 million loan to the 1MDB-PetroSaudi JV and were unable to verify the existence of such a loan.

e.      As detailed below, the $700 million went to an account controlled by LOW, not by PetroSaudi.

57.      Regardless of the veracity of the purported loan from PetroSaudi to 1MDB-PetroSaudi JV, the Position Paper that was presented to the 1MDB Board did not disclose the existence of any loan, or any anticipated loan, from PetroSaudi to the Joint Venture.  Nor did the Position Paper disclose the need for 1MDB to direct any portion of its $1 billion investment in the Joint Venture to PetroSaudi (rather than the Joint Venture) in repayment of a loan.  Indeed, at the time that the 1MDB Board authorized the $1 billion investment in the 1MDB-PetroSaudi JV on September 26, 2009, the Board was not told that any portion of the $1 billion investment in 1MDB-PetroSaudi JV would be transferred to any entity other than the Joint Venture.  Even though Article 75 of 1MDB's Articles of Association requires that 1MDB's Board approve all investment decisions, the Board did not approve the use of 1MDB's investment in the Joint Venture to repay PetroSaudi for a loan, let alone to pay an entity unaffiliated with PetroSaudi.

58.      On or about September 30, 2009, 1MDB issued a press release entitled, "[PSI] and [1MDB] in US $2.5 billion joint-venture partnership, opens new door to FDIs [Foreign Direct Investments.]"  The press release stated:

> The [1MDB-PetroSaudi JV's] objective is to seek, explore, and participate in business and economic opportunities which result in the enhancement and promotion of the future prosperity and long-term sustainable economic development of Malaysia.  It is expected to actively make investment in the renewable energy sector.  The [1MDB-PetroSaudi JV] is also expected to be a vehicle for investments from the Middle East into the region, thereby giving Malaysia the edge in drawing investments from the cash- and resource-rich region.

**D.     FALSE REPRESENTATIONS TO BANKS CAUSING $700 MILLION DIVERSION FROM 1MDB TO THE GOOD STAR ACCOUNT**

59.     As set forth below, members of 1MDB's Senior Management Team, including 1MDB OFFICERS 1 and 2, made material misrepresentations and omissions to Deutsche Bank officials in order to cause Deutsche Bank to divert $700 million of 1MDB's funds to the Good Star Account.

60.     On or about September 30, 2009, a letter signed by 1MDB OFFICER 1 was delivered "BY HAND" to Deutsche Bank in Malaysia instructing the Bank to transfer (i) $300 million to an account at J.P. Morgan (Suisse), S.A. in Switzerland (the "$300 million wire transfer") and (ii) $700 million to an account at RBS Coutts in Switzerland (the "$700 million wire transfer").  The instructions specified the account numbers for the two destination accounts but did not identify account names or beneficiaries.

61.     J.P. Morgan Chase Bank ("J.P. Morgan") records show that the Swiss J.P. Morgan account referenced in the instructions to Deutsche Bank (that is, the account that was to receive the $300 million wire transfer) belonged to an account held in the name of the 1MDB-PetroSaudi JV (hereinafter, the "J.P. Morgan JV Account").

62.     RBS Coutts records show that the RBS Coutts account referenced in the instructions to Deutsche Bank (that is, the account that was to receive the $700 million wire transfer) was the Good Star Account.

63.     These two transactions were to be carried out as foreign exchange transactions, in which Deutsche Bank, on behalf of 1MDB, was to exchange an equivalent sum of Malaysian Ringgit ("MYR") for $1 billion in U.S. dollars.

64.     In an email dated September 30, 2009, at 1:09 p.m., a 1MDB official represented to a Deutsche Bank employee (the "Deutsche Bank Employee"), that the "beneficiar[y]" of the $300 million wire transfer was the Joint Venture and the "beneficiar[y]" of the $700 million wire was PetroSaudi.  In that same email, the 1MDB

official indicated to Deutsche Bank that, "[i]n order to avoid any unforeseen circumstance, we are not incorporating the name of the beneficiary in our instruction letter and please follow our instruction according."

65.     Under Malaysian law, 1MDB was required to obtain approval from Bank Negara, Malaysia's Central Bank, before completing either of the ordered wire transfers. On or about September 30, 2009, at approximately 2:05 p.m., the Acting Deputy Director of Bank Negara's Foreign Exchange Administration Department sent a letter via facsimile to 1MDB OFFICER 1 (the "Bank Negara Letter"). In this letter, Bank Negara acknowledged that "the funds for the approved investment will be remitted to PetroJV's account maintained with J.P. Morgan SA and RBS Coutts Bank Ltd." The reference to "PetroJV" was intended to refer to the 1MDB-PetroSaudi JV.

66.     Later that same day, 1MDB OFFICER 1 provided a copy of the Bank Negara Letter to Deutsche Bank, prior to Deutsche Bank's initiation of the $700 million wire transfer.

67.     On September 30, 2009, at approximately 2:39 p.m., the Deutsche Bank Employee, a Deutsche Bank supervisor ("Deutsche Bank Supervisor"), and 1MDB OFFICER 1 had a telephone conversation regarding the requested $700 million wire transfer. During this conversation, 1MDB OFFICER 1 falsely represented that the beneficiary of the $700 million wire was PetroSaudi. In truth, the beneficiary of the wire was Good Star. Their exchange, conducted in English, was as follows:

| | |
|---|---|
| 1MDB OFFICER 1 | Hey, No [mah], I, whatever mistake they've made you cannot go back [ask] them. They [already] give you approval from [Bank Negara] all the way to the top. |
| Deutsche Bank Supervisor | Um-hum . . . |
| 1MDB OFFICER 1 | Uh. You want to, hang on, this one ___. The ___ is asking me to go and send it now. |

21

| | | |
|---|---|---|
| 1 | Deutsche Bank Supervisor | Okay, okay, okay. Let, let, let me just convince my compliance person.  This is, I'm, I'm fine with you about the compliance side, uh, it's. It's a little bit sticky with this.  But let me just try – |
| 4 | 1MDB OFFICER 1 | Good. |
| 6 | Deutsche Bank Supervisor |  --and convince her |
| 8 | 1MDB OFFICER 1 | Yeah, and __ I don't know how to answer you know, that's why I'm under tremendous pressure – |
| 10 | 1MDB OFFICER 1 | Then, they going to be so upset ____? |
| 12 | Deutsche Bank Supervisor | Um-hum-hum.  But it is okay for us to call [Bank Negara] if we need to, huh?  Just, just to uh – |
| 14 | 1MDB OFFICER 1 | Yeah, yeah, yeah, yeah, yeah, yeah |
| 15 | Deutsche Bank Supervisor | Because it's not my decision. |
| 17 | 1MDB OFFICER 1 | But— |
| 18 | Deutsche Bank Supervisor | --[it's my] compliance uh person. |
| 20 | 1MDB OFFICER 1 | [You tell your] compliance. |
| 22 | Deutsche Bank Supervisor | Yeah. |
| 24 | 1MDB OFFICER 1 | If they don't send it [ah] |
| 25 | Deutsche Bank Supervisor | Yeah. |
| 27 | 1MDB OFFICER 1 | ____ will [blame] them [____], the deal goes off, you know. |

| | | |
|---|---|---|
| 1 | Deutsche Bank Supervisor | Okay, okay, okay. |
| 2 | | |
| 3 | 1MDB OFFICER 1 | No, I'm serious you know, you know this ____? |
| 4 | | |
| 5 | Deutsche Bank Supervisor | No, no, I understand.  Understand.  Yeah. |
| 6 | | |
| 7 | 1MDB OFFICER 1 | You know, if, do whatever you [can] do, either they send it now or they, they, they double [back], or whatever, but they cannot wait for this, you know. |
| 8 | | |
| 9 | Deutsche Bank Employee | Yeah, just, just, just one quick question [1MDB OFFICER 1], what— |
| 10 | | |
| 11 | 1MDB OFFICER 1 | But if they're going to overkill on the compliance thing uh they have to be responsible you know. |
| 12 | | |
| 13 | Deutsche Bank Supervisor | I understand that.  Uh— |
| 14 | | |
| 15 | Deutsche Bank Employee | Yes, that's, that's fine.  But just one question as to why is it going to [PetroSaudi] itself?  Is there any particular reason? |
| 16 | | |
| 17 | | |
| 18 | 1MDB OFFICER 1 | Actually – |
| 19 | Deutsche Bank Employee | Ah— |
| 20 | | |
| 21 | 1MDB OFFICER 1 | --for us, we don't care.  Because 700 million I mean it's a __ advance [that's] owed to them. |
| 22 | | |
| 23 | Deutsche Bank Employee | Oh, I see. |
| 24 | | |
| 25 | 1MDB OFFICER 1 | Alright.  They give us instructions, send [whatever] they want to send it. _____. |
| 26 | | |
| 27 | Deutsche Bank Employee | Ah, I see, I see.  Okay.  Okay. |
| 28 | | |

| | | |
|---|---|---|
| 1 | 1MDB OFFICER 1 | And for us what we care about making sure they have |
| 2 | | issue us one billion dollars [shares]. |
| 3 | Deutsche Bank | Ah. |
| 4 | Employee | |
| 5 | 1MDB OFFICER 1 | --and the three hundred million goes to the account |
| 6 | | where [we control]. |
| 7 | Deutsche Bank | Ah.  Okay.  That, that's— |
| 8 | Employee | |
| 9 | 1MDB OFFICER 1 | _____ to them.  This is where they want to send, they |
| 10 | | want to send to Timbuktu also, we don't care. |
| 11 | Deutsche Bank | Yeah, that's fine.  Alright.  We just wanted to |
| 12 | Employee | understand the background. |
| 13 | 1MDB OFFICER 1 | So [if] your compliance is overkill in terms _____ |
| 14 | | -- |
| 15 | Deutsche Bank | Yeah. |
| 16 | Employee | |
| 17 | 1MDB OFFICER 1 | --the message— |

****

68.     On September 30, 2009, at approximately 2:51 p.m., the Deutsche Bank
Supervisor had a telephone conversation with a Bank Negara official ("Bank Negara
Official").  Their conversation included the following exchange:

| | | |
|---|---|---|
| | Deutsche Bank | I understand that.  I understand that.  Okay.  So you |
| | Supervisor | know in terms of account it's basically a business |
| | | decision for the [client] [now]. |
| | Bank Negara Official | Yeah, yeah, yeah, because we, we, I mean we do not |
| | | know of the, all that when there applied to us, they got |
| | | 1.5 billion will be put by the Saudi MDB, one billion |
| | | by us, uh by Malaysia – |

24

| Deutsche Bank Supervisor | Um-hum, um-hum— |
|---|---|
| Bank Negara Official | --and that, and the crediting of the account and so on , is this their business decision, la, so long as it does not deviate from the original intention and that is not for Bank Negara to say but more of the government [la] because this is MOF's . . . baby [la]. |

69.     When the Bank Negara Official used the words "original intention," he/she meant the $1 billion in funds that were meant to be sent to the 1MDB-PetroSaudi JV.

70.     At approximately 3:14 p.m., Deutsche Bank transmitted to RBS Coutts a SWIFT payment order requesting that $700 million be credited to an account at RBS Coutts.[7]  The SWIFT message did not identify the owner of the RBS Coutts account, but the account number listed on the SWIFT as the recipient of the $700 million wire transfer was the number of the Good Star Account.

71.     Approximately six minutes later, at about 3:20 p.m., Deutsche Bank transmitted a second SWIFT payment order to J.P. Morgan (Suisse) requesting that $300 million be credited to an account at J.P. Morgan (Suisse).  As with the other SWIFT message, the SWIFT message for the $300 million wire transfer did not identify the owner of the beneficiary account.  The account number listed in the SWIFT for the $300 million wire transfer matched the number for the J.P. Morgan JV Account.

72.     At approximately 5:08 p.m., a Deutsche Bank compliance officer sent an email to the Deutsche Bank Employee seeking "email confirmation from 1MDB of the names of the beneficiaries to both payments."  The compliance officer also advised the Deutsche Bank Employee that Bank Negara approved the wire transfers for the purpose of allowing 1MDB to acquire an equity interest in the 1MDB-PetroSaudi JV.  The email

---

[7] SWIFT is an abbreviation for Society for Worldwide Interbank Financial Telecommunication, and a SWIFT payment order is a standard electronic communication used by and between financial institutions to conduct monetary transactions.

25

indicates the compliance officer's belief that the $700 million wire transfer was being sent to PetroSaudi (rather than Good Star).

73.     On October 1, 2009, the Deutsche Bank Employee sent an email to other Deutsche Bank employees stating: "The 3rd party payment by 1MDB to [the 1MDB-PetroSaudi JV] and [PetroSaudi] is approved from my end."  This email indicated the Deutsche Bank Employee's similar belief that the $700 million wire transfer was being sent to PetroSaudi.

74.     On October 2, 2009, an RBS Coutts employee with the Regulatory Risk department emailed a Deutsche Bank employee, stating:  "Please urgently confirm the **full name** of the final beneficiary of the funds per **e-mail** and **authenticated swift** (see details below) in order for us to apply the funds."  (Emphasis in original).  In the email, the RBS Coutts employee further explained that "[w]e are not in a position to credit the funds without full beneficiary details (full name, address, account no.)."

75.     Later, at approximately 6:19 p.m., the Deutsche Bank Employee sent an email to 1MDB OFFICERS 1 and 2, explaining, "I believe RBS [Coutts] needs confirmation on the beneficiary's name in order to complete their internal risk mitigating processes as no name was[.]  We will await your instructions on whether to reveal the beneficiary name and address (please provide) to RBS Coutts."

76.     Thereafter, at approximately 7:51 p.m., 1MDB OFFICER 2 emailed the Deutsche Bank Employee and 1MDB OFFICER 1 with authorization to disclose to RBS Coutts that the beneficiary of the $700 million wire was Good Star.  However, 1MDB OFFICER 2 misrepresented the nature of the relationship between Good Star and PetroSaudi.   Specifically, 1MDB OFFICER 2 stated: "This payment was for beneficiary 'Good Star Limited' in their SWIFT.  Good Star is owned 100% by PetroSaudi International Limited."  In reality, however, Good Star's sole shareholder and the signatory on its account was LOW – not PetroSaudi.  Approximately 30 minutes later, 1MDB OFFICER 2 emailed the Deutsche Bank Employee and provided Good Star's

address as P.O. Box 1239, Offshore Incorporation, Victoria, Mahe, Republic of
Seychelles.

77.    Finally, at approximately 9:30 p.m., Deutsche Bank submitted to RBS
Coutts a revised SWIFT instruction identifying "Good Star Limited" as the beneficiary
of the $700 million wire transfer, located at P.O. Box 1239, Offshore Incorporation,
Victoria, Mahe, Republic of Seychelles.

78.    On or about October 23, 2009, Deutsche Bank informed Bank Negara
through a regulatory filing that the purpose of the $700 million wire transfer was for an
"equity investment in [a] new entity."

79.    J.P. Morgan Chase bank records confirm that on or about September 30,
2009, the Good Star Account received the $700 million wire transfer from Deutsche
Bank.  A U.S. correspondent bank account at J.P. Morgan processed the $700 million
wire transfer to the Good Star Account at RBS Coutts.

80.    The 1MDB-PetroSaudi JV never had an account at RBS Coutts.  Rather, as
stated above, the 1MDB-PetroSaudi JV maintained an account at J.P. Morgan, and that
account received only $300 million of the total $1 billion that was to be invested in the
Joint Venture.

E.    **1MDB OFFICERS 1 AND 2 CONCEAL MISAPPROPRIATION OF
FUNDS FROM 1MDB BOARD OF DIRECTORS**

81.    Even after the $700 million wire transfer was made into the Good Star
Account, 1MDB OFFICERS 1 and 2 continued to make material misrepresentations to
the 1MDB Board relating to the true identity of the beneficiary of the $700 million wire
transfer.

82.    The 1MDB Board met in Selangor, Malaysia on October 3, 2009.  The
individuals present at the meeting included 1MDB OFFICERS 1 and 2, the Chairman of
the 1MDB Board, 1MDB's Secretary, and three directors of the 1MDB Board.

83.     The 1MDB Board minutes for that meeting indicate that 1MDB OFFICER 2 made false and misleading representations to the Board in explaining key details relating to the $700 million wire transfer.  For example, 1MDB OFFICER 2 informed the Board that, "[o]f the US$1 billion [1MDB] was supposed to inject into the [Joint Venture], . . . US$700 million was remitted to PSI directly as settlement of all the amounts owed by the JVCo. to PSI."  This statement is false and misleading for several reasons:

a.     First, the representation by 1MDB OFFICER 2 that the $700 million wire transfer was sent directly to PetroSaudi was false.  As noted above in paragraph 79, these funds were sent to an account held in the name of Good Star.

b.     Second, as noted above, Good Star is not a subsidiary of PetroSaudi, nor was PetroSaudi a beneficial owner of the Good Star Account.

c.     Third, a loan does not appear to have ever been made by PetroSaudi to the 1MDB-PetroSaudi JV and, thus, the $700 million wire transfer could not have been a "settlement of all the amounts owed by the" 1MDB-PetroSaudi JV.

d.     Fourth, notwithstanding the fact that 1MDB OFFICER 2, who signed the JVA on or about September 28, 2009, was aware that the JVA included contractual terms requiring the 1MDB-PetroSaudi JV to repay PetroSaudi $700 million for a purported loan, neither 1MDB OFFICER 1 nor 1MDB OFFICER 2 disclosed this fact to the 1MDB Board prior to October 3, 2009 – after the $700 million wire had already been diverted to the Good Star Account.

84.     Even without having been told that the $700 million wire was sent to an account held in the name of Good Star, 1MDB Board members raised concerns about the transaction as represented by 1MDB OFFICER 2.  Specifically, the minutes state, in pertinent part:

The concerns raised by the [1MDB Board] that the recent developments in the joint venture was not in accordance with the [1MDB Board's]

understanding of the process, based on representations made at the previous Special [1MDB Board] Meetings.  Specifically:

      (a)     The [1MDB Board] was not consulted on the change of plans to remit $700 million to [PetroSaudi].  The [1MDB Board's] understanding was for the full USA $1 billion to be wired to the joint bank account under the name of the [Joint Venture] and the [Joint Venture's] board of directors makes the decision to remit US$700 million to [PetroSaudi].

                    ***

      (d)  The substantial investment of US$1billion should have merited a more thorough thought and due diligence process.

85.    After expressing these concerns, 1MDB Board members asked that 1MDB determine whether it would be possible to seek the return of the $700 million "so that the funds could be remitted through the original agreed channel," namely, the BSI Bank account held in the name of the 1MDB-PetroSaudi JV.

86.    The 1MDB Board instructed 1MDB OFFICER 2 and 1MDB management "not to deviate from the [1MDB Board's] instructions and what the [1MDB Board] has agreed/understood to be the procedures of a particular transaction."

87.    The 1MDB Board met again in Selangor, Malaysia, on October 10, 2009. The individuals present at the meeting included 1MDB OFFICER 2, the Chairman of the 1MDB Board, 1MDB's Secretary, and three directors of the 1MDB Board.

88.    The 1MDB Board minutes for this meeting indicate that 1MDB OFFICER 2 sought to respond to the concerns raised by the 1MDB Board at the October 3, 2009 meeting.  Specifically, 1MDB OFFICER 2 represented that the $700 million wire transfer was sent "directly to" PetroSaudi in order to repay PetroSaudi's purported $700

million loan to the Joint Venture.  1MDB's management explained that, pursuant to clause 4.5 of the JVA, 1MDB was required to repay PetroSaudi's loan by September 30, 2009.

89.     In fact, clause 4.5 of the JVA required the 1MDB-PetroSaudi JV, rather than 1MDB itself, to repay PetroSaudi for the purported loan.  Furthermore, by the JVA's terms, the repayment of the loan could be made only after notice was provided to both 1MDB and PetroSaudi and both entities approved the repayment.  However, prior to October 3, 2009, the 1MDB Board was never told about a purported loan from PetroSaudi to the 1MDB-PetroSaudi JV.

90.     At no point prior to the execution of the Joint Venture, or in the Board meetings held shortly thereafter to discuss the transaction, did 1MDB OFFICER 1 or 2 inform the 1MDB Board that funds from 1MDB had been sent to Good Star.

## F.     AN ADDITIONAL $330 MILLION IN 1MDB FUNDS WAS DIVERTED TO LOW'S GOOD STAR ACCOUNT IN 2011

91.     An additional $330 million in 1MDB funds was subsequently funneled into the Good Star Account in 2011 under false pretenses.  Although these funds were intended to be transmitted to the 1MDB-PetroSaudi JV under a financing agreement signed by 1MDB and the 1MDB-PetroSaudi JV, the funds were instead transmitted via international wire transfers to the Good Star Account.  Although 1MDB officials were aware that these funds were not being sent to an account maintained by the 1MDB-PetroSaudi JV, this fact was withheld from Deutsche Bank.  J.P. Morgan correspondent bank records demonstrate that funds were transferred to LOW's Good Star Account.

92.     On or about June 14, 2010, the 1MDB-PetroSaudi JV entered into a loan agreement with 1MDB called a Murabaha Financing Agreement ("MFA").  Under the MFA, 1MDB agreed to provide the 1MDB-PetroSaudi JV with a loan at an annual rate of return of 8.75%.

93.     On or about May 12, 2011, the 1MDB-PetroSaudi JV issued to 1MDB a Notice of Drawing (the "Notice").  The Notice was signed by the PETROSAUDI CEO on behalf of the 1MDB-PetroSaudi JV and requested that 1MDB transmit $330 million to the Good Star Account.

94.     J.P. Morgan correspondent bank records show that between May 20 and October 25, 2011, $330,000,000 was transferred from 1MDB to the Good Star Account over four wire transfers ("$330 million wire transfers").  Each of these transfers was a foreign exchange transaction completed through financial institutions in Malaysia, including AmBank and Deutsche Bank, and was processed through a U.S. correspondent bank account at J.P. Morgan Chase.  The following is a summary of the 2011 transfers from 1MDB to the Good Star Account:

**Table 1:  2011 Transfers from 1MDB to the Good Star Account**

| Date[8] | Amount | Originating Bank | U.S. Correspondent Bank |
|---|---|---|---|
| May 20, 2011 | $30,000,000 | AmBank | J.P. Morgan Chase |
| May 23, 2011 | $65,000,000 | AmBank | J.P. Morgan Chase |
| May 27, 2011 | $110,000,000 | Deutsche Bank | J.P. Morgan Chase |
| Oct. 25, 2011 | $125,000,000 | AmBank | J.P. Morgan Chase |

95.     On or about May 23, 2011, 1MDB's Chief Financial Officer wrote a letter to a Bank Negara official misrepresenting the identity of the recipient of the 1MDB funds being disbursed under the MFA.  In the letter, the 1MDB official thanked Bank Negara for having approved the transmission of $330 million to the 1MDB-PetroSaudi

---

[8] The dates of wire transfers may vary, even among different records for the same wire transfer, based, for example, on time zone differences and/or the lapse of time between the initiation of the wire, the crediting of funds to the correspondent bank, and the crediting of funds to the beneficiary bank.

JV and explained that "1MDB-PSI has requested us to remit the funds to the account of its parent company, PetroSaudi International Limited ("PSI Limited") instead of the account of 1MDB-PSI."  In truth, however, these funds were not being sent to PetroSaudi, but to Good Star.

96.     On or about May 25, 2011, the PETROSAUDI CEO sent 1MDB a letter on behalf of PetroSaudi and the 1MDB-PetroSaudi JV.  This letter confirmed that the account at RBS Coutts in Switzerland had received the $30 million and the $65 million wires referenced in the table above.  However, the PETROSAUDI CEO requested that 1MDB send to RBS Coutts a "SWIFT CLARIFICATION" explaining that the beneficiary of these wire transfers was actually "Account No. XXX.2000" (the Good Star Account) and not "Petrosaudi International Limited."[9]

97.     The PETROSAUDI CEO's statement in the May 25, 2011, letter that the funds were not going to "Petrosaudi International Limited" was materially inconsistent with the representation made by 1MDB OFFICER 2 in the September 30, 2009, email to Deutsche Bank, described above in paragraph 76, in which 1MDB OFFICER 2 stated that Good Star was a wholly-owned subsidiary of PetroSaudi.

98.     On or about May 27, 2011, 1MDB OFFICER 2 signed a letter of instruction, addressed to Deutsche Bank, requesting that an additional $110 million be transferred from 1MDB to the Good Star Account.

## G.     FUNDS MISAPPROPRIATED FROM 1MDB WERE TRANSFERRED TO THE CO-FOUNDER OF PETROSAUDI AND THEREAFTER TO MALAYSIAN OFFICIAL 1

99.     As set forth above, between September and October 2009, $700 million was fraudulently diverted from 1MDB to the Good Star Account.  An additional $330 million

---

[9] All but the last four digits of the account number identified in PETROSAUDI CEO's May 25, 2011, letter have been redacted pursuant to Federal Rule of Civil Procedure 5.2.  The full account number listed in the PETROSAUDI CEO's letter matches the account number for the Good Star Account.

32

was fraudulently diverted from 1MDB to the Good Star Account between May and October 2011. According to J.P. Morgan Chase banking records, between February and June of 2011, approximately $24,500,000 of these funds was transferred to an account at Riyad Bank maintained in the name of a Saudi prince who, together with the PETROSAUDI CEO, co-founded PetroSaudi ("PETROSAUDI CO-FOUNDER"). From those funds, $20,000,000 was then transferred, within days, to an account belonging to MALAYSIAN OFFICIAL 1.

100. J.P. Morgan correspondent bank records show two transfers of funds from the Good Star Account to the account of the PETROSAUDI CO-FOUNDER at Riyad Bank ("PSI Co-Founder Account"): (i) one for approximately $12,500,000 on or about February 18, 2011, and (ii) another for approximately $12,000,000 on or about June 10, 2011.

101. Correspondent bank records from J.P. Morgan Chase and Wells Fargo show that days after the transfers from the Good Star Account to the PSI Co-Founder Account, approximately $20,000,000 in funds was transferred from the PSI Co-Founder Account to an account at AmBank, whose beneficiary is listed as "AMPRIVATE BANKING-MR" ("AMPRIVATE BANKING-MR Account"). More specifically, the AMPRIVATE BANKING-MR Account received (i) a wire of approximately $10 million on or about February 23, 2011, roughly five days after the PETROSAUDI CO-FOUNDER received $12.5 million from the Good Star Account, and (ii) another wire for approximately $10 million on or about June 13, 2011, roughly three days after the PETROSAUDI CO-FOUNDER received $12 million from the Good Star Account. These funds transferred into and out of the PSI Co-Founder Account are summarized below:

**Table 2:  Transfers from Good Star to the PETROSAUDI CO-FOUNDER to MALAYSIAN OFFICIAL 1**

| Date | Credits into PSI Co-Founder Account | | Debits from PSI Co-Founder Account | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 2/18/2011 | Good Star Account | $12,500,000 | | |
| 2/23/2011 | | | $10,000,000 | AMPRIVATE BANKING-MR Account |
| 6/10/2011 | Good Star Account | $12,000,000 | | |
| 6/13/2011 | | | $10,000,000 | AMPRIVATE BANKING-MR Account |

102.   Plaintiff alleges on information and belief that MALAYSIAN OFFICIAL 1 is the ultimate beneficiary of the AMPRIVATE BANKING-MR Account.  The AMPRIVATE BANKING-MR Account is the same account that later received certain payments totaling approximately $681 million in March 2013.  As set forth in Paragraph 263 below, the Attorney General of Malaysia has publicly stated that the account into which these $681 million payments were made belonged to MALAYSIAN OFFICIAL 1.

**H.    LOW LAUNDERED APPROXIMATELY $368 MILLION IN FUNDS DIVERTED FROM THE 1MDB JOINT VENTURE INTO THE UNITED STATES**

103.   LOW laundered hundreds of millions of dollars in proceeds from the foregoing unlawful activity into the United States for the personal benefit of himself and his associates.

34

104.   Between approximately October 21, 2009, and October 13, 2010, eleven wires totaling approximately $368 million were sent from the Good Star Account to an Interest on Lawyer Account held by the law firm Shearman & Sterling LLP in the United States ("Shearman IOLA Account").[10]

105.   More particularly, bank records show the following credits to the Shearman IOLA Account from the Good Star Account:

**Table 3:  Transfers from Good Star to the Shearman IOLA Account**

| Date | Amount | Notations on Wire Transfer |
|------|--------|----------------------------|
| 10/21/2009 | $148,000,000 | N/A |
| 1/20/2010 | $117,000,000 | A.PH52A1 C.PARK.W .NY (BID-USD 35M) B.AV. INVEST.(USD37.5M) C.STAKE V.H (USD 15M) D.VICEROY ST. M.H(USD 10M) E.PEARL ENERGY (THAILAND) USD 19.5M |
| 3/3/2010 | $35,059,875 | A)PH52A 1 CENT WW NYC(RENOV USD10M) B)AVIATION WORKCAPINC (5M+10559875) C)INC VICEROY HOTEL GR (USD 7M) D)INC RENOV BUDGET BHH (USD2.5M) |
| 5/13/2010 | $15,780,000 | BID PROCESS - ACQUISITION OF THE EDEN HOTEL  ROME (PREPARATION OF PARTIAL PORTION OF EQUITY) |

---

[10] Bank records demonstrate that Shearman maintained one control account into which each of the wire transfers from the Good Star Account referenced above was transferred.  In addition to this control account, Shearman maintained a number of client escrow accounts to which some client funds were distributed after their receipt.  References to the Shearman IOLA Account refer to the control account.

35

| Date | Amount | Notations on Wire Transfer |
|---|---|---|
| 6/23/2010 | $8,599,985 | BID PROCESS-ASCQUISITION OF 94 PICCADILLY RD LONDON (IN AND OUT CLUB)FOR HOTEL DEVELOPMENT + SERVICRESIDENCES (PROOF OF FUNDS) |
| 8/17/2010 | $2,799,985 | N/A |
| 8/31/2010 | $653,985 | ACQUISITION OF ASSETS/PROPERTY PAYMENT FOR EXTENSION |
| 9/3/2010 | $8,645,985 | ACQUISITION OF ASSETS/PROPERTY PARTBALANCE PAYMENT |
| 9/28/2010 | $5,999,985 | ACQUISITION OF ASSETS/PROPERTY (2 PCT BID. NEW YORK HELMSLEY HOTEL - USD300M |
| 9/28/2010 | $17,999,985 | ACQUISITION OF ASSETS /PROPERTY (FULL BALANCE PAYMENT + RENOVATION) |
| 10/13/2010 | $7,999,985 | ACQUISITION OF ASSETS/PROPERTY BID HELMSLEY HOTEL  NYC USD300M TRANCHE 2 |
| **Total:** | **$368,539,770.00** | |

106.   As described in further detail in Section V of the Complaint, funds transferred to the Shearman IOLA Account were then used by LOW and others to purchase assets and invest in business interests for their personal benefit, including, but not limited to, luxury real estate, a Beverly Hills hotel, a private jet, and a major Hollywood motion picture.

107.   In addition, funds transferred to Shearman were also used to fund the luxurious lifestyles enjoyed by LOW and his associates.  For instance, between on or about October 30, 2009, and June 18, 2010, a period of less than eight months, more than $85 million in funds traceable to the Good Star Account was wired from the

36

Shearman IOLA Account to Las Vegas casinos, luxury yacht rental companies, business jet rental vendors, a London interior decorator, and associates and family members of LOW, among others.

108.   For example, between October 2009 and October 2010, misappropriated 1MDB funds sent from the Good Star Account into the Shearman IOLA Account were transferred as follows: (i) approximately $12,000,000 in wires to Caesars Palace, a Las Vegas casino; (ii) approximately $13,400,000 in wires to the Las Vegas Sands Corp., the owner of the Venetian Las Vegas, another casino; (iii) a wire for approximately $11,000,000 to "Eric" TAN Kim Loong, an associate of LOW; (iv) approximately $4,000,000 in wires to Jet Logic Ltd., a luxury jet rental service; (v) a wire for approximately $3,500,000 to LOW's sister; (vi) a wire for approximately $3,080,000 to Rose Trading, a Hong Kong jeweler; (vii) approximately $2,698,000 in wires to Yachtzoo, a luxury yacht rental service; (viii) approximately $2,288,000 in wires to Argent Design Ltd., a United Kingdom-based interior designer; (ix) a wire for approximately $670,000 to Excel Air, a jet rental company; (x) approximately $460,000 in wires to Skyline Private Air, an aircraft rental company; and (xi) a wire for approximately $155,000 to Billiyon Air, a jet rental company.

I.   **LOW TRANSFERRED APPROXIMATELY $389 MILLION IN 1MDB FUNDS TO ANOTHER ACCOUNT CONTROLLED BY HIM BUT HELD IN THE NAME OF ABU DHABI-KUWAIT-MALAYSIA INVESTMENT CORPORATION (ADKMIC)**

109.   Over the course of five wire transfers between June 28, 2011, and September 4, 2013, approximately $389 million was transferred from the Good Star Account to an account at BSI Bank in Singapore held in the name of Abu Dhabi Kuwait Malaysia Investment Corp. ("ADKMIC BSI Account").  LOW is the beneficial owner of the ADKMIC BSI Account.

110.   In a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," that was emailed by LOW's brother to a New York business person on or about August 13, 2013, the Low family represented that "Mr. Jho Low founded the Abu Dhabi-Kuwait-Malaysia Investment Corporation in 2007 and together with third-party investment partners structured numerous multi-million dollar buyouts with interests in construction, real estate development (Putrajaya Perdana Berhad), water infrastructure (Loh & Loh Corporation Berhad), road concessions and oil & gas (UBG Berhad)."

111.   J.P. Morgan Chase correspondent bank account records show the following credits to the ADKMIC BSI Account from the Good Star Account:

**Table 4:  Transfers from Good Star to ADKMIC**

| Date | Amount |
|---|---|
| June 28, 2011 | $55,000,000 |
| September 4, 2012 | $38,000,000 |
| November 2, 2012 | $153,000,000 |
| December 27, 2012 | $142,500,000 |
| September 4, 2013 | $456,027 |

As described below, the funds transferred to the ADKMIC BSI Account were then used by LOW and others to acquire assets in the United States, among other things.

## III.   THE AABAR-BVI PHASE:  APPROXIMATELY $1.367 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE AABAR-BVI PHASE

112.   In 2012, approximately $1.367 billion in 1MDB funds that were raised in two separate bond offerings were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in

the publication and disclosure of two offering circulars that contained material misrepresentations and omissions relating to:

a. How the proceeds of these bond issuances would be used,

b. The nature of the relationship between the issuer (*i.e.*, subsidiaries of 1MDB) and the bond's third-party guarantor (*i.e.*, the International Petroleum Investment Company of Abu Dhabi ("IPIC")), and

c. The existence of any related-party transactions connected to the 2012 bond issuances, including that 1MDB officials, IPIC officials, and their associates would personally benefit from the issuance of these bonds.

113. After more than $1 billion had been misappropriated from 1MDB between 2009 and 2011 in the Good Star Phase, 1MDB needed to raise additional capital to fund its operations. As set forth in greater detail below, 1MDB engaged Goldman to arrange and underwrite two separate bond offerings in 2012. One of the stated purposes of the 2012 bond issues was to raise funds to allow 1MDB to acquire certain energy assets.

114. IPIC, an investment fund wholly-owned by the government of Abu Dhabi, guaranteed, either directly or indirectly, both 2012 bond offerings and, in exchange, a nominated subsidiary of IPIC was granted an option to purchase a minority share of the energy assets acquired by 1MDB.

115. Almost immediately after receiving the proceeds of each of the 2012 bond issues, 1MDB wire transferred a substantial portion of the proceeds – totaling approximately $1.367 billion between the two bond sales, or more than forty percent of the net proceeds raised – to a Swiss bank account belonging to an entity called Aabar Investments PJS Limited, a British Virgin Islands-registered corporation (referred to herein as "Aabar-BVI") that bears a similar name to a legitimate subsidiary of IPIC, called Aabar Investments PJS (referred to herein as "Aabar"). At the time of these transfers, Khadem Abdulla al-QUBAISI ("QUBAISI") was the Managing Director of IPIC and the Chairman of Aabar; and Mohamed Ahmed Badawy Al-HUSSEINY

("HUSSEINY") was the CEO of Aabar.  QUBAISI and HUSSEINY were also directors of Aabar-BVI.

116.   In their audited financial statements for the year ending on March 31, 2014, 1MDB booked their substantial payments to Aabar-BVI as an asset rather than a payment, describing it as a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.

117.   Following the dismissal of QUBAISI and HUSSEINY from their positions at IPIC and Aabar in 2015, IPIC and Aabar have recently clarified that Aabar-BVI is not owned by either entity.

118.   The Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to siphon off proceeds of the two 2012 bond sales for the personal benefit of individuals affiliated with IPIC, Aabar, and 1MDB, as well as their associates. Beginning within days of receiving funds from 1MDB, Aabar-BVI transferred a total of approximately $636 million to the Singapore bank account held by Blackstone Asia Real Estate Partners ("Blackstone Account").  During this same time period, Aabar-BVI transferred, through multiple overseas investment funds, an additional approximately $465 million to the Blackstone Account.  The beneficial owner of the Blackstone Account was identified in bank records as "Eric" TAN Kim Loong ("TAN"), a Malaysian national and an associate of LOW.

119.   Funds transferred to the Blackstone Account by Aabar-BVI were subsequently distributed to officials of IPIC, Aabar, and 1MDB.  Between approximately May and November 2012, shortly after Blackstone's receipt of funds from the Aabar-BVI Swiss Account, Blackstone transferred $472,750,000 into a Luxembourg account beneficially owned by QUBAISI.  During roughly the same time period, Blackstone transferred $66,600,000 into two different accounts beneficially owned by HUSSEINY. In October and November 2012, Blackstone transferred $30,000,000 to an account belonging to MALAYSIAN OFFICIAL 1.  Finally in December 2012, Blackstone

transferred $5 million to a Swiss account beneficially owned by 1MDB OFFICER 3, who was then 1MDB's General Counsel and Executive Director of Group Strategy.

120.   Shortly after receiving proceeds of the two 2012 bond sales from 1MDB, Aabar-BVI also transferred $238,000,000 to a Singapore bank account belonging to Red Granite Capital, an entity owned by Riza Shahriz Bin Abdul AZIZ ("AZIZ").  AZIZ is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  Among other things, AZIZ used these funds to purchase luxury real estate in the United States and the United Kingdom for his personal benefit, and to fund his movie production company, Red Granite Pictures.  1MDB has disclaimed any investment interest in Red Granite Pictures.

## B.   IN 2012, 1MDB ISSUED $3.5 BILLION IN BONDS IN TWO SEPARATE OFFERINGS ARRANGED BY GOLDMAN

### 1.   *May 21, 2012, Bond Issue*

121.   At least as early as January 2012, officials at 1MDB approached Goldman for financial advice in connection with 1MDB's anticipated acquisition of certain power assets in Malaysia.

122.   On or about March 2, 2012, 1MDB Energy Limited ("1MDB Energy"), a wholly-owned subsidiary of 1MDB, entered into a Sale and Purchase Agreement to acquire Tanjong Energy Holdings Sdn Bhd ("Tanjong Energy"), a power production company, from Tanjong Power Holdings Sdn Bhd ("Tanjong Power") for MYR 8.5 billion, or approximately $2.755 billion U.S. dollars.  1MDB planned to raise MYR 6 billion of this MYR 8.5 billion through the local bank market.[11]

123.   1MDB engaged Goldman to assist in securing financing for the remaining MYR 2.5 billion necessary to complete the Tanjong deal.  By letter dated March 19, 2012, 1MDB engaged Goldman, through its Singapore office, as the "sole bookrunner and arranger" for debt financing in connection with its capital needs for the Tanjong

---

[11] Hereinafter, unless otherwise specified, references to 1MDB include 1MDB's wholly-owned subsidiaries.

acquisition.  The engagement letter was signed by 1MDB OFFICER 2 and a Managing Director of Goldman Sachs (Singapore) Pte. ("Goldman Managing Director").  Within Goldman, this bond deal was referred to by the name "Project Magnolia."

124.   1MDB OFFICER 3 served as a primary point of contact between 1MDB and Goldman concerning the Project Magnolia bond transaction.

125.   Electronic communications among Goldman employees during the lead-up to the May 21, 2012, bond closing date reflect that employees at Goldman offered differing information about the nature of LOW's relationship to 1MDB and/or his role in the bond deal and the procurement of the IPIC guarantee:

a.   In an email dated March 27, 2012, a managing director at Goldman-Asia referred to LOW as "the 1MDB Operator or intermediary in Malaysia."

b.   In approximately early April 2012, other Goldman employees discussed whether LOW was involved in the Project Magnolia deal on behalf of 1MDB. In an email dated April 3, 2012, a Goldman employee noted "that Jho Low is also known to have close friends/ contacts in Abu Dhabi."  In an email response dated April 3, 2012, another Goldman employee wrote: "[Goldman Managing Director] said Jho Low [was] not involved at all in deal as far as he aware [sic] but that Low was present when [Goldman Managing Director] met . . . [the] Chairman of IPIC, in Abu Dhabi."

126.   The offering circular for the Project Magnolia bonds, dated May 18, 2012, indicates that 1MDB Energy issued $1.75 billion in privately-placed notes, with an interest rate of 5.99% per annum, redeemable in 2022.  The closing date of the bond issue was May 21, 2012.  The net proceeds were projected to be approximately $1,553,800,000, once Goldman's fees, commissions, and expenses were deducted.

127.   The offering circular represented that the net proceeds of the bond issue were to be used to "partially fund" the acquisition of Tanjong Energy.  Of the approximately $1,553,800,000 raised through the Project Magnolia bond sale, MYR 2.5 billion, or approximately $810 million, was designated in the offering circular for use in acquiring Tanjong Energy.  The remainder of the net proceeds, approximately $744

42

million, was designated for "general corporate purposes (which may include future acquisitions)."

128.   Internal documentation prepared by Goldman summarizing the bond transaction indicates that the "general corporate purposes" for which the bond proceeds were contemplated included "pre-fund guarantee fees to IPIC, cash on balance sheet, and transaction related expenses."

129.   In reality, however, nearly $577 million – a sum equivalent to more than one third of the net proceeds of the Project Magnolia bond offering – was diverted to Aabar-BVI within one day of 1MDB's having received the proceeds of the bond offering.  Nothing in the offering circular disclosed that 1MDB would transfer any of the bond proceeds to Aabar-BVI, or that funds transferred to Aabar-BVI would subsequently be used for the benefit of officials at 1MDB, IPIC, and Aabar, including QUBAISI, IPIC's Chairman, and HUSSEINY, Aabar's CEO.

130.   In exchange for Goldman's services in arranging the bond offering and in underwriting the notes, 1MDB agreed to pay Goldman: (a) a fee of 1% of the principal amount of the notes, or $17.5 million, as an "Arranger Fee," and (b) $175,000,000, as a "Commission," for a total of $192,500,000.  These fees amount to roughly 11% of the principal amount of the offering and were to be deducted directly from the subscription proceeds of the bonds.

131.   The notes issued by 1MBD Energy as part of Project Magnolia were guaranteed by 1MDB.  The notes were also jointly and severally guaranteed by IPIC, which enabled 1MDB to obtain a better credit rating and, thus, a more favorable interest rate on the bonds.  QUBAISI signed the Representation Agreement between IPIC and Goldman in which IPIC agreed to jointly guarantee the $1.75 billion in notes.  Pursuant to an "Interguarantor Agreement" between 1MDB and IPIC, dated May 21, 2012, 1MDB agreed to "procure Ministry of Finance Inc to provide the necessary funding and support to repay IPIC" any amounts payable and due under the notes.  That agreement was signed by QUBAISI and 1MDB OFFICER 2.

43

132.   A document prepared by Goldman for IPIC entitled "IPIC: Meeting With Ratings Agencies, Topics to Discuss," characterized IPIC's joint guarantee for the 1MDB bond issue as "unusual by previous IPIC standards."  It went on to indicate that the guarantee was "expected to cement the strategic partnership between 1MDB and IPIC which is in line with IPIC's broader investment strategy in the energy and related sectors globally and 1MDB's mission to promote foreign direct investment into Malaysia."

133.   The offering circular, however, contained misleading statements and omitted material facts necessary to make its representations not misleading regarding the consideration received by IPIC in exchange for guaranteeing 1MDB's bonds.  For example, the offering circular indicated that in exchange for IPIC's guarantee, 1MDB granted "a nominated subsidiary of IPIC a right to acquire a substantial minority interest of the share of capital in 1MDB Energy" within a ten-year period.  In reality, however, this option was actually awarded to Aabar-BVI, which was neither owned by nor affiliated with IPIC, as described further below.

134.   The consideration given by 1MDB in exchange for IPIC's guarantee was set forth in a May 18, 2012, "Option Agreement" between 1MDB Energy and "Aabar Investments PJS Limited, a company incorporated in the British Virgin Islands" (*i.e.*, Aabar-BVI).  In that agreement, 1MDB Energy granted Aabar-BVI the option to purchase, within a ten-year period, up to forty-nine percent (49%) of 1MDB Energy's shares in the holding company that acquired Tanjong Energy, for a maximum price of up to MYR 1,225,000,000.  The agreement specified that this call option was granted to Aabar-BVI "[i]n consideration of [Aabar-BVI] procuring the Guarantee from IPIC and the sum of United States Dollar One (USD1.00) paid by [Aabar-BVI] to [1MDB Energy]. . . ."  1MDB OFFICER 2 signed the agreement on behalf of 1MDB Energy, and HUSSEINY signed on behalf of Aabar-BVI.

44

1

### 2. *October 19, 2012, Bond Issue*

2

135.   At least as early as approximately June 2012, 1MDB sought financial

3

advice from Goldman in connection with its anticipated acquisition of power assets from

4

Genting Berhad, a Malaysian entity, and sought Goldman's assistance in raising an

5

additional tranche of capital to acquire those assets.  As with the Project Magnolia bond

6

deal, 1MDB elected to have the bond issue fully underwritten by Goldman for an

7

additional fee.  Within Goldman, this private placement bond transaction was referred to

8

by the name "Project Maximus."

9

136.   1MDB OFFICER 3 served as the primary point of contact between 1MDB

10

and Goldman concerning the Project Maximus transaction.

11

137.   1MDB entered into an agreement to purchase power assets from Genting

12

Berhad ("Genting") on or about August 13, 2012.  That same day, 1MDB created

13

another wholly-owned subsidiary called "1MDB Energy (Langat) Limited" ("1MDB

14

Energy Langat"), for the purposes of holding the power assets and issuing debt securities

15

to fund the acquisition Genting power assets.

16

138.   The offering circular for Project Maximus, dated October 17, 2012,

17

indicated that 1MDB issued $1.75 billion in bonds through its second private placement

18

with Goldman, with a closing date of October 19, 2012.  The notes had an interest rate of

19

5.75% per annum and were redeemable in 2022.  The net proceeds of the bond sale –

20

once Goldman's fees, commissions, and expenses were deducted – were listed in the

21

offering circular as approximately $1,636,260,000.

22

139.   The offering circular represented that the net proceeds of the Project

23

Maximus bond sale were to be used by 1MDB Energy Langat, in part, to satisfy its

24

obligations under its agreement to acquire power assets from Genting Berhad.

25

Specifically, the offering circular represents that 1MDB Energy Langat intended to use

26

approximately $692,357,349 of the approximately $1,636,260,000 in net proceeds for

27

the purpose of the Genting acquisition, and it intended to use the balance of the proceeds

28

"for general corporate purposes (which may include future acquisitions)."

140.   In truth, however, as explained in paragraphs 152-153 below, $790,354,855 – a sum equivalent to roughly half of the net proceeds of the Project Maximus bond offering – was diverted to Aabar-BVI on or about the same day that 1MDB received the proceeds of this bond sale.  As with Project Magnolia, the offering circular for Project Maximus nowhere disclosed that nearly half of the net bond proceeds would be transferred to Aabar-BVI, in the form of "collateral" or otherwise, or that funds transferred to Aabar-BVI would subsequently be used for the personal benefit of officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY.

141.   1MDB guaranteed the notes issued by 1MDB Energy Langat.  Although IPIC did not directly guarantee the Project Maximus notes as it had with the Project Magnolia bonds, it nevertheless agreed to privately secure the bonds on a bilateral basis with Goldman.  No reference to IPIC's indirect guarantee was included in the offering circular.  The consideration given for that guarantee was set forth in an October 17, 2012, agreement entitled "Collaboration Agreement (Option)," entered into between 1MDB Energy Langat and "Aabar Investments PJS, a joint stock company organized under the laws of Abu Dhabi."  That agreement stated that, "[i]n consideration of Aabar Investments procuring the Guarantee from IPIC and the sum of United States Dollar One (USD1.00) paid by Aabar Investments to [1MDB]," 1MDB granted Aabar the option to acquire a forty-nine percent (49%) interest in 1MDB Energy Langat within a ten year period.

142.   Taken together, in 2012, 1MDB issued $3.5 billion in bonds that were underwritten by Goldman and guaranteed by IPIC.

## C.   A SUBSTANTIAL PORTION OF THE PROCEEDS OF THE 2012 BOND SALES WAS DIVERTED TO AND THROUGH THE AABAR-BVI SWISS ACCOUNT

143.   Over the course of several months, a large portion of the proceeds of both of the 2012 bond sales – approximately $1.367 billion in total – was transferred from

46

1MDB to a bank account at BSI Bank in Switzerland held in the name of Aabar-BVI. Plaintiff alleges on information and belief that the funds transferred to the Aabar-BVI Swiss Account by 1MDB were not held for the benefit of 1MDB, IPIC, or Aabar. Rather, the Aabar-BVI Swiss Account was used to unlawfully divert proceeds of both the Project Magnolia and Project Maximus bonds, which were thereafter used, after having passed through various accounts, to make substantial payments to QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and 1MDB OFFICER 3.

> 1. *On or about May 22, 2012, Within Roughly One Day of the First Bond Issue, Approximately $577 Million in 1MDB Funds Was Diverted to the Aabar-BVI Swiss Account*

144. The closing date for the Project Magnolia bonds was on or about May 21, 2012. Documentation associated with the bond deal shows that a total of $650,000,000 was to be deducted from the proceeds and remitted directly to accounts designated by Tanjong Power, the entity from which 1MDB Energy had agreed to purchase Tanjong Energy.

145. On or about May 21, 2012, a total of $907,500,000 in proceeds from the bond sale was transferred, at the direction of Bank of New York–London, from an account at Bank of New York Mellon–New York in the United States to an account at Falcon Private Bank Limited ("Falcon Bank") held by 1MDB Energy.

146. Roughly one day later, on or about May 22, 2012, a wire in the amount of $576,943,490 was sent from 1MDB Energy's bank account at Falcon Bank to an account at BSI Bank in Lugano, Switzerland maintained by Aabar-BVI (*i.e.*, the "Aabar-BVI Swiss Account"). This amount represents more than one third of the net proceeds from the bond sale. The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.

147. Nothing in the Project Magnolia offering circular disclosed that any funds would be sent to Aabar-BVI, let alone one third of the net bond proceeds.

148.   Falcon Bank is wholly-owned by Aabar, and at the time that the $576,943,490 was transferred from 1MDB Energy's bank account at Falcon Bank to the Aabar-BVI Swiss Account, HUSSEINY was Falcon Bank's Chairman.

> 2.   *On or about October 19, 2012, Roughly the Same Day as the Second Bond Issue, Approximately $790 Million in 1MDB Funds Was Diverted to the Aabar-BVI Swiss Account*

149.   The proceeds from the Project Maximus bonds, which were issued on or about October 19, 2012, were transferred according to a similar pattern.

150.   1MDB directed that payment of the proceeds of the Project Maximus bond sale, totaling $1,640,000,000, be made on October 19, 2012, to 1MDB Energy Langat's account at Falcon Bank, via Falcon Bank's U.S. correspondent bank account at J.P. Morgan Chase.

151.   On or about October 19, 2012, 1MDB Energy Langat wired $692,174,991 from its account at Falcon Bank in Switzerland to an account at Citibank–Singapore belonging to Genting Power Holdings Limited in connection with the purchase of power assets.

152.   On or about that same day (that is, October 19, 2012), 1MDB wire transferred $790,354,855 to the Aabar-BVI Swiss Account.  This sum represents close to fifty percent (50%) of the net proceeds of the October 19, 2012 bond sale.  The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.

153.   Nothing in the Project Maximus offering circular disclosed that any portion of the funds, let alone close to fifty percent of the net proceeds of the bond sale, would be funneled to Aabar-BVI in the form of "collateral" or otherwise.

154.   Collectively, between the two 2012 bond sales, officials at 1MDB transferred approximately $1.367 billion in bond proceeds to the Aabar-BVI Swiss Account.  This represented more than forty percent (40%) of the total net proceeds of the two bond sales.

### 3. *Funds Transferred to the Aabar-BVI Swiss Account Were Not Held for the Benefit of 1MDB, IPIC, or Aabar*

155. Aabar Investments PJS Limited (referred to herein as "Aabar-BVI") is an entity incorporated in the British Virgin Islands ("BVI") and is separate and distinct from the similarly-named Aabar Investments PJS (referred to herein as "Aabar"), which is controlled by IPIC and is incorporated in Abu Dhabi.

156. A Certificate of Incumbency prepared by Aabar-BVI's registered agent in the BVI indicates that Aabar-BVI was incorporated in BVI on March 14, 2012. That certificate lists QUBAISI and HUSSEINY as Aabar-BVI's Directors and "Aabar Investments PJS" as its sole shareholder.

157. It is possible to register an entity with a name that mimics the name of an existing entity, without the need to prove any relationship to the existing entity. This is a common technique to lend the entity in question an appearance of legitimacy. It is also possible to incorporate an entity in the BVI without providing evidence of the entity's true beneficial ownership and without providing evidence of the relationship between the entity and the shareholder listed in the incorporation records.

158. Irrespective of any apparent nominal relationship between Aabar-BVI and Aabar reflected in incorporation records, Aabar-BVI was not a legitimate subsidiary of Aabar or IPIC operating within the bounds of any authority granted by Aabar or IPIC, and the funds transmitted from 1MDB to the Aabar-BVI Swiss Account were not held in that account for the benefit of 1MDB, IPIC, or Aabar.

159. Neither of the offering circulars contain any mention of an agreement by 1MDB to pay Aabar-BVI, either as a premium or as collateral, more than forty percent (40%) of the net proceeds from the two 2012 bond sales in order to secure the guarantees. This information would have been material to the transactions, because it would have significantly affected 1MDB's liquidity, as well as its ability to engage successfully in the business ventures described in the offering circulars, and thereby increased the risk of default.

160.   As noted in Paragraph 56, the Malaysian Public Accounts Committee ("PAC") initiated an audit of certain 1MDB financial transactions and produced a public report of its findings.  Auditors working at the direction of the PAC concluded that the $1.367 billion "security deposit" payments made to Aabar-BVI in 2012 were "made without the approval of the 1MDB Board of Directors."

161.   On or about April 11, 2016, IPIC and Aabar issued a statement to the London Stock Exchange in response to media reports indicating that a BVI entity called Aabar Investments PJS Limited had received substantial payments from 1MDB.  In that statement, IPIC and Aabar stated that, "Aabar BVI was not an entity within either corporate group" and that neither IPIC nor Aabar "has received any payments from Aabar BVI. . . ."

162.   In response to IPIC's statement to the London Stock Exchange, 1MDB issued a press release on April 11, 2016, in which 1MDB indicated that it paid Aabar-BVI "substantial sums" in 2012, as recorded in its financial statements.  That same release also asserted that, "1MDB company records show documentary evidence of the ownership of Aabar BVI and of each payment made, pursuant to various legal agreements that were negotiated with Khadem Al Qubaisi in his capacity as Managing Director of IPIC & Chairman of Aabar and/or with Mohamed Badawy Al Husseiny, in his capacity as CEO of Aabar."

163.   QUBAISI and HUSSEINY were dismissed from their positions at IPIC and Aabar in 2015.

164.   In June 2016, IPIC filed its consolidated financial statements for the year ending December 31, 2015, with the London Stock Exchange.  In those financial statements, IPIC indicated that it "understands that other companies outside the group's corporate structure were incorporated in other offshore jurisdictions using variations of the 'Aabar' name.  The Group is investigating these entities further."  IPIC reiterated that neither it nor Aabar were affiliated with, or received payments from, Aabar-BVI. Finally, IPIC indicated that after 1MDB defaulted on two interest payments due under

50

the 2012 notes in the first half of 2016, IPIC made interest payments totaling $103 million on 1MDB's behalf "pursuant to its obligations in respect of the Guarantees."

165.   As set forth below, funds transferred from 1MDB to the Aabar-BVI Swiss Account were distributed, inter alia, to officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY, with several payments occurring within days of the receipt of 1MDB funds by Aabar-BVI.  Plaintiff alleges on information and belief that the Aabar-BVI Swiss Account was used to conceal and to facilitate this unlawful diversion of funds.

## D.   AABAR-BVI TRANSFERRED APPROXIMATELY $1.1 BILLION TO THE BLACKSTONE ACCOUNT, BEGINNING WITHIN DAYS OF RECEIVING FUNDS FROM 1MDB

166.   Of the approximately $1.367 billion 1MDB sent to Aabar-BVI by 1MDB, approximately $1.1 billion was thereafter transferred, either directly or indirectly via overseas investments funds, into the Blackstone Account.  The Blackstone Account was controlled by TAN, a close associate of LOW.  Plaintiff alleges on information and belief that the Blackstone Account was used as a transit account to improperly distribute funds to individuals affiliated with 1MDB, IPIC, and Aabar.

*1.   Aabar-BVI Transferred Approximately $636 Million Directly to the Blackstone Account, Beginning Within Days of Receiving Funds from 1MDB*

167.   Between approximately May 25, 2012, and December 14, 2012, five wire transfers totaling $636,000,000 were sent from the Aabar-BVI Swiss Account to an account at Standard Chartered Bank in Singapore held in the name of Blackstone Asia Real Estate Partners ("Blackstone").  These wire transfers were processed through correspondent bank accounts at Standard Chartered Bank and Citibank in the United States.  The approximate dates and amounts of these five wires appear below:

**Table 5:  Wire Transfers from Aabar-BVI Swiss Account to Blackstone**

| Date | Amount | Sending Party | Receiving Party |
|---|---|---|---|
| 5/25/2012 | $295,000,000 | Aabar-BVI | Blackstone |
| 7/25/2012 | $133,000,000 | Aabar-BVI | Blackstone |
| 10/23/2012 | $75,000,000 | Aabar-BVI | Blackstone |
| 11/23/2012 | $95,000,000 | Aabar-BVI | Blackstone |
| 12/14/2012 | $39,000,000 | Aabar-BVI | Blackstone |

168.   TAN was identified as the beneficial owner of the Blackstone Account and an authorized signatory on the account.  The account was originally opened in the name of Foreign FX Trading Limited.  The account name was changed to Blackstone Asia Real Estate Partners on or about May 26, 2011.

169.   TAN is a friend and associate of LOW.  Plaintiff alleges on information and belief, however, that TAN's only connection to 1MDB was his relationship with LOW.

170.   Bank statements show that prior to the wire transfer of $295,000,000 from Aabar-BVI on or about May 25, 2012, the account balance for the Blackstone Account was $532,981.

171.   Plaintiff alleges on information and belief that Blackstone was a shell corporation created for the purpose of maintaining a bank account to funnel diverted money, based on the following facts and circumstances, among others:

a.   The flow of money into and out of the Blackstone Account is not consistent with what can reasonably be characterized as regular business activity.  For example, the account did not have the types of debits and credits consistent with legitimate business activity, including, for example, transfers to vendors, payroll, or receipt of proceeds from customers.

b.   Blackstone made extensive use of a money exchange business in Singapore called Raffles Cash Exchange.  Between approximately July 2011 and February 2013, twenty wires were sent from the Blackstone Account to Raffles Cash

Exchange, totaling approximately $12,800,000.  Frequent use of currency exchange brokers, especially for large sums and where the entity already maintains an account at a major bank capable of processing currency exchanges, is a technique commonly used by individuals engaged in money laundering and other unlawful conduct to move money in a way that is less likely to be traced by law enforcement and regulatory officials.

    c. Blackstone's full name – Blackstone Asia Real Estate Partners – is similar, though not identical, to the name of a major real estate private equity firm, Blackstone Real Estate.   Blackstone Real Estate is an affiliate of the well-known private investment firm Blackstone Group – an entity listed on the New York Stock Exchange – and has, according to its website, $101 billion in assets under management. The practice of utilizing a bank account held by an entity with a name that mimics a well-known commercial enterprise is a technique commonly employed to lend the appearance of legitimacy to transactions that might otherwise be subject to additional scrutiny by the financial institutions involved, for example, because of the size of the transaction or because of the role of a politically-exposed person or entity in the transaction.

    *2.* *Aabar-BVI Transferred an Additional Approximately $455 Million to the Blackstone Account Via Overseas Investment Funds*

  172. Within days of Aabar-BVI's receipt of proceeds from the Project Maximus bond offering, an additional $455,000,000 was transferred from the Aabar-BVI Swiss Account to the Blackstone Account via two overseas investment funds.

  173. On or about October 22, 2012 – roughly six days after the Project Maximus bond issue and four days after Aabar-BVI received approximately $790 million from 1MDB Energy Langat – Aabar-BVI sent approximately $75 million to a bank account at ING Bank N.V. in Amsterdam belonging to Enterprise Emerging Markets Fund ("Enterprise").  On or about the same day, Aabar-BVI also sent approximately $291 million to another bank account at ING Bank N.V. in Amsterdam belonging to

Cistenique Investment Fund ("Cistenique"). On or about November 2, 2012, Aabar-BVI sent an additional approximately $97 million to Enterprise. In the case of each of these three payments, the funds were transferred from Aabar-BVI via the clearing company Citco, before being transferred on to either Enterprise or Cistenique.

174. Enterprise and Cistenique are relatively small investment funds located in Curacao that have other customers and hold investments unrelated to 1MDB.

175. Shortly after Cistenique and Enterprise received funds from Aabar-BVI, each transferred a substantially similar amount to the Blackstone Account. More particularly:

a.   On or about October 24, 2012, roughly two days after receiving approximately $291,000,000 from Aabar-BVI, Cistenique transferred $285,000,000 to the Blackstone Account.

b.   On or about October 24, 2012, approximately two days after receiving approximately $75,000,000 from Aabar-BVI, Enterprise transferred $75,000,000 to the Blackstone Account. On or about November 8, 2012, approximately six days after receiving $97,000,000 from Aabar-BVI, Enterprise transferred an additional $95,000,000 to the Blackstone Account, for a total of $170,000,000.

176. Cistenique and Enterprise were used as intermediaries to pass $455,000,000 from Aabar-BVI to the Blackstone Account.

\*\*\*

177. In total, between May and December 2012, approximately $1.1 billion was transferred directly or indirectly from the Aabar-BVI Swiss Account to the Blackstone Account.

54

**E.     AFTER RECEIVING FUNDS FROM AABAR-BVI, BLACKSTONE DISTRIBUTED APPROXIMATELY $574 MILLION TO OFFICERS OF IPIC, AABAR, AND 1MDB**

178.   Once funds were transferred from Aabar-BVI to Blackstone, they were used to make payments to QUBAISI and HUSSEINY, who served as officers of both Aabar and Aabar-BVI, to MALAYSIAN OFFICIAL 1, and to 1MDB OFFICER 3.  The distribution of these funds from the Blackstone Account for the personal benefit of officials involved in the bond deal further evidences a misappropriation of public funds and the diversion of the bond proceeds from their intended purpose.

179.   Neither of the offering circulars for the 2012 bonds contained any disclosure that a substantial portion of the proceeds of the bonds would be paid to officials of IPIC, Aabar, and 1MDB.  This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party transactions.  The representation that the proceeds of the two bond deals could be used for "other corporate purposes" of 1MDB does not encompass the use of those funds for the personal benefit of officials of IPIC, Aabar, or 1MDB.

180.   Although both offering circulars also contained boilerplate language about the limits of any "forward-looking statements," this boilerplate language similarly did not encompass the possibility that 1MDB would radically depart from the stated intended use of the bond proceeds almost immediately after the closing dates for each offering.  More specifically, each offering circular indicated generically that any "forward-looking statements" contained in the circular, such as those statements containing "will" or "expect," were "reasonable" at the time of the offering circular but were not meant to give "assurance that these expectations will prove to be correct" in the future.  This boilerplate language was intended, among other things, to give 1MDB business flexibility to respond to changed circumstances in the future; it did not, however, contemplate or convey the possibility that 1MDB would almost immediately

55

begin diverting the proceeds of the bond sale to Aabar-BVI and thereafter to accounts

beneficially owned by officials of 1MDB, IPIC, and Aabar.

    1. *Blackstone Transferred Approximately $473 Million to an Account*

      *Controlled by QUBAISI*

  181. Between approximately May 29, 2012, and November 30, 2012, four wires

totaling $472,750,000 were sent from the Blackstone Account to an account at Bank

Privee Edmond de Rothschild ("Bank Rothschild") in Luxembourg maintained in the

name of Vasco Investments Services SA ("Vasco Account").  These wires were

processed through a correspondent bank account at Standard Chartered Bank in the

United States.  As shown in the table below, each of these four wire transfers was made

within a matter of days after the Blackstone Account received funds from Aabar-BVI,

including two of the four that were made within about ten days of Aabar-BVI's receipt

of funds from 1MDB Energy:

**Table 6:  Chronology of Wire Transfers to Vasco Investments**

**in Relation to Other Related Transfers**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 5/22/2012 | 1MDB Energy | Aabar BVI | $576,943,490 |
| 5/25/2012 | Aabar BVI | Blackstone | $295,000,000 |
| 5/29/2012 | Blackstone | Vasco Investments | $158,000,000 |
| | | | |
| 7/25/2012 | Aabar BVI | Blackstone | $133,000,000 |
| 8/1/2012 | Blackstone | Vasco Investments | $100,750,000 |
| | | | |
| 10/19/2012 | 1MDB Energy Langat | Aabar BVI | $790,354,855 |
| 10/22-10/24/2012 | Aabar-BVI (via Enterprise) | Blackstone | $75,000,000 |
| 10/22-10/24/2012 | Aabar-BVI (via Cistenique) | Blackstone | $285,000,000 |
| 10/23/12 | Aabar BVI | Blackstone | $75,000,000 |
| 10/29/12 | Blackstone | Vasco Investments | $129,000,000 |

| 11/23/2012 | Aabar BVI | Blackstone | $95,000,000 |
| 11/30/2-12 | Blackstone | Vasco Investments | $85,000,000 |

182.   Vasco Investments Services SA is a BVI entity affiliated with QUBAISI, and QUBAISI is the beneficial owner of the Vasco Account.

183.   QUBAISI used a portion of the $472,250,000 transferred into the Vasco Account from Blackstone to acquire real property in the United States worth roughly $100 million, as described further in Section V.  The assets purchased with funds from the Vasco Account were not held by or used for the benefit of 1MDB or 1MDB's subsidiaries, nor were the assets held by or used for the benefit of IPIC or Aabar.

184.   QUBAISI's receipt of proceeds from 1MDB's 2012 bond sales for his own personal benefit is in contravention to his charge as Managing Director of IPIC. Pursuant to IPIC's Articles of Association, approved on November 30, 1999, "[n]either the Chairman nor the other Board members shall have a direct or indirect interest in the contracts and projects entered into, carried out or intended to be entered into or carried out by the Company and the Company shall not grant them any financial facilities."  To the extent that QUBAISI purported to be acting in his capacity as Managing Director of IPIC in connection with the above-described transactions relating to Aabar-BVI, including the receipt of 1MDB funds into the Aabar-BVI Swiss Account and the transfer of funds through the Blackstone Account to his own Vasco Account, he was acting *ultra vires*.

185.   Upon information and belief, at the time that LOW, TAN, and QUBAISI transferred or caused the transfer of funds from the Aabar-BVI Swiss Account to Blackstone using a U.S. correspondent bank account at Standard Chartered Bank, as well as at the time that LOW, TAN, and QUBAISI  transferred or caused the transfer of funds from Blackstone to the Vasco Account using a U.S. correspondent bank account at Standard Chartered Bank, as well as at the time that QUBAISI transferred or caused the transfer of funds from the Vasco Account into the United States for the purchase of real

57

property, LOW, TAN, and QUBAISI knew that the funds had been misappropriated from 1MDB and/or IPIC, and they intended to deprive 1MDB and/or IPIC of ownership over those funds.

2. *Blackstone Transferred $66.6 Million to an Account Controlled by HUSSEINY*

186. Between May and December 2012, entities belonging to HUSSEINY, then-CEO of Aabar, also received $66,600,000 from the Blackstone Account.

187. Between approximately May 29, 2012, and December 3, 2012, Blackstone sent four separate wire transfers, totaling $55,000,000, to an account at BHF Bank in Frankfurt, Germany, held in the name of Rayan Inc. ("Rayan").   Each of these four wire transfers was processed through a U.S. correspondent bank account at Standard Chartered Bank.  These wire transfers are summarized below:

**Table 7:  Wire Transfers from Blackstone to Rayan**

| Date | Sending Party | Receiving Party | Amount |
|------|--------------|-----------------|--------|
| 5/29/2012 | Blackstone | Rayan | $30,000,000 |
| 7/13/2012 | Blackstone | Rayan | $5,000,000 |
| 11/2/2012 | Blackstone | Rayan | $10,000,000 |
| 12/3/2012 | Blackstone | Rayan | $10,000,000 |

188. HUSSEINY is the beneficial owner of the Rayan Account.

189. The first wire transfer from Blackstone to Rayan in the amount of $30,000,000 occurred roughly seven days after 1MDB transferred $576,943,490 to Aabar-BVI, and roughly three days after Aabar-BVI transferred $295,000,000 to Blackstone.  The same day that Blackstone transferred $30,000,000 to HUSSEINY's Rayan Account (that is, May 29, 2012), Blackstone separately transferred $158,000,000 to QUBAISI's Vasco Account.

190. On or about December 18, 2012 – four days after Aabar-BVI transferred $39,000,000 into the Blackstone Account – Blackstone sent $10,100,000 to an account at

Bank of America in Texas held in the name of MB Consulting LLC ("MB Consulting Account"). The payment details on the wire read: "PAYMENT FOR SERVICES."

191.   HUSSEINY is the beneficial owner of the MB Consulting Account and the only authorized signatory on the account.

192.   The MB Consulting Account received another wire transfer of $1,500,000 from the Blackstone Account on or about January 22, 2013.

3.   *Blackstone Transferred at Least $30 million to an Account Belonging to MALAYSIAN OFFICIAL 1*

193.   Blackstone also transferred at least $30,000,000 to an account belonging to MALAYSIAN OFFICIAL 1 shortly after receiving funds from Aabar-BVI.

194.   On or about October 30, 2012 – roughly seven days after Blackstone received $75,000,000 directly from Aabar-BVI and roughly six days after it received $360,000,000 indirectly from Aabar-BVI via Enterprise and Cistenique – Blackstone transferred $5,000,000 into an account at AmBank in Malaysia held in the name of "AMPRIVATE BANKING MR."

195.   That bank account belongs to MALAYSIAN OFFICIAL 1 and is the same account that received $20,000,000 from the PETROSAUDI CO-FOUNDER in 2011, within days of the receipt by the PETROSAUDI CO-FOUNDER of funds from Good Star, as set forth in Section II.G.

196.   On or about November 19, 2012 – less than two weeks after Blackstone received $95,000,000 from Aabar-BVI via Enterprise – Blackstone transferred $25,000,000 to the same AMPRIVATE BANKING-MR Account belonging to MALAYSIAN OFFICIAL 1.

4.   *Blackstone Transferred $5 million to an Account Controlled by 1MDB OFFICER 3*

197.   On or about December 6, 2012, a wire in the amount of $5,000,000 was sent from the Blackstone Account to an account at Falcon Bank in Zurich maintained in the name of River Dee International SA ("River Dee Account").

198.   1MDB OFFICER 3 is the beneficial owner of the River Dee Account at Falcon Bank.

***

199.   On or about February 22, 2013, not long after funds were distributed to the various officials as described above, the balance of the Blackstone Account fell to zero and the account had no further transactions thereafter.

200.   Blackstone was used as an intermediary to obscure the fact that 1MDB bond proceeds were being sent from Aabar-BVI – of which QUBAISI and HUSSEINY were directors – to accounts that were beneficially owned by QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and 1MDB OFFICER 3.

201.   The funds sent to accounts belonging to QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and 1MDB OFFICER 3, as described above, were unlawfully misappropriated from 1MDB and/or IPIC.

## F.     AABAR-BVI SENT APPROXIMATELY $238 MILLION TO AN ACCOUNT CONTROLLED BY AZIZ

202.   Between June 18, 2012, and November 4, 2012, $238,000,000 was transferred directly from the Aabar-BVI Swiss Account to an account controlled by AZIZ, a relative of MALAYSIAN OFFICIAL 1.  From there, the funds were used to acquire nearly $100 million in real property for the personal benefit of AZIZ and to fund Red Granite Pictures, AZIZ's movie production company.

203.   Aabar-BVI sent three wire transfers totaling $238,000,000 to an account at BSI Singapore held in the name of Red Granite Capital Limited ("Red Granite Capital Account").  These wires are summarized below:

**Table 8:  Wire Transfers from Aabar-BVI to Red Granite Capital**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 6/18/2012 | Aabar-BVI | Red Granite Capital | $133,000,000 |
| 10/23/2012 | Aabar-BVI | Red Granite Capital | $60,000,000 |
| 11/14/2012 | Aabar-BVI | Red Granite Capital | $45,000,000 |

204.   Red Granite Capital is a BVI-incorporated entity owned by AZIZ.  In his 2012 U.S. tax return, a copy of which was obtained from AZIZ's accounting firm, AZIZ listed Red Granite Capital's "principal business or profession" as "Motion Pictures." Bank records reflect that AZIZ is also beneficial owner of the Red Granite Capital Account in Singapore.

> 1.    *AZIZ Claimed that Approximately $94.3 Million of the $238 Million from Aabar-BVI, which AZIZ Used to Purchase Real Estate, Was a "Gift" from Aabar-BVI*

205.   AZIZ used more than $94,000,000 of the $238,000,000 that Aabar-BVI transferred to Red Granite Capital in 2012 to purchase real estate in the United States and the United Kingdom.  AZIZ claimed, including in his 2012 U.S. tax return, that this money was a "gift" from Aabar-BVI.

206.   Shortly after receiving funds from the Aabar-BVI Swiss Account, AZIZ sent two wires totaling $94,300,000 from his Red Granite Capital Account to the Shearman IOLA Account in the United States.  The first wire, in the amount of $58,500,000, was sent on or about June 20, 2012, roughly two days after Red Granite Capital received $133,000,000 from Aabar-BVI.  The second wire, in the amount of $35,800,000, was sent on or about November 15, 2012, roughly one day after Red Granite Capital received $45,000,000 from Aabar-BVI.  In total, AZIZ caused $94,300,000 to be transferred from his Red Granite Capital Account to a Shearman IOLA Account in the United States in which funds were held for his benefit.

207.   AZIZ used this $94,300,000 to acquire three pieces of real estate – one in New York City, one in Beverly Hills, and one in London, United Kingdom.

208.   The source and nature of the funds received from Aabar-BVI and used by AZIZ to purchase real property was a topic of discussion among AZIZ's accountants at Nigro Karlin Segal Feldstein & Bolno ("NKSFB"), a Los Angeles-based business and accounting firm, in connection with the preparation of his 2012 tax return:

a.     In an email dated October 13, 2013, a partner at NKSFB wrote: "We need something for our files that explains why AABAR Investments gave a gift to Riza for $94,300,050 and it was not income.  Is someone from the company related to Riza? . . ."

b.     By email dated the same day, a Managing Director at NKSFB who acted as the business manager for AZIZ and Red Granite ("Red Granite Business Manager"), responded: "It is the personal holding company of a family friend."

c.     The partner, in a response sent within an hour, indicated in relevant part: "The funds came from an investor in Red Granite Capital, I cannot sign the returns without proof it is not income to Riza.  The firm would be put at risk, these numbers are too high."

209.   In response to this email exchange, the Red Granite Business Manager, through AZIZ, procured a letter, purporting to be from HUSSEINY and bearing his signature.  The text of that letter reads:

This letter is intended to confirm that the transfer of $94,500,000.00 which consisted of a wire transfer on June 18, 2012 to BSI Bank, Ltd. (account number [XXX]250A) for the benefit of Riza Aziz was intended as a gift. The transfer was made for no consideration and no services were performed or gift received for assets.  This was a gratuitous transfer made with

detached and disinterested generosity based on our close personal relationship.[12]

HUSSEINY'S letter purported to have been sent "[o]n behalf of Aabar Investments PJS Limited / Solution Century Limited."

210.    Solution Century Limited is an entity affiliated with HUSSEINY and his wife.

211.    The fact that Aabar-BVI purportedly gifted approximately $94 million to AZIZ on the basis of "disinterested generosity" and the "close personal relationship" between AZIZ and HUSSEINY further demonstrates that Aabar-BVI was not operating as a legitimate subsidiary of Aabar or IPIC and that the funds held in the Swiss Aabar-BVI account were not being held for the benefit of 1MDB, Aabar, or IPIC.

> 2.    *Approximately $64 Million in Funds from Aabar-BVI Was Used to Fund Red Granite Pictures*

212.    Funds transferred from Aabar-BVI to AZIZ's Red Granite Capital Account were also used to fund Red Granite Pictures, an investment unaffiliated with 1MDB, Aabar, or IPIC.

213.    Red Granite Pictures is a movie production company co-founded by AZIZ in 2010, which produced several major motion pictures, including "The Wolf of Wall Street," "Friends with Kids," and "Dumb and Dumber To." Red Granite Pictures was incorporated in California on September 30, 2010, as Red Granite Productions and changed its name to Red Granite Pictures on or about June 6, 2011. Red Granite Pictures' website lists AZIZ as CEO, founder, chairman, and producer.

---

[12] Contrary to the statements in this letter, no wire was sent from Aabar-BVI to Red Granite Capital on June 18, 2012, in the amount of $94,500,00. Rather, as indicated above, the June 18, 2012 wire from Aabar-BVI to Red Granite Capital was in the amount of approximately $133,000,000. The amount claimed to be a gift, $94,500,000, is roughly equal to the amount of money that AZIZ transferred into the United States over a period of approximately five months and used to purchase personal assets.

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

214. Between June 20, 2012 – two days after Aabar-BVI sent its first wire to Red Granite Capital – and November 20, 2012, eleven wires totaling $64,000,000 were sent from the Red Granite Capital Account to an account at City National Bank in the United States maintained by Red Granite Pictures.

215. These funds transferred to Red Granite Pictures in the United States were then used to fund Red Granite Picture's operations, including the production of the film "The Wolf of Wall Street," which was released in the United States on December 25, 2013.

216. The funds sent from Aabar-BVI to Red Granite Capital, which were thereafter transferred into the United States for use by Red Granite Pictures, did not represent a legitimate investment by 1MDB, IPIC, or Aabar in Red Granite Pictures. And balance sheets for Red Granite Pictures and Red Granite Capital show no payments to 1MDB, IPIC, or Aabar indicative of any investment return.

217. Public statements and media interviews by relevant individuals and entities also negate the existence of any legitimate investment by 1MDB, IPIC, or Aabar in Red Granite Pictures. For example, on August 11, 2014, the *New York Times* published an article entitled *An Audacious Studio Rattles Hollywood*, which included an interview with AZIZ and Red Granite Pictures co-founder Christopher "Joey" McFarland ("McFarland"). In that article, AZIZ is reported to have identified HUSSEINY as Red Granite's principle investor. He is also reported as indicating that HUSSEINY was investing personal money rather than government funds. This same article appears in the "News" section of Red Granite Picture's website under the heading *Riza Aziz & Joey McFarland Featured in the New York Times.*

218. In an article published by the *New York Times* on February 8, 2015, entitled *Jho Low, Well Connected in Malaysia, Has an Appetite for New York,* an attorney for HUSSEINY is quoted as saying that HUSSEINY's investment in Red Granite was made with "personal money."

219.  On April 3, 2016, 1MDB issued a press release, available on its public website, denying that it had any role in investing, directly or indirectly, in Red Granite Pictures.

> 3.  *AZIZ Transferred at least $41 Million in Funds Received from Aabar-BVI to an Account That Was Then Used to Pay Gambling Expenses for Himself, LOW, and TAN*

220.  Just days after the Red Granite Capital Account received funds from Aabar-BVI, some of those funds were transferred to an account at Standard Chartered Bank in Singapore held in the name of Alsen Chance Holdings Limited ("Alsen Chance Account").  Account opening documents for the Alsen Chance Account list TAN as the director of Alsen Chance.  Shortly thereafter, the Alsen Chance Account was used to pay gambling expenses for LOW, TAN, AZIZ, and at least one former official from 1MDB.

221.  More particularly, on or about June 21, 2012 – roughly three days after Aabar-BVI transferred $133,000,000 into AZIZ's Red Granite Capital Account – AZIZ caused $41,000,000 to be wired from his Red Granite Capital Account to the Alsen Chance Account.

222.  Roughly three weeks later, on or about July 10, 2012, a wire for $11,000,000 was sent from the Alsen Chance Account to a bank account maintained by Las Vegas Sands, LLC.  Among other things, Las Vegas Sands owns and operates the Venetian Resort-Hotel-Casino ("Venetian Casino") in Las Vegas.  The payment details on the wire read: "PLAYER NO [XXX]4296."

223.  The Venetian Casino used customer account number XXX4296 to identify LOW.  On or about July 10, 2012, $11,000,000 was deposited into LOW's account at the Venetian Casino, and records show that LOW gambled there for approximately seven days beginning on or about that date.

224.  On or about July 11, 2012, an additional wire of $2,000,000 was sent from the Alsen Chance Account to Las Vegas Sands LLC.  The payment details on that wire

read: "TAN KIM LOONG PLAYER NO [XXX]8710."  The Venetian Casino Resort used customer account number XXX8710 to identify TAN.

225.   On or about July 15, 2012, LOW withdrew an aggregate cash amount of $1,150,090 at the Venetian Casino:  $500,000 as a withdrawal of deposit, and $650,090 as redemption of casino chips and other gaming instruments.  Several individuals gambled with LOW on this occasion, using his account.  These individuals included AZIZ; Red Granite Pictures co-founder McFarland; a lead actor in "The Wolf of Wall Street" ("Hollywood Actor 1"); and a former Chief Investment Officer of 1MDB.[13]

***

226.   The use of funds traceable to proceeds of the 2012 1MDB bond sales for interests unrelated to the business of 1MDB, as described above and in further detail in Part V below, is not consistent with the intended use of those funds and further demonstrates that funds transferred from 1MDB to the Aabar-BVI Swiss Account were unlawfully diverted.

## IV.   THE TANORE PHASE:  MORE THAN $1.26 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE TANORE PHASE

227.   As set forth in greater detail in the sections that follow, in 2013, more than $1.26 billion in 1MDB funds that were raised in a third bond offering arranged by Goldman were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of an offering circular that again contained material misrepresentations and omitted material facts necessary to render its representations not misleading regarding:

- How the proceeds of these bond issuances would be used, and

_____

[13] LOW, TAN, AZIZ and McFarland gambled together at the Venetian Casino on other occasions, including several times in 2014.

66

- The existence of any related-party transactions connected to the 2013 bond issuances, including that 1MDB officials and their associates and relatives would personally benefit from the issuance of these bonds.

228.   1MDB issued an additional $3 billion in Goldman-underwritten bonds in March 2013.  Notwithstanding the fact that the stated purpose of these bonds was to generate proceeds to invest in a joint venture with Aabar called Abu Dhabi Malaysia Investment Company ("ADMIC"), more than $1.26 billion in proceeds was diverted to a bank account held in the name of Tanore Finance Corporation ("Tanore Account").  As with the Blackstone Account, TAN was the beneficial owner of record for the Tanore Account.  Although the account had no legitimate affiliation with 1MDB or ADMIC, 1MDB OFFICER 3 was an authorized signatory on the Tanore Account.

229.   Funds transferred to the Tanore Account were distributed for the benefit of at least one public official associated with 1MDB.  More particularly, very shortly after the bond offering closed, between approximately March 21, 2013, and March 25, 2013, $681,000,000 was transferred from the Tanore Account to an account belonging to MALAYSIAN OFFICIAL 1.  Of this amount, approximately $620 million was returned to the Tanore Account on or about August 26, 2013.

230.   1MDB funds diverted to the Tanore Account were also used by LOW and TAN to purchase artwork for their personal benefit and to purchase an interest in the Park Lane Hotel for the personal benefit of LOW.  The disposition of these funds was not consistent with the intended use of the 2013 bond proceeds nor was it made for the benefit of 1MDB or ADMIC.

**B.     IN MARCH 2013, 1MDB ISSUED $3 BILLION IN GOLDMAN-UNDERWRITTEN BONDS FOR INVESTMENT IN A JOINT VENTURE WITH AABAR**

231.   On or about March 12, 2013, 1MDB entered into a 50:50 joint venture with Aabar known as ADMIC.  According to the joint venture agreement ("ADMIC

67

Agreement"), the formation of ADMIC was "of strategic importance to the government to government relationship between the Government of the Emirate of Abu Dhabi and the Government of Malaysia, given the strategic initiatives to be undertaken jointly by the Parties and the catalytic effect such initiatives are expected to have upon the growth and development of Malaysia and the Emirate of Abu Dhabi respectively."[14]

232.   Pursuant to the ADMIC Agreement, ADMIC was to be capitalized by an investment of $3 billion by 1MDB and $3 billion by Aabar.  1MDB and Aabar, as the two shareholders of the company, were to adopt an investment plan for ADMIC, to include a "five (5) year strategic roadmap for the investment policies of the Company," as soon as practicable after formation of the company.

233.   The ADMIC Agreement provides that "the Company [*i.e.*, ADMIC] will open and maintain bank accounts in the name of [ADMIC]."  It further provides that "[a]ll monies of [ADMIC], and all instruments for the payment of money to [ADMIC], shall be deposited in the bank accounts of [ADMIC]."

234.   The joint venture agreement was signed by QUBAISI, as the Chairman of Aabar, and by the Chairman of 1MDB's Board of Directors; and it was witnessed by HUSSEINY, the CEO of Aabar, and by 1MDB OFFICER 2, the CEO of 1MDB.  Aabar appointed QUBAISI as a director of ADMIC and 1MDB appointed its Chief Financial Officer.

235.   At least as early as mid-January 2013, officials at 1MDB enlisted Goldman's assistance to finance its capital contribution to the planned joint venture through privately placed debt securities.  1MDB OFFICER 3 served as a main point of

---

[14] The Abu Dhabi Malaysia Investment Company ("ADMIC") is an entity distinct from the Abu Dhabi Malaysia Kuwait Investment Corporation ("ADKMIC").  The former was a purported joint venture between 1MDB and Aabar in which the proceeds of the Project Catalyze bond were supposed to be invested, whereas the latter was an entity owned and controlled by LOW that was used to launder funds, as described in Part II.I above.

contact between 1MDB and Goldman on this deal.  Within Goldman, this bond

transaction was referred to by the name "Project Catalyze."

236.   In a March 2013 presentation prepared for 1MDB, IPIC, and Aabar in

connection with the deal, Goldman set forth its understanding of 1MDB's "key

objectives."  Foremost among these were "maintenance of confidentiality during

execution" of the deal and "speed of execution."

237.   1MDB issued approximately $3 billion in bonds through its third private

placement with Goldman.  The closing date for the bond issue was March 19, 2013.  The

notes had a 4.4% interest rate and were redeemable in 2023.  The offering circular, dated

March 16, 2013, listed the net proceeds of the bond sale, once Goldman's fees,

commissions, and expenses were deducted, as approximately $2,716,760,000.  The

bonds were issued by 1MDB Global Investments Limited ("1MDB Global"), a wholly-

owned subsidiary of 1MDB that was incorporated in the British Virgin Islands on March

8, 2013.

238.   The Government of Malaysia provided a "Letter of Support," dated March

14, 2013, in connection with the Project Catalyze transaction.  That Letter of Support

provided, among other things, that if 1MDB failed to provide adequate capital to ensure

that 1MDB Global was able to service its obligations with respect to the bonds, Malaysia

would then "step-in to inject the necessary capital into the Issuer or make payments to

ensure the Issuer's obligation in respect of the Debt are fully met."  The Letter of

Support also indicated that, "[t]o the fullest extent permitted by law," Malaysia would

waive its sovereign immunity and submit itself to the jurisdiction of English courts in

connection with disputes arising out of the letter.  The letter is signed by MALAYSIAN

OFFICIAL 1.

239.   The offering circular represents that 1MDB Global intended to "either on-

lend all of the net proceeds of this Offering to ADMIC or use the net proceeds of the

offering to fund its investment in ADMIC, which will be a 50:50 joint venture between

the Issuer and Aabar."  The offering circular noted that "ADMIC has yet to adopt a

69

formal investment plan or establish investment criteria." It further represented that "ADMIC does not have any specific investment, merger, stock exchange, asset acquisition, reorganization, or other business combination under consideration or contemplation and ADMIC has not, nor has anyone on ADMIC's behalf, contacted, or been contacted by, any potential target investment or had any discussions, formal or otherwise, with respect to such a transaction." The circular goes on to note that, "ADMIC does not currently have an investment plan or investment criteria in place. The Board of Directors intends to adopt an investment plan as soon as is practicable. The investment plan, and any future investments, will be made with the mutual agreement of the shareholders of ADMIC," *i.e.*, Aabar and 1MDB.

240. In a press release issued on April 23, 2013, 1MDB indicated that, "[t]he proceeds from the US$3 billion capital raised will be utilised for investments in strategic and important high-impact projects like energy and strategic real estate which are vital to the long term-economic [sic] growth of both countries." The press release gave, as an example of a future investment project, the Tun Razak Exchange (TRX). The Tun Razak Exchange is a project to develop a financial center in downtown Kuala Lumpur that has yet to be completed.

241. In truth, however, as explained below in Paragraphs 243-258, instead of being used to fund ADMIC, more than $1.26 billion in bond proceeds from the 2013 bond offering were diverted to unrelated overseas shell company accounts, including the Tanore Account at Falcon Bank in Singapore and an account opened in the name of Granton Property Holdings Limited at Falcon Bank ("Granton Account").

242. The offering circular also omitted material facts necessary to makes it representations regarding the use of the bond proceeds not misleading, in that it failed to disclose that certain individuals related to 1MDB, including MALAYSIAN OFFICIAL 1, would receive hundreds of millions of dollars from the proceeds of the bond sale within days of its closing. This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party

70

transactions.  The representation that ADMIC had not determined how all of the bond

proceeds would be used did not encompass using those funds, beginning almost

immediately after the bond issue, for the personal benefit of individuals related to 1MDB

and their associates.

## C.    FUNDS FROM THE 2013 BOND SALE WERE DIVERTED TO THE TANORE ACCOUNT

243.    Notwithstanding the fact that 1MDB represented in the offering circular and

its press release that the proceeds of the 2013 bond sale would be used to fund ADMIC,

more than $1.26 billion was diverted from the proceeds of the 2013 bond sale through

bank accounts controlled by TAN and held in the name of various entities, including

Tanore Finance Corporation and Granton Property Holdings.  This approximately $1.26

billion in funds was neither lent to ADMIC nor used to fund 1MDB's investment in

ADMIC, as represented in the bond offering circular, but instead was held and used for

the benefit of LOW and his associates, including public officials of 1MDB.

244.    On or about March 19, 2013, a total of $2,721,000,000, representing

proceeds of the bond sale, was transferred from Bank of New York Mellon into the BSI

Lugano account of 1MDB Global in two separate wires of $2,494,250,000 and

$226,750,000.  The payments details listed in both SWIFT messages indicate, in relevant

part: "ATTN [SINGAPORE BANKER 1.]"  SINGAPORE BANKER 1 is the same

individual whose name appears in Good Star's corporate records, as noted in Paragraph

45 above.  At the time of the wire transfers to 1MDB Global, SINGAPORE BANKER 1

was employed by BSI Bank in Singapore.

245.    Between May 21 and 27, 2013, 1MDB Global transferred a total of

$1,590,000,000 from its account at BSI Lugano to accounts belonging to three different

overseas investment funds:  Devonshire Capital Growth Fund ("Devonshire"), a fund

located in the British Virgin Islands; Enterprise, a fund located in Curacao; and

Cistenique, another fund located in Curacao (collectively, the "Overseas Investment

71

Funds"). This money was routed via the clearing company Citco, before being transferred into the accounts of the Overseas Investment Funds. As described in Paragraphs 172-176 above, two of these three funds, Cistenique and Enterprise, were used in 2012 to pass funds traceable to the Project Maximus bond proceeds from Aabar-BVI to Blackstone.

246. The approximate dates and aggregated amounts of these transfers from 1MDB Global to the three Overseas Investments Funds, via Citco, are set forth below:

**Table 9:  Wire Transfers from 1MDB Global to Overseas Investment Funds**

| Dates | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 3/21/2013 | 1MDB Global | Devonshire | $646,464,649 |
| 3/21/13 - 3/27/2013 | 1MDB Global | Enterprise | $414,756,416 |
| 3/21/13 - 3/22/2013 | 1MDB Global | Cistenique | $531,090,534 |

247. Within approximately two days after 1MDB Global began its transfer of more than $1.5 billion to the Overseas Investment Funds, the Overseas Investment Funds collectively transferred a total of $835,000,000 to the Tanore Account. The approximate dates and amounts of these wires, which passed through a correspondent bank account at J.P. Morgan Chase in the United States, are summarized below:

**Table 10: Wire Transfers from Overseas Investment Funds to Tanore**

| Date | Sending Party | Sending Party Bank | Receiving Party | Amount |
|---|---|---|---|---|
| 3/21/2013 | Devonshire | BSI Bank - Singapore | Tanore | $210,000,000 |
| 3/22/2013 | Enterprise | ING Bank - Netherlands | Tanore | $250,000,000 |
| 3/22/2013 | Cistenique | ING Bank Netherlands | Tanore | $375,000,000 |

248.    TAN opened the Tanore Account on or about November 2, 2012, and he was originally its sole authorized signatory.  Bank records list HUSSEINY as the "referrer" for the account.

249.    On or about March 20, 2013, one day before funds were first credited to the Tanore Account from the Overseas Investment Funds, 1MDB OFFICER 3 was given signing authority on the Tanore Account through the execution of a Power of Attorney form signed by 1MDB OFFICER 3.  A copy of the Malaysian passport belonging to 1MDB OFFICER 3 was included in that documentation.

250.    Bank statements show that the above-referenced wire transfers from the Overseas Investment Funds, beginning on or about March 21, 2013, were the first credits to the Tanore Account.

251.    On or about March 21, 2013, Devonshire transferred an additional $430,000,000 to the Granton Account.  Account opening documents for the Granton Account were signed by TAN.  The $430,000,000 wire from Devonshire was processed through a U.S. correspondent bank account at J.P. Morgan Chase, and bank statements show that it was the first credit to the Granton Account.

252.    On or about that same day, March 21, 2013, Granton transferred $430,000,000 – the same amount received from Devonshire – to the Tanore Account. As set forth above, the Tanore Account and the Granton Account have the same beneficial owner of record (TAN).

253.    Approximately four days later, on or about March 25, 2013, Tanore transferred $378,000,000 back to the Granton Account.

254.    The passage of funds back and forth through accounts held in the name of different legal entities but having the same stated beneficial owner had no legitimate commercial purpose but was instead undertaken as a means of layering these transactions to obscure the nature, source, location, ownership and/or control of the funds.

73

255.   The transfer of 1MDB funds through the Overseas Investment Funds to the Tanore and Granton Accounts could not have been accomplished without the participation or acquiescence of one or more officials at 1MDB.

256.   Bank statements for the Tanore Account demonstrate that funds transferred to the Tanore Account were not thereafter transferred to an account belonging to ADMIC or used for investment purposes with any apparent legitimate business connection to ADMIC or 1MDB.

257.   Instead, funds from the Tanore Account were sent to an account belonging to MALAYSIAN OFFICIAL 1, and were also used by TAN and LOW to purchase art. Funds from the Tanore Account were also used by LOW to acquire a substantial interest in a luxury hotel in New York City.  These uses were inconsistent with the intended purpose of the bond proceeds as set forth in the offering circular and the April 23, 2013, 1MDB press release.

258.   The execution of various SWIFT instructions and other transfer directions, as well as the preparation of the voluminous documentation that was created in connection with the diversion of more than $1 billion in funds from 1MDB through the Overseas Investment Funds to the Tanore Account, would have been difficult to execute within such a short period of time, *i.e.*, within days of the bond closing date, without advance planning.  The plan to divert proceeds of the Project Catalyze bond offering to the Tanore Account pre-dated the March 19, 2013, bond offering.

**D.     $681 MILLION WAS TRANSFERRED FROM THE TANORE ACCOUNT TO AN ACCOUNT BELONGING TO MALAYSIAN OFFICIAL 1**

259.   Shortly after proceeds of the 2013 bond sale were diverted to the Tanore Account, $681,000,000 was sent from the Tanore Account to a bank account belonging to MALAYSIAN OFFICIAL 1.

260.   On or about March 21, 2013, Tanore transferred $620,000,000 into an account at AmBank in Malaysia, whose beneficiary was listed as "AMPRIVATE BANKING-MR."  On or about March 25, 2013, an additional $61,000,000 was wired from the Tanore Account to the same account at AmBank, for a total of $681,000,000.

261.   This account belonged to MALAYSIAN OFFICIAL 1 and is the same account that in 2011 received $20 million from the PETROSAUDI CO-FOUNDER that was traceable to the Good Star Account, as set forth in Section II.G.  It is also the same account that in 2012 received at least $30 million from the Blackstone Account that was traceable to the Aabar-BVI Swiss Account and the 2012 bond proceeds, as set forth in Section III.E.3.

262.   On or about August 26, 2013, $620,010,715 was wired from a different account at AmBank to the Tanore Account.  This AmBank account also belonged to MALAYSIAN OFFICIAL 1, and the transfer represented funds from the $681 million payments that were being returned to Tanore.

263.   The Attorney General of Malaysia publicly stated that he conducted an inquiry into the $681 million in payments.  In a press release issued on January 26, 2016, the Malaysian Attorney General confirmed that, "the sum of USD681 million (RM2.08 billion) [was] transferred into the personal account of [MALAYSIAN OFFICIAL 1] between 22.03.2013 and 10.04.2013," and that, "in August 2013, a sum of USD620 million (RM2.03 billion) was returned by [MALAYSIAN OFFICIAL 1]. . . ."  The Malaysian Attorney General ultimately characterized the payment of $681 million as a "personal donation to [MALAYSIAN OFFICIAL 1] from the Saudi royal family which was given to him without any consideration."

264.   Bank records associated with the Tanore Account show that TAN was the beneficial owner of the Tanore Account, from which the $681,000,000 payments to the account of MALAYSIAN OFFICIAL 1 were made, and that 1MDB OFFICER 3 was added as an authorized signor on the Tanore Account roughly one day before the first

75

wire of $620,000,000 was sent from the Tanore Account to the account of MALAYSIAN OFFICIAL 1.

### E.   FROM APPROXIMATELY MAY THROUGH SEPTEMBER 2013, THE TANORE ACCOUNT WAS USED TO PURCHASE ART FOR THE PERSONAL BENEFIT OF TAN AND LOW

265.   Notwithstanding the fact that 1MDB represented in the offering circular that the proceeds of the 2013 bond sale would be used for ADMIC, funds from the 2013 bond sale that were diverted through the Tanore Account were used to purchase tens of millions of dollars in artwork in the United States.  This artwork was acquired for the personal benefit of LOW, TAN and their associates, not for the benefit of 1MDB or ADMIC.

*1.   From Approximately May Through September 2013, Tanore Purchased Approximately $137 Million in Art*

266.   In early May 2013, TAN opened an account at Christie's Auction House ("Christie's") in the name of Tanore Finance Corporation.  Christie's is a major art auction house with a salesroom in New York.  The Christie's account opened for Tanore was assigned account number XXX7644.  In connection with the opening of this account, TAN submitted a letter to Christie's from Falcon Bank in Zurich, which was dated May 8, 2013 and was signed by the Director and Managing Director of the Bank.  That letter represented that TAN was the beneficial owner of the Tanore Account.

267.   On or about May 10, 2013, TAN designated McFarland, co-founder of Red Granite Pictures, as an agent authorized to bid on behalf of Tanore.   McFarland corresponded with Christie's about Tanore's bidding account using his Red Granite Pictures email account.

268.   At auctions held in New York on or about May 13, 2013, and May 15, 2013, Tanore purchased five works of art for a collective total price of $58,348,750.  Specifically, invoices show that at an "11th Hour" Charity Sale on May 13, 2013, Tanore

purchased an unnamed work by Mark Ryden for $714,000 ("Ryden work") and an unnamed work by Ed Ruscha for $367,500 ("Ruscha work").  At a Post-War & Contemporary Evening Sale on May 15, 2013, Tanore purchased *Dustheads*, by Jean-Michel Basquiat ("*Dustheads*") for $48,843,750; *Untitled – Standing Mobile*, Alexander Calder ("Calder Standing Mobile") for $5,387,750; and *Tic Tac Toe*, by Alexander Calder (*"Tic Tac Toe")* for $3,035,750.

269.   On or about June 4, 2013, $58,348,750 was wire transferred from the Tanore Account at Falcon Bank to an account at J.P. Morgan Chase in the United States maintained by Christie's.

270.   On or about June 28, 2013, Tanore purchased two works of art in a private sale arranged by Christie's:  *Concetto spaziale, Attese*, by Lucio Fontana ("the Fontana piece"); and *Untitled (Yellow and Blue)* by Mark Rothko ("the Rothko piece").  The invoice set forth three alternative payment amounts, depending on when payment was made, including: payment of $7,950,000 by July 5, 2013, and payment of the remaining $71,550,000 by October 3, 2013, for a total purchase price of $79,500,000.

271.   On or about July 3, 2013, $7,950,000 was wired from the Tanore Account to an account at J.P. Morgan Chase in the United States maintained by Christie's.  On or about September 9, 2013, Tanore wired an additional $71,550,000 to Christie's account at J.P. Morgan Chase.  The remittance instructions for both wires contain references to Tanore's account number and "INVOICE DATE: 28JUN13."

272.   A Senior Vice President at Christie's ("Christie's VP") who served as a client representative for Tanore and LOW viewed Tanore and LOW as interchangeable, and the Christie's VP believed that LOW was making purchases for his corporate collection.  The Christie's VP also indicated that McFarland and LOW attended art auctions in New York together and that at those auctions, McFarland would bid for Tanore.

273.   TAN and LOW took deliberate steps to avoid the appearance of an association between LOW and Tanore in written documentation.  For example, on

November 1, 2013, LOW was copied on an email exchange between TAN and Christie's employees about art that Tanore had recently purchased. That same day, LOW responded: "Please deal with Eric directly re his works. Don't need to cc me for confidentiality reasons unless Eric expressly says to do so."

274. On October 1, 2013, TAN requested that Christie's reserve a specific skybox, with seating for twelve guests, at upcoming auctions on November 5 and 12. In connection with this request for a skybox, a Christie's employee sent an email to a colleague stating in relevant part, "It better look like Ceasar Palace [sic] in there . . .The box is almost more important for the client than the art."

275. Tanore successfully bid on additional artwork at a November 5, 2013, Impressionist and Modern Art Evening Sale, including a work by Vincent Van Gogh entitled *La maison de Vincent a Arles* ("VAN GOGH ARTWORK") for $5,485,000. But Tanore had difficulty making payments for the purchased works due to concerns raised by the compliance department at Falcon Bank, where Tanore maintained its account. In a November 21, 2013, email to Christie's, TAN explained in pertinent part:

> I had been on the phone with Falcon Bank (for Tanore Finance Corp) on Thursday to resolve this matter as the compliance department has some questions that required my response about the amount of Art purchases made recently.
>
> Nothing of concern, but just that I have to provide answers re when I started being interested in art, intentions for the artworks and going forward the expected outflows from purchase of Artworks or inflows from sale of Artworks (if any).

276. In an internal email dated December 9, 2013, with the subject line "Tanore," the Christie's VP directed another Christie's employee to "send an email" to

Tanore about its continued failure to make payment for the art purchased on November 5 and to "please CC Jho even though he does not like it."

277.   By email dated December 10, 2013, TAN advised two Christie's employees that he "spoke to Mr Low and he has agreed to buy the items that I recently auction at xties n [sic] private sales since he can pay immediately."  On or about December 13, 2013, a Christie's employee sent TAN an email requesting that he "execute the attached documents confirming that your obligations will be assumed by Mr. Low."  Among the attachments to that email were letter agreements voiding certain purchases that Tanore had made at the November 5 sale, including the VAN GOGH ARTWORK, and letter agreements for the assignment to LOW of Tanore's interest in and payment obligations for those purchases.  TAN responded in an email dated December 13, 2013:  "Please do not have Mr Low in any document.  I prefer just me null and void.  Thank you."

278.   In an email dated December 13, 2013, a Christie's employee transmitted several documents to LOW, including copies of the unsigned assignment agreements described above.  LOW responded the same day: "Please remove any reference to Tanore in the agmt."

279.   As noted in Paragraph 435-447 below, LOW ultimately purchased the VAN GOGH ARTWORK for which Tanore was unable to make payment, and he did so using money traceable to diverted 1MDB funds.

> 2.   *Tanore, Through TAN, Gifted Artwork It Purchased from Christie's to McFarland and LOW*

280.   TAN gifted several pieces of artwork purchased with funds from the Tanore Account to McFarland and LOW, shortly after he acquired them.  These "gifts" are consistent with his having acting as a nominee to purchase art on behalf of others, using diverted 1MDB funds.

281.   On or about August 15, 2013, TAN responded to an email chain between McFarland and several Christie's employees on which he was copied: "Please do not copy me anymore as the Painting has been officially gifted to joey in geneva free port so

it is his."  The subject line of the email was "Re: Mark Ryden work from 11th Hour."
Based on context, the email indicates that TAN was advising Christie's that he had gifted
the Mark Ryden work to Joey McFarland.

282.   On or about September 26, 2013, a Christie's employee advised TAN that,
"Ed Ruscha's studio has reached out to me and asked if we can please let them know
who purchased his work in the 11th Hour auction."  TAN responded, copying
McFarland: "pls talk to joey, it is now owned by him."  McFarland responded further: "I
am [the] owner."

283.   TAN also purported to gift several pieces of artwork to LOW, including
works purchased with funds from the Tanore Account.  These "gifts" of art purchased by
Tanore were memorialized in several "gift letters."  While the body of each letter was
identical, each letter referenced a different work or works being gifted, including:
*Dustheads*; the Rothko work; the Fontana Piece; and *Tic Tac Toe*.

284.   Each of these gift letters was: (a) dated October 2, 2013, (b) addressed to
LOW from TAN and Tanore, and (c) contained the subject line: "RE: GIFT OF ART-
WORK(S) AS STATED BELOW IN CONSIDERATION OF YOUR FRIENDSHIP,
YOUR CHARITABLE CONTRIBUTION TO THE WORLD, AND PASSION IN
PROMOTING THE UNDERSTANDING AND APPRECIATION OF ART-WORKS."

285.   Each letter included representations from TAN that he is the "sole 100%
beneficial owner of TANORE FINANCE CORP," and that he is "the legal and
beneficial owner of all the art-work(s) mentioned in this gift letter."

286.   The body of each letter also states:

I wish to gift you ALL of the art-work(s) mentioned in this gift letter in
consideration of the followings [sic]:

• all the generosity, support and trust that you have shared with me over the
course of our friendship, especially during the difficult periods of my life;
and

- your continuous generosity in providing charitable contributions to advance the well-being and development of our global communities; and
- your passion in promoting the understanding and appreciation of art-works.

287.   Each gift letter closes by stating:

All the art-work(s) gifted to you should not in any event be construed as an act of corruption since this is against the Company and/or my principles and I personally do not encourage such practices in any manner whatsoever. The gift(s) is/are merely a token of appreciation and I am hoping that the gift(s) to you would encourage you to continue with your good work globally.

288.   LOW also procured an additional letter from TAN, dated April 8, 2014, confirming the content of the prior October 2, 2012, "Gift Letters."  This letter indicated that it was prepared in support of LOW's request for financing from Sotheby's Financial Services, for which LOW used certain artwork as collateral (as described further in Paragraph 445 below).  In this April 8, 2014 letter:

a.    TAN identified himself as "Tanore's 100% shareholder and 100% beneficial owner" and indicated that Tanore had been liquidated by him.

b.    TAN indicated that he "remained the sole legal and beneficial owner(s) of" the artwork listed in the Gift Letters, "until immediately prior to each Transfer" to LOW.

c.    The letter goes on to indicate, "To the best of my knowledge, as of the date of this Letter, [LOW] is the sole and absolute owner of the Property, and there is no other person or entity (including Tanore or myself) that has or can claim any interest, direct or indirect, in the Property."

d.    The letter is signed by TAN.  LOW also signed the letter as having "[a]cknowledged and [a]greed."

81

289.   Individuals engaged in money laundering or who otherwise wish to conceal the true nature of financial transactions will sometimes acquire assets through a nominee, who thereafter "gifts" the assets to the true intended purchaser.

290.   Based on these facts, including LOW's presence at auctions where Tanore bid on art and the fact that TAN subsequently gave more than $100 million in art to LOW for no consideration, Plaintiff alleges that TAN acted as a nominee for LOW when purchasing art from the Tanore Account to obscure the fact that LOW was acquiring art with funds from Tanore.

## V.   THE SUBJECT ASSETS WERE INVOLVED IN AND/OR TRACEABLE TO THE PROCEEDS OF THE FOREGOING CRIMINAL CONDUCT

291.   As set forth below, numerous assets, including the DEFENDANT ASSET, represent property derived from proceeds traceable to the foregoing criminal conduct, as well as property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

### A.   LOW PURCHASED THE L'ERMITAGE PROPERTY USING 1MDB FUNDS FROM GOOD STAR MOVED THROUGH THE SHEARMAN IOLA ACCOUNT

292.   Funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used to acquire the L'ERMITAGE PROPERTY, a luxury hotel in Beverly Hills, California, in 2010.

293.   On January 15, 2010, just months after the $700 million wire transfer from 1MDB to the Good Star Account, a signed grant deed was filed with the Los Angeles Recorder's Office ("LA Recorder's Office") transferring ownership of L'ERMITAGE PROPERTY to Wynton Real Estate (Beverly Hills) LLC ("Wynton").  Shearman represented Wynton in the transaction.  The purchase and sale agreement stated that in addition to the hotel and a fee simple ownership in the land, Wynton acquired

L'ERMITAGE's business assets, including but not limited to (i) all right, title and interest in and to all transferable consents, authorizations, variances, waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, and (ii) all right, title and interest and to all names related solely to the ownership and operation of L'ERMITAGE and all related goodwill and domain names ("L'ERMITAGE BUSINESS ASSETS").

294.   The final settlement statement for the purchase of the L'ERMITAGE PROPETY shows that Wynton purchased the L'ERMITAGE PROPERTY for $44,800,000.

295.   The website of the L'ERMITAGE PROPERTY states that the L'ERMITAGE PROPERTY is managed by the Viceroy Hotel Group.

296.   Real estate closing documents show that Chicago Title Insurance Company ("Chicago Title") was the escrow agent used for the purchase of the L'ERMITAGE PROPERTY.  Taek Szen Low, LOW's brother, signed the transaction documents on behalf of Wynton.

297.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW and his brother, LOW was a member of the Viceroy Group's Board and had participated in several major transactions, including "[t]he acquisition of a 50% stake in [Viceroy]."

298.   Likewise, an April 7, 2015, email LOW sent to a Las Vegas casino included an attachment stating:

> [LOW is] proud to be involved in . . . L'Ermitage Beverly Hills and Viceroy Hotel Group, . . . which have appreciated in value under Mr. Low's stewardship . . . .

In another attachment to this same email, LOW confirmed that Jynwel Capital, a company of which he served as the chief executive officer, owned 100 percent of the L'ERMITAGE PROPERTY.  Jynwel Capital, according to this document, manages the

83

assets and funds of LOW's family and "is not licensed to, and does not manage third party funds.

299.   The settlement statement for the sale of the L'ERMITAGE PROPERTY as well as Shearman IOLA Account records show that, on or about December 21, 2009, a $10,000,000 deposit was made for the purchase of the L'ERMITAGE PROPERTY and that the amount due from the seller at closing, on or about January 15, 2010, was $36,700,000.

300.   J.P. Morgan correspondent bank records and Shearman IOLA Account records show that the Shearman IOLA Account was used to purchase the L'ERMITAGE PROPERTY.  Below is a summary of the credits into and debits from the Shearman IOLA Account related to the purchase of the L'ERMITAGE PROPERTY:

**Table 11:  Transfers Through the Shearman IOLA Account Related to the the L'ERMITAGE PROPERTY**

| Date | Credits into Shearman IOLA Account | | Debits from Shearman IOLA Account | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 10/21/09 | Good Star Account | $148,000,000 | | |
| 12/21/09 | | | $10,000,000 | Chicago Title Escrow Account |
| 1/14/10 | | | $36,700,000 | Chicago Title Escrow Account |

301.   Shearman internal records show that Shearman segregated its funds into different internal account numbers and client and matter numbers.  Internal Shearman records show that each of the transactions set forth above were linked to internal Shearman accounts held for client 36853 (The Wynton Group) and matter 4 (Park Laurel).

302.   On January 14, 2010, $36,700,000, representing the balance of the purchase price for the L'ERMITAGE PROPERTY, was wired from the Shearman IOLA Account to an account at Bank of America maintained by Chicago Title.

303.   J.P. Morgan correspondent bank records and Shearman IOLA Account records show that on or about January 20, 2010, approximately $117 million was wired from the Good Star Account to the Shearman IOLA Account.  The notations on the wire transfer state in part: "C. STAKE V.H. (USD 15M) D. VICEROY ST. M.H(USD 10M)."  On or about March 3, 2010, $35,059,875 in additional funds was wired from the Good Star Account to the Shearman IOLA Account.  The notations on the wire transfer state in part:  "INC VICEROY HOTEL GR (USD 7M)."

304.    Delaware Secretary of State records show that Wynton changed its name to LBH Real Estate (Beverly Hills) LLC on November 4, 2013.  In a document filed with the State of California in connection with this name change, Li Lin Seet signed as the LBH Real Estate (Beverly Hills) LLC's manager.  Li Lin Seet was an associate of LOW; he was also an employee of LOW's company Jynwel Capital.

305.   On or about March 27, 2015, a grant deed transferring ownership of the L'ERMITAGE PROPERTY from Wynton to LBH Real Estate (Beverly Hills) LLC was signed.  This grant deed was filed with the LA Recorder's Office, on or about June 26, 2015.  Title to the L'ERMITAGE PROPERTY remains in the name of LBH Real Estate (Beverly Hills) LLC.

**B.    HILLCREST PROPERTY 1 WAS PURCHASED USING 1MDB FUNDS MOVED THROUGH SHEARMAN IOLA ACCOUNT, AND AZIZ THEREAFTER PURPORTEDLY PURCHASED THE PROPERTY FROM LOW WITH 1MDB FUNDS PASSED THROUGH THE AABAR-BVI ACCOUNT**

306.   As set forth below, funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used in 2010 to purchase HILLCREST

85

PROPERTY 1 in Beverly Hills, California, and funds traceable to the Aabar-BVI Phase bond sales were thereafter used to transfer the property from one legal entity to another legal entity controlled by AZIZ.

307.   A grant deed transferring ownership of HILLCREST PROPERTY 1 was signed on May 17, 2010, and filed with the LA Recorder's Office on September 30, 2010.  Real estate closing documents show that HILLCREST PROPERTY 1 was purchased by 912 North Hillcrest (BH) LLC for $17,500,000.

308.   The original contract purchasers of HILLCREST PROPERTY 1 were RGA Group, for whom the authorized signer was AZIZ, and 912 North Hillcrest Road (BH) LLC, for whom the authorized signer was an attorney with Shearman.  The amended escrow instructions state that RGA Group assigned all of its rights under the purchase contract for HILLCREST PROPERTY 1 to 912 North Hillcrest Road (BH) LLC.

309.   On or about July 27, 2010, a California realtor ("California Realtor") sent an email to AZIZ's Gmail account with the subject line "Hilcrest – Important!"  The email read in relevant part:

Hi Riza – We have received calls from the Seller's lawyer questioning our ability to close on schedule. . . Per escrow, we need the remaining $16,985,342.48 in escrow by Friday . . . and the name of the LLC you will be taking title under.

310.   On or about July 28, 2010, AZIZ responded to the California Realtor by email:  "Spoke to Jho and he will follow-up with you with respect to all that is necessary.  Sincerely, Riza."

311.   On or about July 28, 2010, the California Realtor's executive assistant, sent an email to LOW, copying AZIZ.  The email read in relevant part:

Good morning Jho -- . . . escrow received and released to the buyer Riza's original deposit of $525,000.  Riza said he sent another $525,000 on Friday to replace the original deposit . . . In addition, escrow still needs to know the name of the LLC Riza wants to take title under – this is extremely urgent as escrow need [sic] to prepare the Grant Deed.

312.   LOW responded to that email on or about July 28, 2010.  His email read in relevant part: "Can u set-up a conf call, so we can all call in jointly with our lawyers from shearman so we can get up to speed and figure out a solution asap?"

313.   The final buyer's statement for the sale of HILLCREST PROPERTY 1 shows that three deposits in the amount of $525,000 were made for the purchase of HILLCREST PROPERTY 1 and that the total balance due to escrow at closing was $15,917,189.63.

314.   The second and third deposits of $525,000 were made to the HILLCREST PROPERTY 1 escrow account from the Shearman IOLA Account on or about July 28, 2010, and September 2, 2010.  In addition, the remaining balance of $15,917,189.63 was paid to the HILLCREST escrow account from the Shearman IOLA Account on or about September 28, 2010.

315.   Below is a summary of the credits into and debits from the Shearman IOLA Account related to the purchase of HILLCREST PROPERTY 1 ("HILLCREST ESCROW"):

**Table 12:  Transfers Through Shearman IOLA Account Related to HILLCREST PROPERTY 1**

| Date | Approximate Amount of Wire Transfers into Shearman IOLA Account | | Debits from Shearman IOLA Account | |
|------|-------------|--------|--------|------|
| | From | Amount | Amount | To |
| 6/23/2010 | Good Star Account | $8,600,000 | | |
| 7/28/2010 | | | $525,000 | HILLCREST Escrow Account |
| 8/17/2010 | Good Star Account | $2,800,000 | | |
| 8/31/2010 | Good Star Account | $654,000 | | |
| 9/2/2010 | | | $525,000 | HILLCREST Escrow Account |
| 9/3/2010 | Good Star Account | $8,646,000 | | |
| 9/28/2010 | Good Star Account | $17,999,985 | | |
| 9/28/2010 | | | $15,917,190 | HILLCREST Escrow Account |

316.   The notation on the $654,000 wire from the Good Star Account was "ACQUISITION OF ASSETS/PROPERTY PAYMENT FO REXTENSION."  The notation on the September 3, 2010, wire of $8,646,000 from Good Star to the Shearman IOLA Account was "ACQUISITION OF ASSETS/PROPERTY PARTBALANCE PAYMENT."  The notation on the September 28, 2010 wire of $17,999,985 from Good Star to the Shearman IOLA Account was "ACQUISITION OF ASSETS /PROPERTY (FULL BALANCE PAYMENT + RENOVATION)."

317.   912 North Hillcrest Road (BH) LLC, which was the entity used to take title to HILLCREST PROPERTY 1, was owned by Great Delight Limited ("Great Delight"), an entity incorporated in the Seychelles.  On or about July 10, 2012, Great Delight sold its interest in "912 North Hillcrest Road (BH) LLC" to Kreger Trading Inc. ("Kreger Trading") for approximately $12,000,000.  AZIZ signed a purchase and sale agreement on behalf of Kreger Trading in connection with this transaction.  Li Lin Seet, an associate of LOW, signed on behalf of Great Delight.

318.   AZIZ declared himself to be the owner of Kreger Trading in his 2012 U.S. tax return, a copy of which was obtained from AZIZ's accounting firm.

319.   AZIZ used funds that had been moved through the Aabar-BVI account to acquire the entity 912 North Hillcrest Road (BH) LLC, and thereby to acquire the property at HILLCREST PROPERTY 1.

320.   As noted above in paragraph 206, records from Citibank and Red Granite Pictures show that on or about June 20, 2012, $58,500,000 was wire transferred from the Red Granite Capital Account to the Shearman IOLA Account in the United States that held funds on behalf of AZIZ.  On or about July 10, 2012, approximately $12,000,000 was transferred from the same IOLA Account to an attorney trust account held by Sullivan & Cromwell LLP ("Sullivan & Cromwell") for the purchase of the entity 912 North Hillcrest Road (BH).  Sullivan & Cromwell served as counsel to Great Delight in connection with the transfer of ownership over 912 North Hillcrest Road (BH) LLC. Internal Shearman records show that each of these transactions set forth above were linked to internal Shearman accounts held for client 37965 (Riza Aziz).

321.   On or about August 13, 2013, Sullivan & Cromwell wire transferred $10,786,706 to a bank account at BSI Bank in Singapore held by ADKMIC, with payment details that contained reference to "GREAT DELIGHT LTD."  As noted above, ADKMIC is an entity owned by LOW.  On or about the same day, $10,500,000 was transferred from the ADKMIC BSI Account to LOW's personal account at BSI Bank in Singapore, indicating that it was "PAYMENT TO SHAREHOLDER LTJ."  This

transfer of funds represented a payment from AZIZ to LOW for the purported sale of HILLCREST PROPERTY 1, through the transfer of ownership over 912 North Hillcrest Road (BH) LLC.

322.   The transfer of HILLCREST PROPERTY 1 was effectuated in 2012 through the sale of a holding company (*i.e.*, 912 North Hillcrest Road (BH) LLC) rather than the direct sale of the property itself as a means to obscure the ownership, source, and control of the assets.

## C.   LOW PURCHASED THE PARK LAUREL CONDOMINIUM USING 1MDB FUNDS MOVED THROUGH A SHEARMAN IOLA ACCOUNT

323.   Funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used in 2010 to acquire the PARK LAUREL CONDOMINIUM in New York, New York.  The purchase contract for the Park Laurel Condominium listed the ultimate purchaser as Park Laurel (NYC) Ltd., a BVI corporation,[15] the final date of sale as February 5, 2010, and the final sales price as $23,980,000.  Thereafter, in 2012, an entity controlled by AZIZ acquired the PARK LAUREL CONDOMINIUM from Park Laurel (NYC) Ltd. for approximately $35,500,000 by using funds traceable to proceeds of the 2012 bond sales that were misappropriated through the Aabar-BVI Swiss Account.

324.   A real property transfer report filed with the New York City Department of Finance Office of the City Register ("NYC Register's Office") states that a contract for the sale of the PARK LAUREL CONDOMINIUM was signed on or about October 27, 2009 – less than 30 days after the $700 million wire transfer from 1MDB to the Good

---

[15] The original contract purchaser of the PARK LAUREL CONDOMINIUM was Assured Alliance Investment Corporation, which, on December 4, 2009, assigned its rights under the contract to Ivory Industrial Investments Ltd., which was identified in Park Laurel (NYC) Ltd. documents as the predecessor name for Park Laurel (NYC) Ltd.

90

Star Account.  The transfer report is signed by an individual affiliated with Ivory Industrial Investments Ltd. on behalf of the buyer, Park Laurel (NYC) Ltd.  The buyer's attorney is identified as the same attorney from Shearman who handled the purchase of HILLCREST PROPERTY 1.  The buyer's real estate agent represented that LOW was the purchaser.

325.    LOW purchased the PARK LAUREL CONDOMINIUM using funds traceable to the $700 million wire transfer from 1MDB to Good Star.  J.P. Morgan correspondent bank records and Shearman IOLA Account records show that on or about October 21, 2009, $148,000,000 was wired from the Good Star Account to a Shearman IOLA Account.  On or about February 5, 2010 – the same day as the final sale date listed in the property transfer records – four bank checks totaling $22,179,049.82 were written on the Shearman IOLA Account for the purchase of the PARK LAUREL CONDOMINIUM.  Records related to the Shearman IOLA Account included the notation "Funds From Park Laurel Escrow" with regards to these four checks.  Internal Shearman records show that each of these transactions were linked to internal Shearman accounts held for client 36853 (The Wynton Group) and matter number 4 (Park Laurel).  The final settlement statement for this purchase demonstrates that checks totaling $21,626,661.58 were used in the purchase of the PARK LAUREL CONDOMINIUM.

326.    On or about July 6, 2012, a contract for the sale of the PARK LAUREL CONDOMINIUM was executed between Park Laurel (NYC) Ltd. as the seller, and Park Laurel Acquisition LLC, as the buyer.  Shearman represented the buyer, Park Laurel Acquisition LLC, and Sullivan & Cromwell represented the seller, Park Laurel (NYC) Ltd., in connection with this transaction.  The sales contract was signed by AZIZ on behalf of the buyer, Park Laurel Acquisition LLC.

327.    In a letter dated September 28, 2012, AZIZ requested that the Condominium Board for the PARK LAUREL CONDOMINIUM waive its first right of refusal to the transfer of title from Park Laurel (NYC) Ltd. to Park Laurel Acquisition LLC.  In that letter, AZIZ represented that he was the sole director of an entity called

Sorcem Investments Inc. ("Sorcem") and that Sorcem was the sole member of Park Laurel Acquisition LLC.  AZIZ also represented that upon transfer of title, "the Unit shall be occupied by Riza Aziz . . . as if Riza was the individual owner of the Unit."

328.   AZIZ claimed ownership of Sorcem in his 2012 U.S. tax return.  In those returns, Sorcem is listed as having the same Los Angeles address that is listed as AZIZ's address.

329.   Title to the PARK LAUREL CONDOMINIUM was transferred from Park Laurel (NYC) Ltd. to Park Laurel Acquisition LLC for a purchase price of $33,500,000, by deed recorded on or about November 28, 2012.  AZIZ signed the relevant transactional documents on behalf of Park Laurel Acquisition LLC.

330.   On or about November 16, 2012, $33,800,000 was transferred from AZIZ's Red Granite Capital Account at BSI Bank in Singapore to the Shearman IOLA Account in the United States.  Thereafter, $34,406,188 was wired from the Shearman IOLA Account to a Sullivan & Cromwell attorney trust account at Citibank on or about November 19, 2012, the date of the closing for the purchase of the PARK LAUREL CONDOMONIUM.  That same day, $1,049,126 was wired from the Shearman IOLA Account to Chicago Title Insurance Company for closing costs.  According to the contract of sale, Chicago Title Insurance Company was the escrow agent for the PARK LAUREL CONDOMINIUM sale.  Shearman records indicate that the client on whose behalf the funds were transferred into and out of the Shearman IOLA Account was AZIZ.

331.   Citibank records show that on or about November 20, 2013, the day after the closing, $34,406,188 was transferred from the Sullivan & Cromwell attorney trust account to an account at Rothschild Bank AG held in the name of "Park Laurel NYC Ltd.," the seller of the property.  This wire transfer represented payment to LOW for the sale of the PARK LAUREL CONDOMONIUM.

### D.    LOW PURCHASED THE BOMBADIER JET USING 1MDB FUNDS PASSED THROUGH SHEARMAN IOLA ACCOUNT

332.    In 2010, LOW used funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account to acquire the BOMBARDIER JET, a Bombardier Global 5000 aircraft bearing manufacturer serial number 9265 and registration number N689WM, with two Rolls Royce engines bearing manufacturer's serial numbers 12487 and 12488, for approximately $35,371,335.

333.    An aircraft bill of sale dated March 31, 2010, was executed transferring title and ownership of the BOMBARDIER JET from J.T. Aviation Corp. to Wells Fargo Bank Northwest in its capacity as "owner trustee" of a trust created by Wynton Aviation (Global 5000) Ltd. (hereinafter, "Wynton Aviation").  Wynton Aviation was incorporated in the British Virgin Islands on or about December 30, 2009.

334.    On or about December 31, 2009, J.T. Aviation Corp. and Wynton Aviation executed a purchase agreement to sell the BOMBARDIER JET to Wynton Aviation less than three months after the $700 million wire transfer was executed.

335.    At the time of the purchase, the BOMBARDIER JET bore FAA Registration Number N501JT and its beneficial owner was J.T. Aviation Corp.'s president.

336.    Wells Fargo records indicate that Wynton Aviation is a holding company owned by LOW.  According to these records, LOW is this entity's sole beneficial owner, controlling party, and legal owner.

337.    Escrow and transactional documents relating to the sale of the BOMBARDIER JET show that Crowe and Dunleavy ("Crowe"), a law firm in Oklahoma, served as the escrow agent for the purchase of the BOMBARDIER JET.

338.    As noted in paragraph 105 above, on or about October 21, 2009, the Shearman IOLA Account received a wire from the Good Star Account for $148,000,000. Internal Shearman records show that this transfer was linked to an internal Shearman

93

account held for client 36853 (The Wynton Group) and matter 4 (Park Laurel). On or about January 26, 2010, the Shearman IOLA Account received a wire from the Good Star Account for $117,000,000. Internal Shearman records show that this transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 8 (General).

339. On or about December 31, 2009, the same day the purchase agreement for the sale of the BOMBARDIER JET was executed, a wire for approximately $7 million was sent from the Shearman IOLA Account to an escrow account maintained by Crowe at Bank of Oklahoma in the name of Crowe and Dunlevy Aircraft Escrow I ("Crowe Aircraft Escrow Account"). Internal Shearman records show that the $7,000,000 transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 4 (Park Laurel).

340. On or about March 26, 2010, Wynton Aviation and Wells Fargo Bank Northwest, N.A. ("Wells Fargo") entered into a trust agreement whereby Wells Fargo agreed to serve as the "Owner Trustee" over a trust settled by Wynton Aviation for the purpose of "ensur[ing] the eligibility of [the BOMBARDIER JET] for United States registration with the Federal Aviation Administration."

341. On or about March 29, 2010, a wire for $28,376,000 was sent from the Shearman IOLA Account to the Crowe Aircraft Escrow Account at Bank of Oklahoma. Internal Shearman records show that the $28.376 million transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 8 (General).

342. On or about March 31, 2010, a wire for $35,371,375 was sent from the Crowe Aircraft Escrow Account to an account at Citibank in the name of the seller.

343. On or about April 2, 2010, the FAA issued a Certificate of Registration and Assignment of Special Registration Numbers Form to Wells Fargo, indicating that the BOMBARDIER JET's new FAA Registration Number and tail number would be N689WM.

**E.    LOW PURCHASED THE TIME WARNER PENTHOUSE AND TIME WARNER STORAGE UNIT USING 1MDB FUNDS PASSED THROUGH THE ADKMIC BSI ACCOUNT**

344.   As set forth below, funds traceable to the approximately $1 billion diverted from 1MDB to the Good Star Account were used to purchase the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT, in New York, New York.

345.   Contracts for the sale of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT were signed on or about March 22, 2011.  A transfer report filed with the City of New York listed the ultimate purchaser as 80 Columbus Circle (NYC) LLC,[16] the final date of sale as July 6, 2011, and the final sales price as $30,550,000.  Shearman represented 80 Columbus Circle (NYC) LLC in the purchase of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  The sales contract and amendments thereto show that Harvey & Hackett was the escrow agent for the purchase of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  As set forth below, the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT were purchased with funds traceable to the $700 million wire transfer and $330 million wire transfers from 1MDB to Good Star.

346.   On or about June 28, 2011, $55,000,000 was wire transferred from the Good Star Account to the ADKMIC BSI Account.  On or about the same day, the following transactions occurred:  (i) approximately $54,750,000 was wire transferred from the ADKMIC BSI Account to an account at BSI Bank held in the name of Low Hock Peng, a/k/a Larry Low, who is LOW's father, (the "LHP Account") and (ii)

---

[16] The original purchaser of the TIME WARNER PENTHOUSE AND TIME WARNER STORAGE UNIT was Sabola Limited, a Seychelles company.  A document entitled "Assignment and Assumption of Contract of Sale – Condominium Unit and Purchase Agreement for Personalty" states that Sabola Limited assigned its interest under the sales contract to 80 Columbus Circle (NYC) LLC.  The assignment agreement is signed on behalf of Sabola Limited by Li Lin Seet.

approximately $30,000,000 was wire transferred from the LHP Account to an account in the name of Selune Ltd. at Rothschild Bank AG in Switzerland.  LOW represented to BSI Bank in Singapore that he was the beneficial owner of Selune Ltd.

347.   Internal Shearman records show that approximately eight days later, on or about July 5, 2011, a wire for $27,000,000 was sent from another account at Rothschild Bank AG in the name of 1/80 Columbus Circle (NYC) to the Shearman IOLA Account. Plaintiff alleges that these funds originated from Selune's account at Rothschild Bank AG and were transferred to the 1/80 Columbus Circle account using an intra-bank transfer.  Internal Shearman records show that this $27,000,000 wire transfer was linked to an internal Shearman account held for client 37103 (TJL/RT MISCELLANEOUS INVESTMENT MATTERS) and matter 6, which was associated with the address of the TIME WARNER PENTHOUSE.

348.   Six bank checks totaling $27,247,677.74 were written on the Shearman IOLA Account and directed to various parties involved in the purchase of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  Internal Shearman records show that these checks were linked to an internal Shearman account held for the same client and matter associated with the incoming wire of $27,000,000 discussed above.  Specifically:

a.    A check for $534,625 and a second check for $687,375, both dated July 5, 2011, were written on the Shearman IOLA Account to Prudential Douglas Elliman.  The final settlement statement shows that $534,625 and $687,375 were separate line items that were owed to the realtors as a broker's fee.

b.    A check for $17,750 dated July 5, 2011 was written on the Shearman IOLA Account to New York State Sales Tax.  The final settlement statement shows that $17,750 was owed as "NY Sales Tax."

c.    A check for $15,778,071.79 dated July 5, 2011 was written on the Shearman IOLA Account to J.P. Morgan Chase.  The final settlement statement shows that $15,778,071.79 was owed to J.P. Morgan Chase, N.A. to pay off a mortgage loan

owed by the former owner of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.

          d.    A check for $9,829,634.89, dated July 5, 2011, and a second check for $103.20, dated July 11, 2011, was written on the Shearman IOLA Account to the former owner of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  Real estate closing documents show that the former owner signed as the seller of all of the personalty, namely, the furniture, furnishings, and non-fixture items, sold during the transaction.

          e.    A check for $400,221.06, dated July 5, 2011, was written on the Shearman IOLA Account to Chicago Title Insurance Company.  The final settlement statement shows that $400,221.06 is the sum of all title charges involved in the purchase. Chicago Title Insurance Company was the title agent on this purchase.

      349.   A Notice to the Board of Intention to Sell or Lease Condominium Unit was completed in connection with the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  The signed notices for both the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT identified Low Hock Peng, also known as Larry Low, LOW's father, as the occupant of the units.  However, an unsigned version of this notice dated May 15, 2011, identifies that LOW is the "ultimate beneficial owner of each Sabola Limited and 80 Columbus Circle (NYC) LLC."

      350.   According to a realtor involved in the sale of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT, LOW was the intended occupant of the apartment, and Larry Low never even viewed the apartment before the purchase.

### F.   LOW PURCHASED THE ORIOLE MANSION USING 1MDB FUNDS FUNNELED THROUGH THE ADKMIC BSI ACCOUNT

351.   The ORIOLE MANSION, located in Beverly Hills, California, was purchased with funds traceable to the $700 million wire transfer and the $330 million wire transfers from 1MDB to Good Star.

352.   A grant deed transferring ownership of ORIOLE MANSION to Oriole Drive (LA) LLC, a Delaware corporation, was signed on November 20, 2012, and filed with the County of Los Angeles on November 30, 2012.  Real estate closing documents show that the purchase price for ORIOLE MANSION was $38,980,000.  A Notice of Completion filed with the LA Recorder's Office on July 29, 2013, states that construction of a gym, audio visual upgrade, and miscellaneous work was completed on ORIOLE MANSION on July 12, 2013.

353.   An attorney at DLA Piper ("DLA Piper"), a U.S.-based law firm, signed the Notice of Completion on behalf of Oriole Drive (LA) LLC.  DLA Piper represented the buyer in this sale.

354.   J.P. Morgan Chase bank records show that on or about November 2, 2012 – eighteen days prior to the signing of the grant deed transferring ownership of the ORIOLE MANSION – approximately $153 million was wire transferred from the Good Star Swiss Account to the ADKMIC BSI Account.

355.   Approximately three days later, on or about November 5, 2012, approximately $153 million was transferred from the ADKMIC BSI Account to the LHP Account.  Two days later, on or about November 7, 2012, approximately $150 million was transferred from the LHP Singapore Bank Account to an account in LOW's name at BSI Bank ("LOW BSI Account").

356.   Citibank records show that on or about November 7, 2012, approximately $110 million was wired from the LOW BSI Account to an account in the name of Selune

Ltd. at Rothschild Bank AG in Switzerland.  As set forth above in paragraph 346, LOW is the beneficial owner of Selune Ltd.

357.   Bank of America records show that on or about November 29, 2012, $37,882,800 was wired from an account at Rothschild Bank AG in the name of 1/Oriole Drive (LA) LLC, to an account at Bank of America in the name of Chicago Title. Records from Bank of America contain a reference notice of: "[XXX]0583-994-X5TITLE OFFICER[]."  The wire instructions for the sale of ORIOLE MANSION required that $37,859,200 be sent to a Bank of America account in the name of Chicago Title Company with a reference for "[XXX]0584-994-X59 Title Officer[]."  The escrow agent involved in the purchase of ORIOLE MANSION stated in an email, dated November 29, 2012 at 11:22 p.m., that the title company had received the wire sufficient for closing.  Records from the escrow agent demonstrate that $1,849 was later credited back to Oriole Drive (LA) LLC.

## G.   LOW PURCHASED GREENE CONDOMINIUM USING 1MDB FUNDS FUNNELED THROUGH THE ADKMIC BSI ACCOUNT

358.   The GREENE CONDOMINIUM, located in New York, New York, was purchased with funds traceable to the $700 million wire transfer and $330 million wire transfers from 1MDB to Good Star.

359.   A real property transfer report was filed regarding the sale of GREENE CONDOMINIUM on or about March 5, 2014.  The transfer report states that a contract for the purchase of the GREENE CONDOMINIUM by 118 Greene Street (NYC) LLC, a New York legal entity, was signed on or about February 5, 2014, that the final date of sale was February 27, 2014, and that the final purchase price was $13,800,000.

360.   On or about November 2, 2012, approximately $153 million was wire transferred from the Good Star Account to the ADKMIC BSI Account.  On or about November 5, 2012, $153 million was transferred from the ADKMIC BSI Account to the LHP Account.  Two days later, on or about November 7, 2012, approximately $150

million was transferred from the LHP Account to the LOW BSI Account. That same day, approximately $110 million was wired from the LOW BSI Account to an account in the name of Selune, Ltd. which, as set forth above, belongs to LOW. This transaction left approximately $40 million in the LOW BSI Account.

361.   Citibank records show that on or about February 5, 2014, $13,800,000 was wired from the LOW BSI Account to an account at Citibank in the name of DLA Piper. On or about February 12, 2014, a wire in the amount of $13,721,286 was sent from DLA Piper to Chicago Title. The payment details for that wire included the address for the GREENE CONDOMINIUM.

362.   According to a realtor familiar with this property, LOW claimed that he was the owner of this property.

## H.   LOW ACQUIRED AN INTEREST IN EMI MUSIC PUBLISHING USING 1MDB FUNDS DIVERTED THROUGH THE GOOD STAR ACCOUNT

363.   LOW laundered at least approximately $106,666,667 in misappropriated funds traceable to the Good Star Account to acquire a substantial interest in EMI Music Publishing Group North America Holdings Inc. ("EMI"), a music publishing company. Specifically, LOW used these funds to acquire an interest in an entity called Nile Acquisition Holding Company Ltd. ("EMI Partner A"), a Cayman Islands entity that partnered with Nile Acquisition LLC ("EMI Partner B"), a Delaware entity, to form DH Publishing L.P. (the "EMI Partnership"), EMI's parent company.

364.   On or about October 5, 2011, the EMI Partnership, a Cayman Islands limited partnership, was formed by a consortium of entities consisting of EMI Partner A and EMI Partner B with the express purpose of acquiring EMI Group Global Limited's music publishing business. EMI Partner A is comprised of several investors, including (i) Mubadala Development Company ("Mubadala"), a sovereign wealth entity owned by the Government of Abu Dhabi, and (ii) JCL Media (EMI Publishing) Ltd. (also known

as JW Nile (BVI) Ltd.) ("LOW EMI Partner"), a subsidiary of Jynwel Capital Ltd.,
LOW's financial services firm based in Hong Kong.  The LOW EMI Partner was formed
in the British Virgin Islands on or about November 7, 2011.  EMI Partner B is owned
jointly by Sony Music Holdings, a New York corporation, and the Estate of Michael
Jackson.

365.   On or about November 11, 2011, the EMI Partnership, through BW
Publishing Ltd., an indirect, wholly-owned subsidiary of the EMI Partnership, entered
into a sale and purchase agreement with EMI Group Global Limited, a United Kingdom
company, to acquire EMI.

366.   Simultaneously with this acquisition, the EMI Partnership entered into an
Administration Agreement with Sony/ATV Music Publishing LLC ("Sony/ATV").
Under the Administration Agreement, Sony/ATV agreed to manage EMI's day to day
operations, including management and exploitation of EMI's music catalog, in exchange
for an administration fee.

367.   EMI is the world's third largest music publishing company by revenue.
EMI owns or possesses the rights to publish approximately 2.3 million musical
compositions, both historic and recent, from a variety of genres and a variety of
musicians, including a number of Grammy-winning artists.

368.   In connection with its vast music catalog, EMI generates revenue from
several sources including, among others: (i) royalties and fees earned when its songs are
performed publicly; (ii) royalties from paid-streaming services; (iii) royalties and fees
earned in exchange for the right to use songs for physical recordings or digital
downloads; (iv) royalties and fees paid for use of music in timed synchronization with
visual images; and (v) royalties and fees paid for use of a song in stage productions, and
rental of orchestra scores.

   *1.*   *LOW's Acquisition of an Interest in EMI PARTNER A*

369.   EMI Partner A was formed on or about September 29, 2011, in the Cayman
Islands.  Initially, EMI Partner A's sole shareholder was Fifty Sixth Investment

Company Ltd., an entity based in Abu Dhabi.  In June 2012, Fifty Sixth Investment Company Ltd. transferred its sole share in EMI Partner A to Mubadala.

370.   On or about June 29, 2012, several entities agreed to subscribe for ordinary shares in EMI Partner A pursuant to an Investment Agreement Relating to Nile Acquisition Holding Company Limited (the "EMI Investment Agreement").  These entities included:  (i) Nile Cayman Holding Ltd. ("the "Mubadala Subsidiary"), an entity owned by Mubadala; (ii) Pub West LLC, a Delaware company; (iii) GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l.; (iv) Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l.; (v) GSO SJ Partners LP; and (vi) the LOW EMI Partner.

371.   An internal EMI document described the LOW EMI Partner as follows: [LOW EMI Partner] is a private equity investment holding company advised by Jynwel Capital Limited, an investment and advisory firm whose chief executive officer is [LOW].  [LOW] is a member of [EMI's] advisory board and served as [EMI's] Non-executive Chairman-Asia.  Jynwel Capital Limited has advised [EMI] that [LOW EMI Partner] is owned by trusts for the benefit of the Low family.

372.   Pursuant to the EMI Investment Agreement, several investors agreed to subscribe for shares in EMI Partner A.  Specifically:

a.   The Mubadala Subsidiary agreed to acquire approximately 66.2 percent of EMI Partner A's capital, consisting of 6,620.068965 ordinary shares, for $320,000,000.

b.   The LOW EMI Partner agreed to acquire approximately 22.06 percent of EMI Partner A's capital, consisting of 2,206.89656 ordinary shares, for $106,666,667.  Li Lin Seet executed the EMI Investment Agreement on behalf of the LOW EMI Partner in his capacity as its "director."

c.      GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l. agreed to acquire approximately 5.69 percent of EMI Partner A's capital, consisting of 569.36719 ordinary shares, for $27,519,414.

d.      Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 3.22 percent of EMI Partner A's capital, consisting of 322.68240 ordinary shares, for $15,596,316.[17]

e.      Pub West LLC agreed to acquire approximately 1.37 percent of EMI Partner A's capital, consisting of 137.93104 ordinary shares, for $6,666,667.

f.      Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 1.2 percent of EMI Partner A's capital, consisting of 120.15875 ordinary shares, for $5,807,673.

g.      GSO SJ Partners LP agreed to acquire approximately 0.22 percent of EMI Partner A's capital, consisting of 22.27442 ordinary shares, for $1,076,597.

373.    Furthermore, under the EMI Investment Agreement, the LOW EMI Partner was authorized to play a role in the management and operations of EMI through its ownership stake in EMI Partner A.  Specifically, for instance, the EMI Investment Agreement provides that the LOW EMI Partner may participate in selecting two of EMI Partner A's nine directors.

374.    Additionally, under the EMI Investment Agreement, the single largest individual shareholder within the LOW EMI Partner  (the "LOW EMI Principal Shareholder") is permitted to play a role in selecting key EMI officials, including EMI Partner A's chief executive officer, EMI Partner A's general counsel, EMI Partner A's chief financial officer as well as the EMI Partnership's officers.  According to internal records from Bank of New York Mellon, where the LOW EMI Partner opened a bank

---

[17] Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. is an affiliate of the private investment firm Blackstone Group, an entity discussed previously in Paragraph 171.c.  It is unrelated to the BVI shell corporation referred to herein as Blackstone.

account, the LOW EMI Partner is a wholly-owned subsidiary of Jynwel Capital Ltd., whose sole shareholder is LOW.

375.   Additionally, the LOW EMI Principal Shareholder is permitted in his sole discretion to select the EMI Partnership's Non-Executive Chairman – Asia.  This official is responsible for "observational oversight of the business operations of the Partnership in Asia excluding Japan."  EMI's Non-Executive Chairman – Asia is also invited to attend "ceremonial events relating to [EMI] and any other related music industry public events that may be relevant to [EMI], in each case, to which all members of the board of [the EMI Partnership] are invited."

376.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW as recently as February 2015, LOW serves as the "Non-executive Chairman, Asia, for EMI Music Publishing, [and is] also serving as a member of [EMI's] advisory board."  According to this same document, LOW led recent transactions and advised the Low family investment trusts including one relating to a "USD2.2 billion acquisition of EMI Music Publishing Group by Sony, Mubadala, Blackstone Group's GSO Capital Partners and David Geffen."

377.   The proceeds of the share purchases described in Paragraph 372 above were used by EMI Partner A to, among other things, make capital contributions to the EMI Partnership.  Each partner's respective partnership interest in the EMI Partnership is calculated based upon its percentage of ownership of the partnership's Class A Units.  According to the Fourth Amended and Restated Exempted Limited Partnership Agreement of D.H. Publishing L.P., dated March 7, 2014, EMI Partner A made a capital contribution of $483,333,396 to the EMI Partnership in exchange for 60.166 percent of the EMI Partnership's Class A Units.  Likewise, EMI Partner B made a capital contribution of $320,000,038 to the partnership in exchange for 39.834 percent of the EMI Partnership's Class A Units.

### 2. *Transfer of Proceeds Through the United States*

378.   As noted in Section II.I above, on or about June 8, 2012, approximately $120,000,000 in funds were wired from the Good Star Account to the ADKMIC BSI Account via a correspondent bank account in the United States at J.P. Morgan.

379.   On or about June 11, 2012, a wire of approximately $120,000,000 was sent from the ADKMIC BSI Account to the LHP Account.  That same day, (i) a wire for $118,000,000 was transmitted from the LHP Account to LOW's personal account at BSI Bank; (ii) a wire for $115 million was sent from LOW's personal account at BSI Bank to an account in the name of Jynwel Capital at BSI Bank ("Jynwel Account A"); (iii) a wire for $115 million was sent from Jynwel Account A to another account also maintained in the name of Jynwel Capital ("Jynwel Accont B") at BSI Bank; and (iv) a wire for $110 million was sent from Jynwel Account B to an account in the name of the LOW EMI Partner at BSI Bank ("LOW EMI Account").

380.   On or about June 13, 2012, an escrow account was opened by LOW EMI Partner with Bank of New York Mellon (the "EMI Escrow Account") in the United States.  The account opening documents were signed by Li Lin Seet, who identified himself as LOW EMI Partner's director.  The opening records also confirm that LOW is the "100[%] (ultimate)" owner of the LOW EMI Partner and that Jynwel Capital Ltd. is the "100% direct" owner.

381.   On June 26, 2012, a wire for $320,000,000 was sent from Mubadala Treasury Holding Co. LLC's account at First Gulf Bank in Abu Dhabi to the EMI Escrow Account.  A notation on the wire instructions indicated that the funds were intended to be sent to "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT." As noted above at Paragraph 363, "NILE ACQUISTION HOLDING LTD" is the name of EMI Partner A.  Furthermore, as noted above at Paragraph 372, pursuant to the EMI Investment Agreement, Mubadala agreed to acquire its interest in EMI Partner A for $320,000,000.

382.   That same day, a wire for $106,666,667 was sent from the LOW EMI Account to the EMI Escrow Account.  A notation on this wire also read "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT."  As noted above at Paragraph 372, pursuant to the EMI Investment Agreement, the LOW EMI Partner agreed to acquire its interest in EMI Partner A for $106,666,667.

383.   Upon information and belief, the funds transferred by LOW into the EMI Escrow Account were used to acquire the LOW EMI Partner's interest in EMI Partner A and were transmitted in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.   Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.   For instance, there is no apparent commercial reason that LOW would layer his transaction by funneling the exact same amount of money through six different bank accounts at the same financial institution on or about the same day.

c.   Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

d.   In materials that LOW submitted to entities with whom he sought to do business, including materials described below in Paragraphs 432-434, LOW represented that family resources were a significant source of his wealth.  By funneling money through his father's account for a brief period of time, LOW created the appearance that funds in his personal account, which were used to acquire an interest in EMI Partner A, came from his father rather than from Good Star or ADKMIC.

384.   Upon information and belief, at the time LOW transferred misappropriated funds from his LOW EMI Partner account in Singapore to the EMI Escrow Account, he knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.

## I.   TENS OF MILLIONS OF DOLLARS IN FUNDS DIVERTED FROM 1MDB WERE USED TO FUND RED GRANITE PICTURES AND TO PRODUCE THE MOTION PICTURE "WOLF OF WALL STREET"

### 1.   *LOW Distributed Millions in 1MDB Funds from Good Star to Red Granite Pictures to Fund "The Wolf of Wall Street"*

385.   As set forth below, funds from the Good Star Account were transferred into and through various bank accounts at City National Bank in Los Angeles associated with Red Granite Pictures, and that money was ultimately used to fund the production of "The Wolf of Wall Street," a motion picture produced by Red Granite Pictures and released in the United States on December 25, 2013.  These funds are directly traceable to the $700 million wire transfer and $330 million wire transfers unlawfully diverted from 1MDB to the Good Star Account.

386.   As set forth above in Sections II.D and II.F, approximately $1.03 billion was diverted from 1MDB to the Good Star Account between approximately September 30, 2009 and October 25, 2011.

387.   Bank account records from City National Bank and correspondent bank records from J.P. Morgan Chase show that two wires totaling $10,173,104 were sent from the Good Star Account to a bank account at City National Bank in Los Angeles that was designated as the "Operating Account" for Red Granite Pictures ("RGP Operating Account").  AZIZ is a signatory on this account.

388.   More specifically, first, on or about April 12, 2011, a wire for $1,173,104 was sent from Good Star to the RGP Operating Account.  The notation on this wire read: "INVESTOR ADVANCES OF USD 1 173 104 OUT OF USD 5 000 000 to RED GRANITE (MOVIES)."  Second, on or about September 10, 2012, a wire for approximately $9,000,000 was sent from Good Star to the RGP Operating Account.  The notation on this wire read:  "ADVANCES FOR WOLF OF WALL STREET MOVIE FOR ACHL."

389.   On or about September 11, 2012, one day after this second wire transfer, approximately $9,015,191 was transferred from the RGP Operating Account to another City National Bank account held in the name of Red Granite Pictures ("RGP Pictures Account").   On or about September 12, 2012, the same amount – $9,015,191 – was transferred from the RGP Pictures Account to yet another account at City National Bank held in the name of TWOWS LLC ("TWOWS Account #1").

390.   "TWOWS" is an acronym for "The Wolf of Wall Street," and TWOWS LLC was a special purpose vehicle ("SPV") created by Red Granite Pictures to produce "The Wolf of Wall Street."   Delaware state records show that TWOWS LLC was formed on or about April 16, 2012, and California state records show that AZIZ is one of the entity's managers.   It is common in the film industry to create an SPV, such as a limited liability corporation, for the purpose of producing a film.   It is also common to open a separate bank account or accounts in the name of that SPV and to use the funds in that account to finance the film's production.

391.   City National Bank records show that the TWOWS Account #1 was used to pay expenses associated with the production of "The Wolf of Wall Street."   In or around April 2013, the TWOWS Account #1 was closed and the balance of the funds transferred to another account at City National Bank also held in the name of TWOWS LLC (hereinafter, "TWOWS Account #2").   The TWOWS Account #2 was also used to pay expenses associated with the production of "The Wolf of Wall Street."   Collectively, these two accounts are referred to herein as the "TWOWS Accounts."

392.   The TWOWS Accounts, in which funds traceable to the Good Star Account were deposited, were used to pay for production expenses including, but not limited to, the following:  (i) between April 2013 and February 2014, 17 payments totaling approximately $3.9 million were made to Sikelia Productions, Inc., a production company belonging to the film's director; (ii) between May 2012 and April 2014, at least $48 million was paid to a company that specializes in managing payroll and production expenses for the film industry; (iii) between July 2012 and May 2014, at least $4.1

million was paid to various visual effects companies;  (iv) between May 2012 and April 2014, approximately $2.5 million was paid to the Screen Actors Guild; and (v) approximately $80,000 was paid to a yacht charter company.

393.   LOW, who distributed more than $10 million to Red Granite Pictures from the Good Star Account, received a "special thanks" full-screen credit in the closing credits of "The Wolf of Wall Street."

394.   In his acceptance speech upon winning a Golden Globe for his role in "The Wolf of Wall Street," Hollywood Actor 1 thanked "the entire production team," singling out in particular "Joey, Riz, and Jho," whom he characterized as "collaborators" on the film.  Upon information and belief, this reference was to Joey McFarland, a co-founder of Red Granite Pictures, AZIZ, and LOW.

395.   During at least part of the time during which the above-referenced transfers were made, LOW maintained a Red Granite email account with the domain name @redgranitepictures.com.  This email account was deleted in or around April 2012.

2.    *Tens of Millions in 1MDB Funds Funneled Through the Aabar-BVI Account Were Used to Fund Red Granite Pictures and "The Wolf of Wall Street"*

396.   Red Granite Pictures, and its production of "The Wolf of Wall Street" in particular, were also funded with money traceable to the proceeds of the 2012 bond sales that were diverted through the Aabar-BVI Swiss Account.

397.   As set forth in Paragraph 203 above, between June 18, 2012, and November 14, 2012, $238,000,000 in funds traceable to the diverted proceeds of the 2012 1MDB bond sales was transferred from Aabar-BVI to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.

398.   Between on or about June 20, 2012 – roughly two days after Aabar-BVI sent its first wire to Red Granite Capital – and November 20, 2012, eleven wires totaling $64,000,000 were sent from AZIZ's Red Granite Capital Account in Singapore to the RGP Operating Account in the United States.

399.    Shortly after each of these eleven wires, Red Granite Capital transferred funds from its Operating Account to the RGP Pictures Account.  Between on or about June 26, 2012 and November 20, 2012, a total of $54,797,321 was transferred from the RGP Operating Account to the RGP Pictures Account.

400.    In a series of nine transfers between approximately June 27, 2012, and November 23, 2012, $52,004,162 of this $54,797,321 was then transferred from the RGP Pictures Account to the TWOWS Account #1, which, as noted above, belonged to the SPV responsible for producing "The Wolf of Wall Street."

401.    The movement of funds from the Red Granite Capital Account in Singapore through various accounts associated with Red Granite Pictures to the TWOWS Account #1 occurred in very close succession.  For example, in one series of transfers all occurring on or about August 10, 2012: (i) $3,000,000 was sent from the Red Granite Capital Account to the RGP Operating Account; (ii) $2,831,754 was sent from the Red Granite Operating Account to the RGP Pictures Account; and (iii) $2,831,754 was sent from the RGP Pictures Account to the TWOWS #1 Account.

## J.    LOW ACQUIRED AN INTEREST IN "SYMPHONY CP (PARK LANE) LLC" AND THE PARK LANE HOTEL USING 1MDB FUNDS DIVERTED THROUGH THE TANORE ACCOUNT

402.    LOW laundered more than $200 million in misappropriated funds traceable to the 2013 bond sale into an account in the United States belonging to the law firm DLA Piper.  LOW and his brother Low Taek Szen ("Szen") used those funds to acquire an interest in an entity called "Symphony CP (Park Lane) LLC" (hereinafter, "the Park Lane Partnership" or "the Partnership"), a limited liability partnership between the New York real estate development company Witkoff Group and an investment entity controlled by LOW.  On or about November 25, 2013, the Park Lane Partnership,

through wholly-owned subsidiaries, acquired 36 Central Park South, New York, New York, 10019, also known as the Park Lane Hotel, for approximately $654,316,305.

*1.   Transfer of Proceeds into the United States*

403.   On or about March 21 and 22, 2013, $835,000,000 in funds raised by 1MDB through its March 19, 2013 bond issue was transferred to the Tanore Account at Falcon Bank in Singapore, after being routed through one of three Overseas Investment Funds.

404.   On or about March 25, 2013, a wire of approximately $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore.

405.   On or about the same day the Granton Account received $378,000,000 from Tanore (that is, March 25, 2013), Granton wired $378,000,000 to an account at RBS Coutts in Switzerland held in the name of Dragon Market Limited ("Dragon Market"). LOW is the beneficial owner of this account.  In early November 2013, two additional wires were sent from the Granton Account to the RBS Coutts account belonging to Dragon Market ("Dragon Market Account").  All three wires were processed through a U.S. correspondent bank account at J.P. Morgan Chase.  The approximate dates and amounts of these wires, totaling $518,500,000, are summarized below:

**Table 13:  Relevant Wire Transfers from Granton to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 3/25/2013 | Granton | Dragon Market | $378,000,000 |
| 11/05/2013 | Granton | Dragon Market | $93,300,000 |
| 11/06/2013 | Granton | Dragon Market | $47,200,000 |

406.   Between on or about April 25, 2013, and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account at RBS Coutts to an account at BSI Bank in Singapore held in the name of Dragon Dynasty Limited ("Dragon Dynasty").  These four wires were processed through a U.S. correspondent

bank account at J.P. Morgan Chase.  The approximate dates and amounts of these wires are summarized below:

**Table 14:  Relevant Wire Transfers from Dragon Market to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|--------------|-----------------|--------|
| 4/25/2013 | Dragon Market | Dragon Dynasty | $98,000,000 |
| 7/5/2013 | Dragon Market | Dragon Dynasty | $120,000,000 |
| 9/10/2013 | Dragon Market | Dragon Dynasty | $9,800,000 |
| 11/8/2013 | Dragon Market | Dragon Dynasty | $248,500,000 |

407.    Account opening documents for the BSI Bank account maintained by Dragon Dynasty ("Dragon Dynasty Account") list LOW as the authorized signatory on the account.  Those documents also list Dragon Market as the director of Dragon Dynasty.

408.    On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account.  On or about the same day that LOW's father received $248,500,000 from Dragon Dynasty, $235,500,000 was wired from the LHP Account to the LOW BSI Account.  The wire details for that transfer read:  "Gift from Low Hock Peng to Low Taek Jho."

409.    On or about November 12, 2013, $12,500,000 was wired from the LHP Account to an account at BSI Bank in Singapore belonging to Szen.

410.    On or about November 12, 2013, LOW transferred $205,900,000 from his account at BSI to an IOLA account at Citibank New York maintained by DLA Piper ("DLA Piper IOLA Account").  The payment details on the wire read: "LOW TAEK JHO SETTLEM ENT OF TRUSTS."

411.    On or about November 12, 2013, Szen transferred $12,185,189.32 from his account at BSI Bank to the same DLA Piper IOLA Account.  The payment details on the wire read: "LOW TAEK SZEN SETTLE MENT OF TRUSTS."

412.   In total, LOW and his brother Szen collectively transferred $218,085,189 to the same DLA Piper IOLA Account on or about November 12, 2013.

413.   Upon information and belief, the funds transferred by LOW and Szen into the DLA Piper IOLA Account in the United States were moved in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.   Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.   For example, there is no apparent commercial reason that LOW would transfer funds from Dragon Market, an account he controlled, to Dragon Dynasty, another account he controlled, and then to an account belonging to his father, only to have a substantially similar amount of funds transferred from his father's account to LOW's personal account on or about the same day.

c.   Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

d.   In materials that LOW submitted to entities with whom he sought to do business, including materials described in Paragraphs 432-434 below, LOW represented that his family was a significant source of his wealth.  By passing money through his father's account for a brief period of time, LOW created the appearance that funds in his personal account, which were used to acquire an interest in the Park Lane Partnership, came from his father rather than from Dragon Market, Granton, and Tanore.

414.   Upon information and belief, at the time LOW transferred misappropriated funds (i) from his Dragon Market Account to his Dragon Dynasty Account using a correspondent bank account at J.P. Morgan in the United States, and (ii) from his personal account in Singapore to the DLA Piper IOLA Account in the United States, he

knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.

> 2.      *LOW's Interest in Symphony CP (Park Lane) LLC and the Park Lane Hotel*

415.   LOW entered into a limited liability partnership with an affiliate of the Witkoff Group LLC ("Witkoff Group"), a New York-based real estate investment and management company, to operate an entity called "Symphony CP (Park Lane) LLC" (hereinafter, "Park Lane Partnership" or "Partnership").  LOW used funds traceable to diverted 1MDB funds to invest in the Park Lane Partnership.  The formation of the Park Lane Partnership entailed the creation of numerous legal entities, including many with similar names.  LOW's investment interest in the Park Lane Partnership was held through two entities: Symphony CP Investments LLC and Symphony CP Investments Holdings LLC (collectively, "LOW Investment Entities" or "the Investor").

416.   The Park Lane Partnership was formed as a Delaware limited liability company with the filing of a Certification of Formation on July 15, 2012, and with the execution of an Operating Agreement dated July 16, 2013.  As originally constituted, the Park Lane Partnership represented a partnership between an affiliate of the Witkoff Group and an entity called Symphony CP Investments LLC, which was designated as the "Investor."  As of October 25, 2013, LOW, Szen, and Li Lin Seet were designated as the authorized signatories on behalf of Symphony CP Investments LLC ("LOW Investment Entity I").

417.   Transactional documents describe the Park Lane Partnership as follows: Symphony CP (Park Lane), LLC ("Partnership") is a partnership formed for the purpose of developing a world class residential condominium tower and the possibility of developing a 6-star boutique hotel property . . . on the parcels located at 36 Central Park South (Park Lane Hotel) and 21 West 58th Street . . . . The Parcels are currently occupied by a 607-room hotel and a 66-unit residential rental building, respectively.

114

418.   An Amended Operating Agreement for the Partnership was executed on or about November 25, 2013.  Pursuant to that agreement, the Partnership consisted of: (1) WG Partners 36 CPS LLC, an affiliate of the Witkoff Group (hereinafter, collectively referred to as "Witkoff"), and (2) Symphony CP Investments Holdings LLC.  As the "Investor," Symphony CP Investments Holdings LLC was to contribute 85% of the capital, and Witkoff was to contribute 15%.  A then-partner at DLA Piper signed the Amended Operating Agreement on behalf of Symphony CP Investments Holdings LLC.

419.   Symphony CP Investments Holdings LLC ("LOW Investment Entity II"), the "Investor" in the Partnership, is a Delaware limited liability company having the same address as DLA Piper in Chicago.  According to its operating agreement, also dated November 25, 2013, it has a single member:  Symphony CP Investments LLC, *i.e.*, LOW Investment Entity I.

420.   LOW and Szen dealt with Witkoff in connection with the Park Lane Partnership through and on behalf of Jynwel Capital, a Hong Kong based entity founded by LOW and Szen.

421.   On or about November 20, 2013, a Managing Director of Witkoff ("Witkoff Managing Director") sent an email addressed to the "Jynwel Team."  Included on that email were LOW and Szen; other employees of Jynwel Capital and Witkoff; and lawyers from DLA Piper and U.S.-based law firm Akin Gump Strauss Hauer & Feld LLP.  The email attached a Capital Call Notice from the Park Lane Partnership, calling for a capital contribution of $214,776,720.27 for the closing of the Park Lane acquisition, of which $202,206,876.48 represented the share to be contributed by the "Investor."  The email directed payment to an account at J.P. Morgan Chase maintained by Commonwealth Land and Title Insurance Company, the escrow agent used in connection with the acquisition of the Park Lane Hotel.

422.   Bank records obtained from Citibank show that on or about November 25, 2013, DLA Piper transferred $202,206,876.48 from a DLA Piper IOLA Account at Citibank to a bank account at J.P. Morgan Chase maintained by Commonwealth Land

115

Title Insurance Company.  These funds were sent from the same account into which LOW transferred approximately $205,900,000 on or about November 12, 2013.

423.   Documents pertaining to the formation of the Park Lane Partnership, including electronic communications, reveal that the Partnership was structured to permit the possibility that Mubadala Development Company PJSC ("Mubadala") would join Jynwel as an investor in the LOW Investment Entities after the initial capitalization of the Partnership.  Mubadala is an investment vehicle wholly-owned by the Government of Abu Dhabi.  An organizational chart prepared by LOW's counsel after the initial capitalization appears to indicate that Mubadala did subsequently acquire some indirect interest in Symphony CP Investments LLC, and thus in the Park Lane Partnership, through various holding companies.  That same organizational chart also shows than an entity called "Virtue Trustees (Switzerland) AG" holds an interest in Symphony CP Investments LLC and the Partnership through various holding companies.

424.   In a May 2016 letter, the directors of Virtue Trustees (Switzerland) AG represented that "Symphony CP Investments LLC is owned by Virtue Trustees (Switzerland) AG as Trustee of a trust for the benefit of the Low family."

425.   The Investor's total contribution to the Partnership to date has been approximately $380 million.

426.   As recently as February 2016, LOW paid a capital call on behalf of the "Investor" in the amount of approximately $2,956,162.03.  Specifically, on or about February 10, 2016, LOW transferred $3,206,162.03 from an account held in his name at Amicorp Bank and Trust in Hong Kong to the M&T Bank account held by Symphony CP Investments LLC, one of the LOW Investment Entities.  On or about February 11, 2016, Symphony CP Investments LLC sent $2,956,162.03 through an intrabank transfer to the M&T Bank account held by the Park Lane Partnership.

427.   LOW and the "Investor" failed to make the most recent capital call dated May 5, 2016.  On May 20, 2016, Witkoff notified the "Investor" that it was in default.

1

2

### 3. *The Park Lane Partnership's Acquisition of the Park Lane Hotel*

428.   On or about July 16, 2013, the Park Lane Partnership entered into a Purchase and Sale Agreement with the Leona M. and Harry B. Helmsley Charitable Trust and the Park Lane Hotel, Inc., for the purchase of 36 Central Park South, then known as the Helmsley Park Lane Hotel, for $660,000,000.  The Park Lane Partnership assigned its interests in that purchase agreement to a wholly-owned subsidiary, "Symphony CP (Park Lane) Owner LLC."

429.   Real property transfer documents from the New York City Department of Finance, Office of the City Register, indicate that, "Symphony CP (Park Lane) Owner LLC" acquired 36 Central Park South on November 25, 2013, for $654,316,305.  The deed was recorded on December 5, 2013.  The Park Lane Partnership secured a mortgage on the property from Wells Fargo Bank for a maximum principle amount of $291,700,000, with an initial loan of $266,700,000. The mortgage in the amount of $266,700,000 was recorded on December 5, 2013.

430.   "Symphony CP (Park Lane) Owner LLC," the entity used to acquire the Park Lane Hotel, is wholly-owned, through multiple subsidiaries, by the Park Lane Partnership.

### 4. *Low  Acquired an Interest in the Park Lane Hotel for His Personal Benefit Rather Than That of 1MDB*

431.   LOW, Szen, and Jynwel Capital did not invest in the Park Lane Partnership for the benefit of 1MDB or ADMIC.  Neither 1MDB nor ADMIC holds any interest in the Park Lane Partnership, and there is no indication that any proceeds of the investment in the Partnership have been returned to 1MDB or ADMIC.  Rather, LOW and Szen invested in the Partnership, through Jynwel, solely on behalf of themselves and their family, and LOW falsely claimed to be investing personal family funds, not 1MDB funds.

432.   On October 16, 2013, a Principal at Witkoff who worked on the Partnership deal sent an email to LOW and Szen stating in relevant part:

117

We are getting down to the end with the lender, they are asking for specifics on where the money on your side of the deal is coming from given it is international money . . ., can you please provide specifics to me so I can forward it to the lender.

LOW responded the same day:  "Low Family Capital built from our Grandparents, down to the third generation now."  In reply, the Witkoff Principal wrote: "Ok, thanks Jho, just didn't know if there were any other minority investors on your side, I will let the bank know."  LOW confirmed in response, in relevant part:  "Just all the family."

433.   In an email dated October 17, 2013, the Witkoff Managing Director advised individuals at Wells Fargo, where the Park Lane Partnership was at the time seeking a mortgage, that "Jynwel serves as the advisory team to the Investor (Jho and Szen Low). Their capital derives from a family trust which Jho and Szen control."

434.   Promotional material about Jynwel Capital, which LOW relied on to demonstrate the purported nature and source of his wealth to other entities with which he sought to do business, characterized Jynwel's investment in the Park Lane Hotel as one of its "key investments."  Another background document relied on by LOW to show the origins of his wealth indicated that Jynwel "provides services to the Low Family Investment Trusts" and "does not manage third party funds."  This same material claims that LOW is a "third generation steward" of family wealth.

## K.   LOW PURCHASED THE VAN GOGH ARTWORK USING 1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET ACCOUNT, DRAGON DYNASTY ACCOUNT, AND ADKMIC BSI ACCOUNT

435.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the VAN GOGH ARTWORK, a 76 x 54 cm pen and ink drawing by Vincent Van Gogh entitled *La maison de Vincent a Arles*.

118

436.   As noted in Paragraphs 277-278 above, Tanore successfully bid on the VAN GOGH ARTWORK at a November 5, 2013, Christie's auction, for a purchase price of $5,485,000.  After Tanore was unable to make payments for the artwork, TAN informed Christie's that LOW would be purchasing the artwork instead.  Christie's issued LOW an invoice for $5,485,000 on December 20, 2013.

437.   LOW purchased the VAN GOGH ARTWORK using funds diverted from the 2013 bond sale.  As noted above in Paragraphs 404-405, on or about March 25, 2013, a wire of $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore.  On or about that same day, a wire of $378,000,000 was sent from the Granton Account to the Dragon Market Account.  As noted above in Paragraph 408 and Table 13, on November 5 and 6, 2013, two additional wires totaling $140,500,000 were sent from the Granton Account to the Dragon Market Account.  In total $518,500,000 was transferred from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013.

438.   As noted above in Paragraph 406, between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 on or about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account.  That same day, $9,300,000 was sent from the ADKMIC BSI Account to LOW's personal account at BSI Bank in Singapore.

439.   As noted in Paragraph 408 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to LOW's personal bank account at BSI Bank in Singapore.

440.   On or about December 20, 2013, a wire of $7,288,667 was sent from the LOW BSI Account to Christie's bank account at J.P. Morgan Chase in the United States.

119

A second wire of $5,120,000 was sent on or about January 22, 2014, to the same Christie's account.  The payment details for that wire read: "NOTES: NOV 2013 AUCTIONS: VAN GOGH (2ND PAYMENT USD1,583,333.00) AND BASQUIAT (2ND PAYMENT USD3,533,333.33.)  A third wire of $5,117,000 was sent from the LOW BSI Account to Christie's on or about February 5, 2014, with the payment details: "NOTES: FINAL PAYMENT FOR AUCTION 2013 (VAN GOGH AND BASQUIAT.)[18]

441.   A Christie's invoice for the VAN GOGH ARTWORK, marked "PAID," reflects that LOW paid $5,485,000 for the VAN GOGH ARTWORK.

442.   On March 13, 2014, LOW sent an email to an employee at SNS Fine Art (the "SNS Employee"), an art dealer, inquiring:  "Do you know of any banks, financiers who take art as security for raise bank loans for investments/acquisitions of more artwork?"  Later that same day, LOW explained further in another email to the SNS Employee which read in relevant part, "Just looking to borrow based on asset value. . . Abt usd 330m, so looking for 50%.  Only would like facility for 6 months to a year, so I free up cash . . . Can you let me know who can do it?  And the top 2 or 3 that would be v aggressive."

443.   That same day, the SNS Employee responded to LOW, stating in relevant part, "I think those sort of numbers would scare off Sotheby's . . ." and suggested that LOW consider other financial institutions.  LOW responded in an email, "Yes pls. Prefer the boutique banks that can move fast vs the large ones like JPM."  In another email dated March 13, 2014, LOW explained to the SNS Employee what types of lenders he would be looking to utilize.  Specifically, LOW requested that the SNS Employee look for "Quick, fast and aggressive and ones you know v well.  Out of Europe or usa or middle east not asia.  Have abt usd350m and looking for line of 50% so I can buy more."

_____

[18] On February 4, 2014, the LOW BSI Account received a wire transfer of $334,102,534 from the LHP Account.

120

444.   In discussing the issue of using artworks as collateral to obtain funding from a creditor, LOW sent another email to the SNS Employee on March 14, 2014, explaining that the lender "can take all the art no problems.  All in Geneva free port. Speed is the most important and one with a fairly quick and relaxed kyc process. Thanks!"

445.   In April 2014, LOW used several pieces of art, including the VAN GOGH ARTWORK, to secure a loan from Sotheby's Financial Services, Inc. ("Sotheby's Financial"), a Sotheby's affiliate.  The loan, with a principal amount of $107 million, was obtained by Triple Eight Ltd., a Cayman Island entity wholly-owned by LOW. LOW secured the loan by pledging to Sotheby's, as collateral, all right and title to 17 pieces of art, which the April 14, 2014 Loan Agreement estimated to be worth between $191.6 and $258.3 million.  The list of art used as collateral to secure the loan included the VAN GOGH ARTWORK, as well as several works originally purchased by Tanore in May and June 2012 and "gifted" to LOW in October 2013, as described in Section IV.E above.

446.   Disbursement records show that Sotheby's Financial disbursed $105,188,721.95 to an account at Caledonia Bank Ltd. in the Cayman Islands held in the name of Triple Eight Ltd. on or about April 10, 2014.

447.   After disbursing the loan amount to LOW, Sotheby's sold some of the paintings that LOW had pledged as collateral for the loan at LOW's direction.  By May 2016, Sotheby's had recovered sufficient funds from the proceeds of the sale of certain pledged art, including the painting *Dustheads* discussed in Paragraph 268, to cover the outstanding balance of the loan.  Upon repayment of the loan, Sotheby's released its security interest in the artwork.  As of June 7, 2016, Sotheby's still had the VAN GOGH ARTWORK in its possession.

**L.    LOW PURCHASED THE SAINT GEORGES PAINTING USING
1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET
AND DRAGON DYNASTY ACCOUNTS**

448.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the
SAINT GEORGES PAINTING, a 25½ x 36¼ inch (65 x 92 cm) oil on canvas painting
entitled "*Saint-Georges Majeur.*"  The painting was signed and dated "Claude Monet
1908" in the lower left-hand corner of the painting.

449.   LOW purchased the SAINT GEORGES PAINTING from SNS Fine Arts
("SNS"), an art dealer, for a purchase price of $35,000,000 on December 18, 2013.

450.   SNS issued LOW an invoice for the SAINT GEORGES PAINTING, stating
that LOW owed SNS an initial down payment of $5,000,000 on or before December 25,
2013.  The remaining $30,000,000 was due on or before January 31, 2014.

451.   On December 20, 2013, LOW sent an email to the SNS Employee asking,
"Wld you be kind enough to send me an image of this artwork so I can show my family?
Thank you."

452.   On December 22, 2013, the SNS Employee sent an email to LOW stating in
pertinent part, "Dear Jho, Congratulations on acquiring Monet's stunning "Saint-Georges
Majeur' . . . which, as you know, once belonged to the Art Institute of Chicago and is
also on the cover of Phillipe Piguet's book, 'Monet et Venise.'"

453.   LOW paid for the VAN GOGH ARTWORK using funds diverted from the
2013 bond sale.  As noted in Paragraphs 404-405 above: (i) a wire in the amount of
$378,000,000 was sent from the Tanore Account to the Granton Account on March 25,
2013; and (ii) three wires totaling $518,500,000 were sent from the Granton Account to
the Dragon Market Account between March 25, 2013 and November 6, 2013.

454.   As noted above in Paragraph 406, between April 25, 2013 and November 8,
2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to
the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 on or

about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account. That same day, $9,300,000 was sent from the ADKMIC BSI Account to the LOW BSI Account.

455.   As noted in Paragraph 408 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to the LOW BSI Account.

456.   On December 23, 2013, a $5,000,000 wire was sent from the LOW BSI Account to SNS Fine Arts' account at J.P. Morgan Chase in connection with the purchase of the SAINT GEORGES PAINTING.

457.   On December 23, 2013, the SNS Employee sent an email to LOW confirming that SNS received the $5 million payment.  The subject line of the email read, "Re: Fw: Swift advice on USD 5 mio value 23.12.2013."  The email stated in pertinent part, "Dear Jho— I just received notification that the $5M are pending in our account.  Congratulations, it's a marvelous painting.  I would love to send you a copy of the Monet in Venice book, should I send it to the address of your invoice in HK?"

458.   On February 5, 2014, a wire for $30,000,000 was sent from the LOW BSI Account to SNS Fine Arts' account at J.P. Morgan Chase.

459.   On January 28, 2014, the SNS employee sent an email to LOW.  The email read in relevant part, "Dear Jho, . . . We are currently preparing the crate and shipment for Claude Monet's stunning Venice view 'Saint-Georges Majeur'.   Could you kindly confirm the name, address and contact information of where you would like us to arrange to send it please."  The following day, LOW responded to the SNS employee and informed him that he would like to have the painting placed in LOW's storage in "Geneva Free Port," in Switzerland.

460.   The SAINT GEORGES PAINTING was one of the pieces of art that LOW used as collateral to secure the loan from Sotheby's Financial to Triple Eight in April 2014, as referenced in Paragraph 445.  After the balance of that loan was paid through the sale of other pledged artwork, as set forth in Paragraph 447, Sotheby's released its security interest in the SAINT GEORGES PAINTING.  As of June 7, 2016, Sotheby's still had the SAINT GEORGES PAINTING in its possession.

## M.   LOW PURCHASED THE NYMPHEAS PAINTING USING 1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET AND DRAGON DYNASTY ACCOUNTS

461.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the NYMPHEAS PAINTING, a 130 x 200 cm oil on canvas painting entitled "*Nympheas avec Reflets de Hautes Herbes.*"  The painting was stamped "Claude Monet" in the lower right-hand corner of the painting.

462.   LOW purchased the NYMPHEAS PAINTING on June 23, 2014, from Sotheby's for a purchase price of £33,829,500 British Pounds ("GBP") (equivalent to approximately $57.5 million).

463.   As noted in Paragraphs 404-405 above: (i) a wire in the amount of $378,000,000 was sent from the Tanore Account to the Granton Account on March 25, 2013; and (ii) three wires totaling $518,500,000 were sent from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013.

464.   As noted above in Paragraph 406, between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 on or about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account.  That same day, $9,300,000 was sent from the ADKMIC BSI Account to the LOW BSI Account.

124

465.    As noted in Paragraph 408 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to the LOW BSI Account.

466.    On July 31, 2014, a wire for £3,183,997 GBP (equivalent to approximately $5.4 million) was sent from the LOW BSI Account to an account maintained by Sotheby's as an initial payment for the NYMPHEAS PAINTING.

467.    On October 21, 2014, another wire for $65,000,000 was sent from the Dragon Market Account to the Dragon Dynasty Account.  This wire was processed through a U.S. correspondent bank account at J.P. Morgan Chase.[19]

468.    Two days later, on October 23, 2014, a wire for $65,000,000 was sent from the Dragon Dynasty Account to the LOW BSI Account.  That same day, a wire for £28,500,000 GBP (equivalent to approximately $45.7 million) was wired from the LOW BSI Account to Sotheby's in the United Kingdom to acquire the NYMPHEAS PAINTING.

469.    On or about March 17, 2015, LOW, Triple Eight, and Sotheby's Financial executed an amendment to the April 2014 loan agreement discussed in Paragraph 445 ("Loan Amendment").  Among other things, the Loan Amendment extended the maturity date of the loan, released certain pledged artwork, and added additional artwork as collateral to secure the original loan.  The NYMPHEAS PAINTING was among the works of art that LOW added as collateral in that Loan Amendment.  Pursuant to the Loan Amendment, LOW was required to surrender possession of the NYMPHEAS PAINTING to Sotheby's.  After the balance of the loan was paid through the sale of other pledged artwork, as set forth in Paragraph 447, Sotheby's released its security

---

[19] On October 16, 2014, a wire for $72,510,000 was sent from an account in the name of TKIL Capital Partners Ltd. at AmiCorp Bank in Barbados to the Dragon Market Account.

interest in the NYMPHEAS PAINTING.  As of June 7, 2016, Sotheby's still had the NYMPHEAS PAINTING in its possession.

### N.   QUBAISI ACQUIRED THE WALKER TOWER PENTHOUSE USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT

470.   Funds traceable to the proceeds of the 2012 bond sales, which were diverted from 1MDB and/or IPIC, were used by QUBAISI to acquire a penthouse condominium unit in the Walker Tower in New York, New York.  The property was purchased by an entity called 212 West 18th Street LLC on January 21, 2014 for approximately $50,912,500.  Greenberg Traurig, LLP, a U.S.-based law firm, represented 212 West 18th Street LLC in connection with the purchase.

471.   As noted in Paragraphs 143-154 above, beginning on or about May 22, 2012, the Aabar-BVI Swiss Account received approximately $1.367 billion in funds traceable to the 2012 bond sales.  And, as set forth in Section III.D above, between May and November 2012, Aabar-BVI, of which QUBAISI was a purported director, sent five wires totaling approximately $637,000,000 from its account at BSI Lugano in Switzerland to the Blackstone Account at Standard Chartered in Singapore.  On or about October 24, 2012, Aabar-BVI also caused an additional $366,000,000 to be sent to Blackstone via intermediaries.

472.   As described in Paragraph 181 above, between on or about May 29, 2012, and November 30, 2012, four wires totaling $472,750,000 were sent from the Blackstone Account to the Vasco Account.

473.   On or about February 20, 2013, $20,750,000 was wired from the Good Star Account to the Vasco Account.

474.   On October 28, 2013, a wire of $15,000,000 was sent from the Vasco Account to an account at Citibank in the United States maintained by Greenberg Traurig. The payment details on the wire read: "WALKER TOWER, PH1 CLIENT/MATTER

126

NO: 148376/010100 ATTORNEY NAME:" followed by the name of the attorney at Greenberg Traurig who represented the buyer in the transaction.

475.   On January 21, 2014, another wire of $36,596,281 was sent from the Vasco Account to the same Citibank account maintained by Greenberg Traurig.  The payment details on the wire indicated, in relevant part: "WALKER TOWER ON BEHALF AL QUBAISI FAMILY TRUST FOR LOAN TO AL QUBAISI212 WEST 18 STREET LLC"; the payment details also included the name of the attorney at Greenberg Traurig who represented the buyer in the transaction.

476.   On October 30, 2013, QUBAISI entered into a Purchase Agreement with "SMJ 210 West 18 LLC," a Delaware limited liability company, for the purchase of THE WALKER TOWER PENTHOUSE for the price of $50,000,000.  The agreement is signed by QUBAISI as the purchaser.

477.   On January 21, 2014, QUBAISI assigned his interest in the Purchase Agreement to "212 West 18th Street LLC f/k/a Al Qubaisi 212 West 18th Street LLC." QUBAISI signed on behalf of himself as the assignor, and also on behalf of "Al Qubaisi 212 West 18th Street LLC" as the assignee.  Neil Moffitt ("Moffitt") signed as the Manager of "Al Qubaisi 212 West 18th Street LLC."

478.   The property was purchased by "212 West 18th Street LLC" by deed dated January 21, 2014, for a purchase price of $50,912,500.  Moffitt signed as the Manager of "212 West 18th Street LLC."  Moffitt manages or managed several properties on behalf of QUBAISI.

479.   On March 9, 2015, $158,664.71 was transferred from the Vasco Account to an account at J.P. Morgan Chase maintained by Moffitt.  Payment details on the wire read: "WALKER TOWER COMPLETE EXPENSES . . . TOTAL TO 2.20.2015."

### O.   QUBAISI ACQUIRED THE LAUREL BEVERLY HILLS MANSION USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT

480.   As described below, QUBAISI used funds from the Vasco Account, which are traceable to the proceeds of the 2012 bond sales, to purchase THE LAUREL BEVERLY HILLS MANSION in Beverly Hills, California.  The property was purchased for $31,000,000 on or about February 5, 2014, by Laurel Beverly Hills Holdings LLC, a Delaware limited liability company.  The property is currently on the market and is listed for $38,000,000.

481.   On or about January 10, 2014, QUBAISI transferred $930,000 from an account at Falcon Bank in Switzerland held in his name to an account at Chase Manhattan Bank belonging to Escrow of the West.  The Buyer's Final Settlement Statement for the property acquisition, dated February 5, 2014, characterizes this transfer as a deposit for the purchase of the LAUREL BEVERLY HILLS MANSION "from Khadem Al-Qubaisi FBO Neil Moffitt."

482.   On or about January 30, 2014, $31,050,387.75 was wired from the Vasco Account to an account at City National Bank in New York held in the name Escrow of the West.  The wire notations indicate: "7 M. FOR EQUITY TO AL QUBAISI WALKER TOWER TRUST AND 24 M. FOR LOAN CONTRIB. FROM AL QUBAISI TO LAUREL BEVERLY HOLDING LLC."

483.   Escrow of the West recorded a deposit of $31,050,387.75 for the purchase of the LAUREL BEVERLY HILLS MANSION from Vasco Investments "FBO Laurel Beverly" on the Buyer's Final Settlement Statement for the property acquisition.

484.   LAUREL BEVERLY HILLS MANSION was purchased by Laurel Beverly Hills Holdings LLC by deed dated January 14, 2014, which was recorded in the land records on February 5, 2014.  The purchase price was $31,000,000.  Neil Moffitt was an authorized signor for Laurel Beverly Hills Holdings LLC.

### P.   QUBAISI ACQUIRED HILLCREST PROPERTY 2 USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT

485.   QUBAISI used funds traceable to the proceeds of the 2012 bond sales to purchase HILLCREST PROPERTY 2 in Beverly Hills, California.  The property was purchased on or about March 24, 2014 by 1169 Hillcrest LLC, a Nevada limited liability company, for $15,000,000.

486.   On or about March 21, 2014, $14,749,071.51 was wired from the Vasco Account to an account at First American Trust, F.F.B. in the United States, held in the name of First American Title Company.  The payment details on the wire contain the address for HILLCREST PROPERTY 2.

487.   First American Title Company is the title company used in connection with the acquisition of HILLCREST PROPERTY 2.  First American Title Company recorded the receipt of a deposit in the amount of $14,749,071.51 from Vasco Investments on March 21, 2014 for the purchase of HILLCREST PROPERTY 2.

488.   Land records maintained by the LA Recorder's Office show that a Nevada limited liability company called 1169 Hillcrest LLC purchased the property by deed dated March 20, 2014, which was recorded in the land records on March 24, 2014.

489.   According to the final closing statement for the transaction, dated March 24, 2014, 1169 Hillcrest LLC acquired the property for the purchase price of $15,000,000. This included a deposit of $14,749,071.51 from First American Title Company.

490.   The Operating Agreement for 1169 Hillcrest LLC, dated March 20, 2014, lists Neil Moffitt as the manager and sole member of the entity.

491.   On or about January 8, 2016, a wire of $490,522.79 was sent from the Vasco Account to an account at J.P. Morgan Chase in the United States held in the name of 1169 Hillcrest LLC.  The wire details read: "OUTSTANDING INVOICES FOR WALKER TOWER (USD 26.194,81) AND BEVERLY LAUREL (USD 463.327,98) PERIOD FROM SEPTEMBER TO DECEMBER."

**Q.    AZIZ ACQUIRED THE QENTAS TOWNHOUSE & PARKING SPACE 2 USING FUNDS DIVERTED THROUG THE AABAR-BWI SWISS ACCOUNT**

492.   Funds traceable to proceeds of the 2012 bond sales were used by AZIZ to purchase the QENTAS TOWNHOUSE, Belgravia, London, United Kingdom – together with a leasehold for PARKING SPACE 2.  The property was purchased by Qentas Holdings Limited on or about July 12, 2012, for £23,250,000.  In accounting records for AZIZ, the amount he paid for the QENTAS TOWNHOUSE is recorded as equivalent to $41,799,886.

493.   As noted in Paragraphs 203 and 206 above, on or about June 18, 2012, Aabar-BVI transferred $133,000,000 in funds traceable to the proceeds of the 2012 Project Magnolia bond sale to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.  On or about June 20, 2012—approximately two days later—AZIZ transferred $58,500,000 from his Red Granite Capital Account to the Shearman IOLA Account at Citibank.

494.   One day later, on June 21, 2012, the Shearman IOLA Account wired $43,000,000 from the same Shearman IOLA Account funds held on behalf of AZIZ to an account maintained by Shearman & Sterling's London office.

495.   A purchase agreement for the QENTAS TOWNHOUSE was signed on July 2, 2012.  An entity called "Lygon Place (London) Limited," is listed as the seller; Qentas Holdings Limited ("Quentas"), a British Virgin Islands entity, is listed as the purchaser; and Shearman & Sterling's London office is listed as the purchaser's counsel.  The purchase price was £23,250,000.

496.   Qentas acquired the QENTAS TOWNHOUSE from "Lygon Place (London) Limited" by deed dated July 27, 2012, for £23,250,000.  AZIZ signed the deed on behalf of Qentas, and the Red Granite Business Manager signed as a witness.

497. Qentas also acquired leasehold rights to PARKING SPACE 2 as part of the transaction. Closing documents indicate that a lease agreement was originally entered on August 9, 2010 between O & H Properties Developments Limited and "Lygon Place (London) Limited," the entity that sold the property to Qentas. The lease agreement granted "Lygon Place (London) Limited" a 999 year lease, beginning on January 1, 2009, to Parking Space 2 for rent of "a peppercorn per annum." "Lygon Place (London) Limited" conveyed this leasehold interest to Qentas by the same deed that transferred title to the QENTAS TOWNHOUSE.

498. AZIZ claimed beneficial ownership of Qentas in his 2012 tax return. That tax return lists a Los Angeles address for Qentas.

**FOREIGN LAW BASES FOR FORFEITURE**

499. Misappropriating public funds by a public official is a criminal offense under Malaysian law, as enumerated by the Penal Code of Malaysia, including but not limited to sections 403 (dishonest misappropriation of property), 405 (criminal breach of trust), 409 (criminal breach of trust by public servant or agent), 166 (Public servant disobeying a direction of the law, with intent to cause injury to any person (including a company)), 415 (cheating), 418 (cheating with knowledge that wrongful loss may be thereby caused to a person whose interest the offender is bound to protect), and 420 (cheating and dishonestly inducing delivery of property); and the Malaysian Anti-Corruption Act 2009, including sections 16, 17, and 23. Copies of these laws are set forth in Attachment A.

500. Bank fraud is a criminal offense under Malaysian law, as enumerated by the Penal Code of Malaysia, including but not limited to section 415 (cheating), 418 (cheating with knowledge that wrongful loss may be thereby caused to a person whose interest the offender is bound to protect), and 420 (cheating and dishonestly inducing delivery of property).

131

501.   Misappropriating public funds by a public official is a criminal offense under U.A.E. law, as enumerated in Federal Law No. (3) of 1987 on Issuance of the Penal Code, including but not limited to Articles 224, 225, 227, 228, 229, and 399. Copies of these laws, translated into English, are set forth in Attachment A.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

502.   Paragraphs 1 through 501 above are incorporated by reference as if fully set forth herein.

503.   The Defendant Asset is property that constitutes, and is derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. §  1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

504.   The Defendant Asset is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

505.   Paragraphs 1 through 501 above are incorporated by reference as if fully set forth herein.

506.   The Defendant Asset was involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of section 18 U.S.C.

§ 1956(h).  Specifically, the Defendant Asset was involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

507.   The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

508.   Paragraphs 1 through 501 above are incorporated by reference as if fully set forth herein.

509.   The Defendant Asset was involved in, and is traceable to property involved in, one or more transactions, or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the Defendant Asset was involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), and were designed in whole or in part to conceal or disguise the nature,

the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

510.   The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

511.   Paragraphs 1 through 501 above are incorporated by reference as if fully set forth herein.

512.   The Defendant Asset was involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the Defendant Asset was involved in and are traceable to funds that were and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

513.   The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the Defendant Asset;

134

1      (b)    due notice be given to all interested parties to appear and show cause why

2  forfeiture should not be decreed;

3      (c)    this Court decree forfeiture of the Defendant Asset to the United States of

4  America for disposition according to law; and

5      (d)    for such other and further relief as this Court may deem just and proper,

6  together with the costs and disbursements of this action.

7  Dated:  July 20, 2016            Respectfully submitted,

8

9                           M. KENDALL DAY
                              Chief, AFMLS

10

11                         EILEEN M. DECKER
                            United States Attorney

12

13                           /s/ John J. Kucera

14                         JOHN J. KUCERA
                         CHRISTEN A. SPROULE

15                         Assistant United States Attorneys

16

17                         WOO S. LEE
                         Deputy Chief, AFMLS

18                         KYLE R. FREENY
                         Trial Attorney, AFMLS

19

20                         Attorneys for Plaintiff
                         UNITED STATES OF AMERICA

21

22

23

24

25

26

27

28

135

## VERIFICATION

I, Robert B. Heuchling, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of July, 2016, at Los Angeles, California.


Robert B. Heuchling
Special Agent
Federal Bureau of Investigation